# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT                  For Publication
SOUTHERN DISTRICT OF NEW YORK
————————————————————————
                                                :
In re                                           :    Chapter 11
                                                :
ENRON CREDITORS RECOVERY CORP.,                 :    Case No. 01-16034 (AJG)
et al.,                                         :    Confirmed Case
                      Reorganized Debtors.      :
————————————————————————:


OPINION REGARDING LIMITED OBJECTION OF
THE BAUPOST GROUP AND ABRAMS CAPITAL
TO APPROVAL OF AMENDED SCHEDULE S TO PLAN SUPPLEMENT


A P P E A R A N C E S

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, NY  10153

            Martin J. Bienenstock, Esq.
            Brian S. Rosen, Esq.
            Sylvia Ann Mayer, Esq.
                  Of Counsel

KELLEY DRYE & WARREN LLP
Attorneys for JPMorgan Chase Bank, N.A.
101 Park Avenue
New York, NY  10178

            Mark I. Bane, Esq.
            Sarah Reid, Esq.
            Jay N. Heinrich, Esq.
            Alison L. MacGregor, Esq.
                  Of Counsel


DEBEVOISE & PLIMPTON LLP

Attorneys for John Hancock Life Insurance Company
919 Third Avenue
New York, NY  10022

> Michael E. Wiles, Esq.
> James B. Roberts, Esq.
> Of Counsel

STROOCK & STROOCK & LAVAN LLP
Attorneys for Bayerische Hypo-Und Vereinsbank AG
180 Maiden Lane
New York, NY  10038

> Robin E. Keller, Esq.
> Brian M. Cogan, Esq.
> Of Counsel

Attorneys for ABN AMRO Bank N.V.

> Kenneth Pasquale, Esq.
> Erez Gilad, Esq.
> Of Counsel

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for Bear Stearns & Co., Inc.,
        Credit Suisse First Boston,
        Deutschebank Trust Company America,
        Farallon Capital Management, LLC,
        Fortress Capital Management,
        Goldman Sachs Credit Partners, L.P.,
        King Street Capital, L.P.,
        Redwood Partners, and
        Silver Point Capital, L.P.
1177 Avenue of the Americas
New York, NY  10036

> Thomas Moers Mayer, Esq.
> Amy Caton, Esq.
> Of Counsel

HAHN & HESSEN LLP
Attorneys for American Express Bank Ltd.

2

488 Madison Avenue
New York, NY 10022

      David I. Blejwas, Esq.
          Of Counsel


STUTMAN, TREISTER & GLATT PROFESSIONAL CORPORATION
Attorneys for The Baupost Group, L.L.C. and
     Abrams Capital, LLC
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

      Isaac M. Pachulski, Esq.
      Eric D. Winston, Esq.
      Nathan A. Schultz, Esq.
          Of Counsel

ARTHUR J. GONZALEZ
UNITED STATES BANKRUPTCY JUDGE


      Commencing on December 2, 2001 (the "Petition Date"), and from time to time

continuing thereafter, Enron Corp. ("Enron") and its affiliates, (collectively, and together with

Enron, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order (the

"Confirmation Order") confirming the Debtors' Supplemental Modified Fifth Amended Joint

Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November

17, 2004 (the "Effective Date") and the Debtors emerged from chapter 11 as reorganized debtors

(the "Reorganized Debtors"). Effective March 1, 2007, Enron changed its name to Enron

Creditors Recovery Corp. Thereafter, on April 4, 2007, an order was entered authorizing the

change of the caption of the Reorganized Debtors' cases.

      The following provides certain background facts relevant to the dispute regarding

approval of the proposed Amended Schedule S to the Plan Supplement ("Amended Schedule S"). Amended Schedule S lists the instruments and types of claims that, as described in Exhibit "L" of the Plan, are purportedly entitled to the benefits of subordination provisions contained in certain subordinated notes and loans. Within the indentures and loan agreements pursuant to which the subordinated notes and loans were issued, the holders of those notes or loans agreed to contractually subordinate their claims against the Debtors to claims of "Senior Indebtedness" as defined in the specific subordination agreements. The subordinated notes and loans include (1) the 8.25% subordinated debentures with $104,563,109 outstanding as of the Petition Date and the 6.75% subordinated debentures with $164,123,200 outstanding as of the Petition Date, issued pursuant to the certain indenture dated February 1, 1987 (the "1987 Indenture"); (2) the 7.75% subordinated debentures with $184,275,878 outstanding as of the Petition Date and the 7.75% subordinated debentures Series II with $138,218,479 outstanding as of the Petition Date in connection with the Trust Originated Preferred Securities offerings, issued pursuant to the certain indentures (collectively, the "TOPRS Indentures"); and (3) the loan agreements executed November 15, 1993 by and between Enron and Enron Capital LLC in the amount of $270,569,621 and August 3, 1994 by and between Enron and Enron Capital Resources L.P. in the amount of $94,936,709 (collectively, the "1993 and 1994 Loan Agreements") in connection with the issuances of Enron Capital Resources, L.P. Preferred Securities, Series A and the Enron Capital LLC 8% Cumulative Guaranteed Monthly Income Preferred Securities ("MIPS").

*FACTS*

Pursuant to the terms of the Plan and Confirmation Order, the Reorganized Debtors were to file a schedule listing the instruments and types of claims described in Exhibit "L" to the Plan

that are entitled to the benefits of subordination according to the provisions of the subordinated notes and loans.  By notice of presentment dated July 29, 2005, the Reorganized Debtors submitted Amended Schedule S for approval by the Court.  On August 22, 2005, The Baupost Group L.L.C. ("Baupost") and Abrams Capital, LLC ("Abrams," and with Baupost, collectively, the "Objecting Parties"), submitted a limited objection (the "Objection") to the approval of the Amended Schedule S.  The Objecting Parties, holders of undisputed senior unsecured claims against Enron, are beneficiaries of subordination provisions under the 1987 Indenture, the TOPRS Indentures and the 1993 and 1994 Loan Agreements.  However, they were not parties to those agreements.  Their objections relate to two separate types of claims included in Amended Schedule S (1) certain claims held by affiliates of Enron (the "Intercompany Claims"), and (2) claims arising from Enron's obligation to reimburse issuers of letters of credit (the "LOC Claims").

The Intercompany Claims can be separated into three categories.  In the first, Cherokee Finance V.O.F ("Cherokee") holds a claim (the "Cherokee Claim") that is related to certain transactions referred to as the Choctaw transactions.  The Cherokee Claim is a claim against Enron relating to Enron's guaranty of obligations of Enron North America ("ENA"), its affiliate, under a promissory note dated as of November 1, 2001 (the "2001 Note").  The 2001 Note was issued by ENA in favor of Cherokee.  Enron held 100% of the common equity of Cherokee. Choctaw Investors B.V. ("Choctaw") controlled by JPMorgan Chase Bank, N.A. ("Chase") and the Choctaw lenders held 100% of the preferred interests of Cherokee with the right to vote to elect members to the board of Cherokee.  Pursuant to the terms of the Choctaw/Zephyrus Settlement in May 2004, (1) Chase, among others, retained voting power through Cherokee's

dissolution, and (2) the Cherokee Claim was allowed in the amount of $796.5 million and assigned from Cherokee to Chase. The Objecting Parties oppose the inclusion of the Cherokee Claim on the list of claims entitled to benefit from the subordination provisions contained in the TOPRS Indentures and the 1993 and 1994 Loan Agreements.

Enron Equity Corp. ("EEC") holds the claims (the "EEC Claims") that are the second category of Intercompany Claims. The EEC Claims arise from three promissory notes that Enron executed in favor of EEC (collectively, the "EEC Notes"). Two of the EEC Notes were issued on December 30, 1994. The third was issued on April 5, 1996. Prior to the Petition Date, EEC entered into warrants that granted EEC the rights to purchase the EEC Notes. As of the Petition Date, Enron owed EEC approximately $107 million. Enron, directly and indirectly through a subsidiary, held 100% of the common equity of EEC. EEC sold preferred stock with the right to elect directors of EEC to, among others, John Hancock Life Insurance Company ("John Hancock"). Pursuant to the terms of a settlement approved by the Court (the "EEC Settlement") between the Reorganized Debtors and John Hancock and other holders of preferred-stock in 2004, (1) the EEC Claims were allowed in the amount of approximately $107 million (as scheduled in Amended Schedule S), and (2) the EEC Claims were assigned to John Hancock and others. The Objecting Parties oppose the inclusion of the EEC claims on the list of claims entitled to benefits of subordination under the 1993 and 1994 Loan Agreements.

Enron Finance Partners, LLC (the "EFP") holds the claims (the "EFP Claims") in the third category of Interconpany Claims. The EFP Claims include (1) a claim against Enron (the "EFP Class 4 Claim") arising from a certain demand promissory note dated as of November 21, 2000 (the "ECIC Note") that Enron executed and delivered to Enron Capital Investments Corp.

6

("ECIC"), and (2) Enron's guaranty of amounts owed to EFP by ENA (the "EFP Class 185 Claim") pursuant to a certain promissory note dated as of November 1, 2001(the "ENA/EFP Note") that ENA executed and delivered to EFP. With respect to the EFP Class 4 Claim, pursuant to the ECIC Note and a confirmation letter dated, November 28, 2000, Enron confirmed that the ECIC Note was an obligation of Enron to ECIC. On November 21, 2000, ECIC assigned its interest in and under the ECIC Note in the full amount of $125 million to EFP. Additionally, pursuant to the ENA/EFP Note, Enron guaranteed to EFP the payment and performance of ENA in the amount of $508 million.

The current status and ownership of the EFP Claims arose from certain "Zephyrus" transactions. Enron and its affiliates owned two of the classes of membership interests in EFP. Zephyrus, controlled by Chase, held the third class of membership interests ("Class C") with the right to elect EFP's board members. Pursuant to the terms of the Choctaw/Zephyrus Settlement, (1) the EFP Class 4 Claim and the EFP Class 185 Claim were allowed in the amount of $135 million and $280.5 million, respectively, (2) the EFP Claims were assigned to Chase partly in exchange for the redemption and cancellation of Class C held by Chase. The Objecting Parties oppose the inclusion of the EFP claims on the list of claims entitled to the benefit of subordination under the 1987 Indenture, the TOPRS Indentures and the 1993 and 1994 Loan Agreements.

In addition, the Objecting Parties oppose the inclusion of the LOC Claims on the list of claims benefiting from the subordination provisions of the 1987 Indenture and TOPRS Indentures. While all of the LOC Claims can be referenced together as one group for the purposes of this motion, they involve claims resulting from a number of reimbursement contracts

between Enron and various letter of credit issuers. Certain of such claims (the "Chase LOC Claims") are held by Chase, and Bayerische Hypo-Und Vereinsbank AG ("HVB") holds certain others (the "HVB LOC Claims").

In part, the Chase LOC Claims arise from a $500 million Letter of Credit and Reimbursement Agreement dated as of May 14, 2001 (the "Syndicated LC Facility Reimbursement Agreement") among Enron, Chase and other financial institutions. Pursuant to the agreement, Chase agreed to issue letters of credit for the account of Enron. The issuance of a letter of credit obligated Enron to reimburse Chase for any amounts drawn. Letters of credit under that agreement were drawn between November 28, 2001 and May 22, 2002 by beneficiaries in the aggregate amount of approximately $373.7 million. Enron and its affiliates have not paid any of these reimbursement obligations and other fees arising from those draws. The Chase LOC Claims also arise from a certain Master Letter of Credit and Reimbursement Agreement dated as of June 16, 1995 (the "Bilat LC Facility Reimbursement Agreement") between Enron and Chase. Under the Bilat LC Facility Reimbursement Agreement, Chase agreed to issue letters of credit for the account of Enron to support the performance of Enron's and its subsidiaries' obligations to one or more beneficiaries. Again, Enron was obligated to reimburse Chase for any draws. Letters of credit under that agreement were drawn between November 30, 2001 and January 31, 2002 by beneficiaries in the aggregate amount of approximately $61.8 million. Enron has not paid any of the reimbursement obligations and other fees arising from those draws.

The HVB LOC Claims arise from in a Master Letter of Credit and Reimbursement Agreement dated February 6, 1996 and its amendment dated April 25, 2000 (collectively, the

"Master LOC Agreement").  Pursuant to the Master LOC Agreement, at Enron's request, HVB issued letters of credit to support the performance of obligations of Enron or its affiliates to third party beneficiaries.  Letters of credit were drawn in the amount of $81 million under the Master LOC Agreement.  Enron has not paid any of its reimbursement obligations and other fees related to those draws.

Chase, a holder of Intercompany Claims' and LOC Claims, opposes (the "Chase Opposition") the Objecting Parties request to exclude such claims from Amended Schedule S. Certain holders of Intercompany Claims, including Bear Stearns & Co., Inc., Credit Suisse First Boston, Deutschebank Trust Company America, Farallon Capital Management, LLC ("Farallon"), Fortress Capital Management, Goldman Sachs Credit Partners, L.P., King Street Capital, L.P., Redwood Partners, Silver Point Capital, L.P., holders of claims pursuant to the Choctaw/Zephyrus Settlement, join in the Chase Opposition and adopt Chase's arguments. American Express Bank Ltd. a holder of the EEC Claims, joins in the Chase Opposition and adopts Chase's arguments.  John Hancock, a holder of the EEC Claims, filed its opposition to the relief sought in the Objection.  In addition, certain other LOC Claims' holders, including Farallon, HVB, and ABN AMRO Bank N.V. ("ABN") also filed opposition to the relief sought in the Objection.  In its opposition, ABN, a LOC Claims' holder involved in the Syndicated LC Facility Reimbursement Agreement and a 1995 Master Letter of Credit and Reimbursement Agreement between Enron and ABN, incorporates all of the arguments raised by the other LOC Claims' holders, including Chase.  Farallon, also a holder of certain LOC Claims stemming from Master Letter of Credit and Reimbursement Agreements between Enron and the Bank of America, and between Enron and the SunTrust Bank, incorporates all of the arguments raised by

9

Chase and other LOC Claims' holders.

The disputed master reimbursement agreements between Enron and the issuers provide that Enron's reimbursement obligations in connection with letter-of-credit transactions are senior to Enron's obligations arising from the 1987 Indenture, the TOPRS Indentures and the 1993 and 1994 Loan Agreement. At oral argument held on October, 20, 2005 (the "Hearing"), the Reorganized Debtors characterized the instant matter as being essentially an inter-creditor dispute and asserted that the result of that dispute will have no impact on the funds available for distribution. Accordingly, the Reorganized Debtors stated that they would remain neutral concerning the instant controversy. However, they reserved their right to further modify Amended Schedule S in order to consistently apply the Court's ruling with respect to issues raised by the Objecting Parties.

*DISCUSSION*

*Legal Standard for Contractual Subordination*

Section 510(a) provides that "(a) subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). A contractual subordination agreement is an inter-creditor arrangement where one creditor agrees to subordinate its claims to claims of another creditor. See *In re Kors, Inc.*, 819 F.2d 19, 24 (2d Cir. 1987). The enforcement of a contractual subordination agreement falls within the scope of a bankruptcy court's core jurisdiction. See *In re Best Products Co.,* 68 F.3d 26, 31-32 (2d Cir. 1995). A bankruptcy court must first examine whether a subordination agreement falls within the meaning of section 510(a). See 4 Collier on Bankruptcy ¶ 510.03[2], at 7 (15th ed. 2006). The bankruptcy court is required to look to

10

nonbankruptcy law to determine that issue. *Id.* Contract law is the "applicable non-bankruptcy law" under section 510(a). See *In re Best Products Co., Inc*., 168 B.R. 35, 69 (Bankr.S.D.N.Y. 1994). It is well-established that if an agreement is a subordination agreement, it must be enforced according to its terms. See *In re Kors, Inc.,* 819 F.2d, at 24; see also *In re Credit Industrial Corp*., 366 F.2d 402, 410 (2d Cir. 1966) (holding that " if the terms of the contracts are clear and unambiguous . . . it is unnecessary to resort to strained theories of third-party beneficiary, estoppel or general principles of equity to evaluate and determine the proper respective positions of the parties involved"). The Second Circuit in *Credit Industrial* highlighted the policy of enforcing subordination agreement as follows

> A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them. To deprive lending institutions of the right to enforce lawful subordination agreements and require them to prove in each instance that they relied on such agreements in advancing funds to businesses would not only place in jeopardy literally billions of dollars of outstanding loans, but in all probability would prompt lending institutions to reconsider, and possibly curtail their subordinated debt-financing activities to the detriment of the entire business community.

*Id.* (internal quotations, footnotes and citations omitted).

Thus, in order to determine the enforceability of subordination agreement, a court must first inquire whether the contract is ambiguous on its face. See *Met Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990). A contract's proper construction is a question of law for a court. *Met Life,* 906 F.2d, at 889. The TOPRS Indentures and the 1993 and 1994 Loan Agreements are governed by New York law. The 1987 Indenture is governed by Texas law, however, the parties agree that Texas law is similar to the New York law that is relevant to the matter at issue, therefore, the same principles would apply. Pursuant to New York, when a

11

contractual subordination agreement is unambiguous, the words of such agreement "are given

their plain, ordinary and usual meaning." *Hong Kong Export Credit, Inc. v. Dun & Bradstreet,*

414 F.Supp. 153, 158 (S.D.N.Y.1975); see also *In re Best Products Co., Inc.*, 168 B.R., at 69.

This application is particularly proper when the contract "was negotiated between sophisticated,

counseled business people negotiating at arm's length." *Vermont Teddy Bear Co., Inc. v. 538*

*Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004). The Second Circuit has held that a contract

under New York law is intrinsically ambiguous if the contract language is reasonably susceptible

to more than one meaning. See *Met Life,* 906 F.2d, at 889; see also *Sayers v. The Rochester Tel*

*Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993) (stating that

"[c]ontract language is ambiguous if it is 'capable of more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business").

　　However, a contract is not ambiguous simply because the parties do not agree on the

meaning of its terms. *Id.* (stating "language whose meaning is otherwise plain is not ambiguous

merely because the parties urge different interpretations in the litigation") (citation omitted); see

also *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989). Moreover, a

court "should not find the language ambiguous on the basis of the interpretation urged by one

party, where that interpretation would 'strain[ ] the contract language beyond its reasonable and

ordinary meaning.'" *Met Life,* 906 F.2d, at 889 (citation omitted).

　　If a contract is unambiguous, courts should preclude extrinsic evidence of the contract's

purpose. See *Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir. 2002). However, where

a contract is ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent.  See *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 274 (2d Cir.1992).

A court should not rewrite a contract or create new terms or change the terms made by the parties.  See *Broadway Nat'l Bank v. Progessive Cas. Ins. Co.,* 775 F.Supp.1123, 126 (S.D.N.Y. 1991), *aff'd,* 963 F.2d 1522 (2d Cir.1992).  The *Met Life* court particularly emphasized that under an unambiguous contract, courts must not alter the terms of the agreement in order to preserve the rights of contract parties.  See *Met Life*, 906 F.2d, at 889.  Those rights should be understood "from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." *Id.*  However, a court should, if possible, avoid an interpretation that "will result in an absurdity, an injustice or have an inequitable or unusual result."  *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F.Supp. 401, 413 (S.D.N.Y. 1994) (citation omitted).  Nevertheless, the rule of construction that an absurd, unreasonable or inequitable result should be avoided is meant to assist a "court in resolving the meaning of contract terms, rather than providing a justification for departing from those terms."  *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,  2002 WL 31106406 *7 (Bankr. S.D.N.Y. 2002).  In support of this proposition, the *Granite* court quoted *Uribe v. Merchants Bank of New York,* 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396, 693 N.E.2d 740 (1998) to the effect that if "the meaning of [a] ... contract is plain and clear ... [it is] entitled to [be] enforced according to its terms ... [and] not to be subverted by straining to find an ambiguity which otherwise might not be thought to exist."

13

*Id.*[1]

*The 1987 Indenture*

Article 13, Section 1301 of the 1987 Indenture states that each Holder of the Securities is subordinated to the prior payment in full of all "Senior Indebtedness."

The 1987 Indenture defines "Senior Indebtedness" as

the principal of, and premium, if any, and interest on, any indebtedness of the Company[2] (other than the Securities and Exchangeable Subordinated Debentures issued and to be issued pursuant to the indenture, dated as of June 1, 1983…) outstanding at any time, whether unsecured or secured by a mortgage, deed of trust, pledge, security interest or other lien, except indebtedness which by its terms is not superior in right of payment to the Securities. Notwithstanding anything herein to the contrary, "Senior Indebtedness" (x) shall include Senior Bank Debt (including all Obligations which constitute Senior Bank Debt) and (y) shall not include (a) indebtedness of or monies owed by the Company for compensation to employees or for goods or material purchased in the ordinary course of business or for services or (b) indebtedness of the Company to a Subsidiary for money borrowed or advanced from such Subsidiary.

In relevant part, Section 101 defines "Indebtedness" to mean

[A]s applied to the Company or any Subsidiary,…bonds, debentures, notes and other instruments representing obligations created or assumed by any such corporation for the repayment of money borrowed (other than unamortized debt discount or premium). All indebtedness secured by a lien upon property owned by the Company or any Subsidiary and upon which indebtedness any such

---

[1] The burden of proving any factual issues regarding the existence, terms and validity of a contract rests on the party seeking enforcement of that contract. See *Kosson v. Algaze,* 203 A.D.2d 112, 113, 610 N.Y.S.2d 227, 228 (1st Dep't 1994); see also *In re Best Products Co., Inc.,* 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (noting that the party seeking to prove the existence and validity of a subordination agreement has the burden of proof). Entities that fall within the definition of Senior Indebtedness are third-party beneficiaries of the various indentures and loan agreements. A party claiming third-party beneficiary status has the burden of establishing that the contract was intended for its benefit. *See Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 427, 469 N.Y.S.2d 948, 950 (N.Y.A.D. 2 Dept. 1983); *In re Conay's Estate*, 29 Misc.2d 1090, 1093, 121 N.Y.S.2d 481, 484 (N.Y.Sur. 1953). The fact that the Debtor listed, on Amended Schedule S, the entities purportedly entitled to benefit from subordination places the burden of coming forward on an objectant. However, the burden of persuasion still rests with the party seeking the benefit of the contract. Thus, to the extent the burden of proof is implicated, the party seeking to benefit from the subordination provisions bears the burden of proof. Here, because there are no facts in dispute and the Court makes its determination as a matter of law based on contract interpretation, the burden of proof is not implicated.

[2] Pursuant to the terms of the 1987 Indenture, the "Company" is Enron.

14

corporation customarily pays interest, although such corporation has not assumed or become liable for the payment of indebtedness, shall for all purposes hereof be deemed to be indebtedness of any such corporation.  All indebtedness for money borrowed incurred by other persons which is directly guaranteed as to payment of principal by the Company or any Subsidiary shall for all purposes hereof be deemed to be indebtedness of any such corporation, but no other contingent obligation of any such corporation in respect of indebtedness incurred by other persons shall for any purpose be deemed indebtedness of such corporation. Indebtedness of the Company or any Subsidiary shall not include . . . (iv) indirect guarantees or other contingent obligations in connection with the indebtedness of others, including agreements, contingent or otherwise, with such other persons or with third persons with respect to, or to permit or ensure the payment of, obligations of such other persons, including, without limitation, agreements to purchase or repurchase obligations of such other persons, agreements to advance or supply funds to or to invest in such other persons, or agreements to pay for property, products, or services of such other persons (whether or not conferred, delivered or rendered), and any demand charge, throughput, take-or-pay, keep-well, make-whole, cash deficiency, maintenance of working capital or earnings or similar agreements; and (v) any guarantees with respect to lease or other similar periodic payments to be made by other persons.

As described above, under the 1987 Indenture, "Senior Indebtedness" specifically excludes "indebtedness of the Company to a Subsidiary for money borrowed or advanced from such Subsidiary."  The Objecting Parties take issue with the inclusion of the EFP Claims, specifically, the EFP Class 4 Claim and the EFP Class 185 Claim, on the list of claims entitled to benefit from subordination under the 1987 Indenture.  They argue that because EFP is a Subsidiary and because the 1987 Indenture expressly provides that indebtedness of, or money owed to, a Subsidiary is not included within the definition of Senior Indebtedness, the EFP Claims are not entitled to the benefit of subordination under the 1987 Indenture.

Chase disputes this contention and argues that neither of the EFP Claims against Enron are held by a Subsidiary as defined in the 1987 Indenture.

The 1987 Indenture defines a Subsidiary as

a corporation all of the voting shares (that is, shares entitled to vote for the

15

election of directors, but excluding shares entitled so to vote only upon the
happening of some contingency unless such contingency shall have occurred) of
which shall be owned by the Company or by one or more Subsidiaries or by the
Company and one or more Subsidiaries.

(1987 Indenture, § 101, at p. 9).  Chase maintains that EFP is not a Subsidiary under this

definition because only a corporation qualifies as a Subsidiary.  As EFP is a limited liability

company, Chase contends that EFP does not qualify.

The Objecting Parties counter that, as defined in the 1987 Indenture, a "corporation

*includes* corporations, voluntary associations, joint stock companies and business trusts."

(emphasis added).  The Objecting Parties assert that this definition is not limited strictly to the

corporate form.  Rather, because the definition includes several forms or structures of

organization other than an actual corporation, the Objecting Parties argue that there is no

rationale offered to exclude a limited liability company with attributes similar to those of a

corporation from qualifying as a corporation under this definition.  At a minimum, the Objecting

Parties argue that the term corporation, as defined, is ambiguous and that the parties should be

afforded an opportunity to conduct discovery to allow them to introduce evidence.

The definition of corporation in the 1987 Indenture includes various other forms or

structures of organization, including a structure as unrestricted as a voluntary association.  A

voluntary association is generally formed by the voluntary action of a number of individuals in

associating themselves together under a common name for the accomplishment of some lawful

purpose.  6A N.Y. Jur. 2d Associations and Clubs § 5 (2007).  The term "voluntary association"

is applied to "[a]n unincorporated organization that is not a legal entity separate from the persons

who compose it."  BLACK'S LAW DICTIONARY (8th ed. 2004).  If, however, the association has

sufficient corporate attributes, it may be classified as such.  *Id*.  While, "[a]n association may or

16

may not be incorporated, it usually means an unincorporated organization composed of a group of people, partaking of and assuming in its general form and mode of procedure the characteristics of a corporation." 6A N.Y. Jur. 2d Associations and Clubs § 3, Characteristics. (2007).

A joint-stock company is "[a]n unincorporated association of individuals possessing common capital, the capital being contributed by the members and divided into shares, of which each member possesses a number of shares proportionate to the member's investment." BLACK'S LAW DICTIONARY, (8th ed. 2004).  It is also known as a joint-stock association and "is generally an unincorporated business enterprise with ownership interests represented by shares of stock." *Id.* (citing, Henry G. Henn & John R. Alexander, *Laws of Corporations* § 50, at 109 (3d ed. 1983)).  *See also*, *McKinney's General Associations Law*, § 2 Definitions (noting that a joint stock company, association or enterprise is unincorporated and has written articles of association and capital stock divided into shares).  Further, a joint-stock company has been described as a partnership with some of the powers of a corporation.  *Hibbs v. Brown*, 28 Bedell 167, 82 N.E. 1108 (N.Y. 1907) (citing, *Van Aernam v. Bleistein*, 102 N.Y. 360, 7 N.E. 537 (N.Y. 1886)).

A business trust is "[a] form of business organization, similar to a corporation, in which investors receive transferable certificates of beneficial interest (instead of stock shares)." BLACK'S LAW DICTIONARY, (8th ed. 2004).  It was developed, in part, "to achieve limited liability."  *Id.* (citing, Henry G. Henn & John R. Alexander, *Laws of Corporations* § 58, at 117 (3d ed. 1983).  *See also McKinney's General Associations Law*, § 2 Definitions (noting that a business trust is "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates").

Thus, the 1987 Indenture definition of corporation includes entities that are not corporations but may have attributes of a corporation.  Moreover, the definition is not restricted solely to the organizational forms listed because the definition provides that the term corporation "includes" the list of organizational forms that follow but does not limit it to that list.  The use of the term "includes" often operates as a nonrestrictive modifier which indicates that the list that follows is not exhaustive but, rather, illustrative of the types of items intended to be included.  *See Willow Wood Rifle & Pistol Club, Inc. v. Town of Carmel Zoning Bd. Of Appeals*, 115 A.D.2d 742, 744, 496 N.Y.S.2d 548, 551 (A.D. 2 Dept. 1985) (noting that the words "include" and "including" are terms of enlargement, not of limitation, and that their use indicates that there are other items that can be included even though not specifically enumerated).

A limited liability company is a company that is "characterized by limited liability, management by members or managers, and limitations on ownership transfer."  BLACK'S LAW DICTIONARY (8th ed. 2004).  Limited liability companies are authorized by statute in certain states.[3]  *Id.*  As defined in New York Limited Liability Company Law § 102, a limited liability company is "an unincorporated organization of one or more persons having limited liability for the contractual obligations and other liabilities of the business . . . other than a partnership or trust, formed and existing under . . . the laws of this state.  New York Limited Liability Company Law § 102(m).  A limited liability company "combines the limited liability feature available to the shareholders of a corporation . . .  with the pass-through income taxation available to the partners of a general or limited partnership."  16 N.Y. Jur. 2d Business Relationships § 1995

---

[3]The fact that New York State did not adopt legislation permitting limited liability companies until 1994 may explain why that organizational form for a business was not specifically listed in the 1987 Indenture when the more general term of voluntary association was listed.  16 N.Y. Jur. 2d Business Relationships § 1994.

18

(2007).  Limited liability companies have also been found to have "the attributes of a voluntary association with corporate limited liability protection."  *Carlo v. Yorro*, 195 Misc. 2d 762, 761 N.Y.S.2d 766 (Dist. Ct. 2002).  Thus, limited liability companies have attributes of both corporations and voluntary associations.  Moreover, the term voluntary association encompasses a wide range of organizational structures, both incorporated and unincorporated.  In addition, a limited liability company has attributes similar to the business trust, which has limited liability, as well as to a joint stock company, which is unincorporated but has powers of a corporation.  Thus, because the definition of corporation in the 1987 Indenture includes such a wide variety of organizational structures and because the definition is not restricted to the categories listed, the Court concludes that the term corporation as defined in the 1987 Indenture includes a limited liability company.  Further, it appears consistent that a wholly-owned limited liability company would be classified as a Subsidiary similar to a wholly-owned corporation, as Enron apparently used each structure in a similar manner, i.e., as a mechanism to raise funds.

Having concluded that a limited liability company qualifies as a corporation under the definition of that term in the 1987 Indenture, it is still necessary, in order to conclude that such corporation is a Subsidiary, to determine whether Enron and/or one or more of its Subsidiaries owned all of the voting shares of such corporation.

Chase argues that EFP was not an Enron "Subsidiary" because Enron did not have voting power to elect EFP's directors.  All parties concede that Enron was not in control of all of the voting shares of EFP from the Petition Date to the date of the Choctaw/Zephyrus Settlement.  As noted, however, the Objecting Parties argue that the date payments are made to the holders of notes under the 1987 Indentures is the relevant date upon which to determine Enron's voting

power in EFP.  The Objecting Parties further argue that the earliest date at which holders of notes under the 1987 Indenture could have been entitled to payment was the effective date of the Plan.

As previously discussed, prior to the Choctaw/Zephyrus Settlement, Enron, directly and indirectly, held two classes of the membership interests of EFP.  Zephyrus, controlled by Chase, held preferred interests of EFP, Class C - the third class of the membership interests.  Pursuant to section 7.01 under the Third Amended and Restated Limited Liability Company Agreement of EFP (the "EFP Agreement"), upon the occurrence of any one of a number of events, including any credit rating downgrade of Enron by credit agencies, Enron, as a Class A member, had the right to select, appoint and remove the director acting as its representative on the board.  Chase, as a Class C member, had the same right.  However, pursuant to that section, Chase was entitled to elect two of the three directors to the board.

Because credit agencies had downgraded Enron's credit rating, Chase was entitled to exercise its voting right to elect two of three directors.  Therefore, its voting shares were included in the count of total voting shares of EFP and Enron did not own *all* of the voting shares as required under the "Subsidiary" definition.  The Choctaw/Zephyrus Settlement resulted in the redemption and cancellation of Class C voting shares causing a change in the ownership composition of voting shares of EFP.  Pursuant to the settlement, upon the redemption of Class C, all rights and obligations in connection with Class C were terminated.  In addition, the board members appointed by former Class C shareholders were deemed to have resigned.

The Objecting Parties concede that as a result of actions taken after the downgrade, prior to the settlement, EFP was not a "Subsidiary" under the 1987 Indenture.  However, they contend

that EFP was a "Subsidiary" after the settlement and, therefore, as of the effective date of the Plan. This is because EFP redeemed and cancelled all preferred membership interests, leaving Enron and its affiliates with all of the voting power. As previously noted, the Objecting Parties assert that the relevant date for determining the status of an entity as a Subsidiary is the date payments are capable of being made to holders of notes under the 1987 Indenture. They further assert that the earliest date such payments could have been made was on the effective date of Enron's Plan. The effective date of the Plan occurred after the Choctaw/Zephyrus Settlement, in which EFP redeemed all preferred membership interests held by Choctaw and such interests were cancelled. Thus, by the effective date of the Plan, EFP preferred interests were redeemed and cancelled and, therefore, Enron and its affiliates had acquired all voting power.

The Court agrees that the date upon which to determine the status of an entity as a Subsidiary is the date the right to payment of holders of notes under the 1987 Indenture is fixed under the Plan. The Court enforces the subordination agreement under state law as of the date of distribution because, pursuant to the terms of the agreement itself, the subordinated entities' obligation arises at that time. Pursuant to the 1987 Indenture, the subordinated noteholders are obligated to allow any distributions that they otherwise would have been entitled to receive from Enron to be paid to the holders of Senior Indebtedness until the latter are paid in full. Thus, the obligation of the subordinated noteholders to the senior creditors arises when they are entitled to receive payment, it is at that time that they are obligated, under the indenture, to forgo receipt of any payments in favor of the holders of Senior Indebtedness. The effective date of the Plan was the earliest date at which distributions could be made to creditors and, therefore, the Court will determine whether a company was a Subsidiary as of that date.

The structure of the Choctaw/Zephyrus Settlement caused the redemption and cancellation of the shares controlled by Chase resulting in Enron and its affiliates acquiring all of the voting power. Thus, at the effective date of the Plan, because Enron and its affiliates had all of the voting power, EFP was a Subsidiary and its claim is excluded from the definition of Senior Indebtedness and, therefore, the EFP Claim does not benefit from subordination pursuant to the 1987 Indenture.[4]

### The TOPRS Indentures

The TOPRS Indentures define Senior Indebtedness,[5] in relevant part, as "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed." In addition, indebtedness of others of similar kind that are assumed or guaranteed in any manner by Enron, or in effect guaranteed by Enron, are included in the

---

[4]The Objecting Parties alternatively argues that even if the Court determined that EFP was not a Subsidiary under the 1987 Indenture, the EFP Class 4 Claim, nevertheless, should be excluded from the benefits of subordination. The EFP Class 4 Claim relates to a note (the "ECIC Note") Enron issued to ECIC. ECIC, a corporation wholly owned by Enron and its affiliates, was the payee on that note. The ECIC Note was entered into by Enron and ECIC and simultaneously assigned to EFP as part of a credit enhancement for a financing transaction. The Objecting Parties argue that the fact that the ECIC Note was assigned to EFP does not result in the note losing its status as an indebtedness of Enron to a subsidiary, ECIC. As the Court has determined that, in any event, EFP qualifies as a Subsidiary, it does not address the Objecting Parties alternative argument concerning the Class 4 Claim.

[5]The TOPRS Indentures define Senior Indebtedness as

the principal of, premium, if any, interest on and any other payment due pursuant to any of the following, whether outstanding at the date hereof or hereafter incurred, created or assumed: (i) all indebtedness of the Company (other than any obligations to trade creditors) evidenced by notes, debentures, bonds or other securities sold by the Company for money borrowed and capitalized lease obligations; (ii) all indebtedness of others of the kinds described in the preceding clause (i) assumed or guaranteed in any manner by the Company or in effect guaranteed by the Company; and (iii) all renewals, extensions or refundings of indebtedness of the kinds described in either of the preceding clauses (i) or (ii), unless, in the case of any particular indebtedness, capitalized lease obligation, guarantee, renewal, extension or refunding, the instrument creating or evidencing the same or the assumption or guarantee of the same expressly provides that such indebtedness, renewal, extension or refunding is subordinated to or is pari passu with the Securities.

definition of Senior Indebtedness.  The Objecting Parties contend that based upon this definition, to qualify as Senior Indebtedness, any indebtedness evidenced by notes, debentures, bonds or other securities must have been "sold . . . for money borrowed."  The Objecting Parties concede that each EEC claim is evidenced by a promissory note for money borrowed and that the EEC Notes were "sold" to EEC based upon certain EEC purchase warrants.  The Objecting Parties contend, however, that neither the note that is the subject of the Cherokee Claim nor the notes relevant to the EFC Claims were "sold."

The Cherokee Claim is a claim against Enron relating to Enron's guaranty of ENA's obligations under a promissory note issued by ENA in favor of Cherokee.  At Cherokee's formation, Enron indirectly held 100% of the common equity of Cherokee.  Choctaw Investors B.V. ("Choctaw") owned all of the preferred interests of Cherokee, which permitted it to elect members to the Cherokee board of directors.  After downgrade notices were issued by Chase in November 2001, Chase and the Choctaw Lenders exercised control of Cherokee through Choctaw, and Cherokee was dissolved as of February 21, 2003.  At all relevant times through Cherokee's dissolution, certain entities not affiliated with Enron had voting power to elect directors to the board.  The Choctaw/Zephyrus Settlement, pursuant to which the Cherokee Claim was allowed, provided that Cherokee's assets were to be liquidated, and any directors appointed by Chase on behalf of Choctaw were deemed to have resigned from the board of Cherokee.

The Objecting Parties contend that because neither the EFP Notes nor the Cherokee Note were sold, the claims based upon those notes do not constitute Senior Indebtedness under the TOPRS Indentures.  The Objecting Parties concede that the Cherokee Note and the EFP Notes

are evidenced by promissory notes, however, they maintain that notes involving only two parties are ordinarily issued, delivered or given but not considered sold.  Enron issued the ECIC Note to ECIC, which note was later assigned to EFP.  ENA issued the Cherokee Note to Cherokee and issued the ENA/EFP Note to EFP, both the Cherokee Note and the ENA/EFP Note were guaranteed by Enron.  Therefore, the Objecting Parties maintain that none of those notes were sold.  The Objecting Parties argue that to benefit from subordination under the TOPRS Indentures, it must be established that Enron sold the ECIC Note and that ENA sold the notes that were guaranteed by Enron.

Chase argues that it does not have to establish that the relevant notes were sold because the clause in the TOPRS Indentures "sold for money borrowed" modifies only the last item listed - securities.  Chase maintains that this interpretation is supported by the "last antecedent rule" which provides that, ordinarily, a qualifying phrase is to be applied to the words immediately preceding it and not extended back to other more remote words within the phrase.

Chase's application of the last antecedent rule is consistent with the Court's view of the rule but that does not finally resolve the issue.  This is because the clause "all indebtedness of [Enron] . . . evidenced by notes, debentures, bonds or other securities sold by [Enron] for money borrowed" includes the term "other" preceding the term securities.  The use of the term "other" indicates that what follows "other" is a more general term that includes the preceding specific items.  Thus, the terms notes, debentures and bonds are other types of securities.  Were the term "other" omitted, then the modifier, as applied solely to securities, would not relate to the previous items.  However, because the type of securities that are similar to the previous enumerated items are "securities sold for money borrowed," the Court concludes, based upon the

24

inclusion of the word "other" preceding the term "securities sold for money borrowed," that the item that follows "other" is similar to the items that precede it. Therefore, notes, debentures and bonds are securities that are sold for money borrowed. The enumerated terms notes, debentures and bonds are subsets of the set "securities sold for money borrowed." *See Texas Sav. & Community Bankers Assen v. Federal Housing Finance Bd.*, 1998 WL 842181 at*6, W.D.Tex.,1998 (interpreting the phrase "mortgages, obligations, or other securities ... sold by [Freddie Mac]" to enumerate "mortgages" and "obligations" as subsets of the larger set "securities," which latter term was read broadly and, further, noting that mortgages and obligations are enumerated because they are the most common forms of securities sold by Freddie Mac).

The TOPRS Indentures require that to qualify as Senior Indebtedness, the notes evidencing Enron's indebtedness be sold by Enron. In addition, the TOPRS Indentures require that the notes evidencing the indebtedness of others, in this case ENA, that are guaranteed by Enron be of a similar kind and, therefore, sold by ENA. If the EFP Claims and Cherokee Claim are based on notes that were not sold, those claims cannot benefit from the subordination provisions. The Court concludes that those notes were not "sold."

Chase does not argue that any issuance of the relevant securities constitutes a "sale" of those securities. Rather, it argues that because there are instances where securities are sold for purposes other than to borrow money, (e.g., as equity, as common stock, or preferred stock), that the use of the clause "sold for money borrowed" was intended merely to capture debt but not any kind of an equity security interest.

Chase's argument, however, does not address the specific use of the term "sold" in the

TOPRS Indentures.  It is clear from the definition of Senior Indebtedness in the TOPRS

Indentures that debt and not equity would benefit from subordination.  Indeed, the whole section

of the definition of Senior Indebtedness deals with debt and not with equity.  Therefore, an

additional term was not necessary to distinguish debt from equity because "indebtedness" is

precisely what is included within the parameters of the whole section and the section does not

concern equity.

Moreover, the Court is required to interpret the plain meaning of the contract as

evidenced by the terms used by the parties.  The TOPRS Indentures specifically use the term

"sold."  As support for their position that Chase understands that there is a distinction between a

note that is only "issued" and an issued note that is "sold" or "purchased," the Objecting Parties

reference certain note purchase agreements, pursuant to which EFP and Cherokee, respectively,

"purchased" senior secured notes issued by Sequoia Financial Assets LLC ("Sequoia"), an entity

in which Chase had security interests.[6]  Thus, Chase recognized the distinction in the

terminology and, at the time it became involved with EFP,[7] it should have considered the import

of the language in the TOPRS Indentures and its potential impact on whether any indebtedness

for money borrowed or advanced would benefit from subordination.  The Court must apply the

plain meaning of the TOPRS Indentures utilizing the terms used, and concludes that the TOPRS

Indentures require that securities, including notes, must be sold to qualify as Senior

---

[6]In the Sequoia transactions, not only were the notes issued but that those issued notes were "purchased." The Objecting Parties contend that the specific terminology used in the Sequoia transactions shows that Chase was cognizant of the fact that when it is intended for a transaction to represent a sale, a reference is specifically made to the issued note being "sold" or "purchased."

[7]The manner in which EFP acquired the note from Enron determined whether the indebtedness represented by the note would qualify as Senior Indebtedness under the TOPRS Indentures. Thus, any party purchasing an interest in EFP knew, or should have known, the characteristics of the note and whether it would benefit from the TOPRS Senior Indebtedness.

Indebtedness.  There is no reference to the notes related to the Cherokee Claim and the EFP

Claims having been purchased or sold.  Indeed, as previously noted, Chase has not even argued

that the notes were sold.  Rather, they argue that the term "sold" does not relate back to notes.

As the relevant notes were not sold, the holders of those notes are not entitled to the benefit of

subordination pursuant to the TOPRS Indentures.

Chase also argues that accepting the Objecting Parties definition of Senior Indebtedness

in the TOPRS Indentures means that notes, debentures and bonds have to be sold by Enron but

not capitalized lease obligations.  This is, however, the plain reading of the section because it

lists the items that must be sold and, subsequently, separately lists capital lease obligations

without that requirement.  Moreover, it is not an unreasonable conclusion to read the provision

as requiring that various types of securities be sold but not applying that requirement to capital

lease obligations.

Finally, Chase argues that the requirement that the securities be sold is unusual for this

type of agreement.  The Objecting Parties concede that such a requirement it is not ordinarily

included in these agreements.  However, they assert that such term was specifically included in

these agreements.  As such, the Objecting Parties contend that, in accordance with the plain

meaning rule, the securities must be sold to benefit from subordination.  The Court agrees that

the plain meaning rule requires that the notes and other securities must be sold to qualify as

Senior Indebtedness.

As recognized by the Objecting Parties, bank loans are generally classified as

indebtedness and included within the definition of Senior Indebtedness.  However, it is also the

case that bank debt, certainly then-existing bank debt, is often addressed separately, as illustrated

by the language of the 1987 Indenture where the then-existing bank loans were specifically listed as Senior Indebtedness.  Alternatively, as in the 1993 and 1994 Loan Agreements, discussed later, the definition of senior indebtedness utilizes very broad language that includes bank debt within the breadth of its definition.  While previously issued bank debt is ordinarily not excluded from the definition of Senior Indebtedness, this is exactly what the TOPRS Indentures provide.  This is simply the plain meaning of the TOPRS Indentures.  The use of the term "sold," and its application to the notes, debentures and bonds is precise and does not leave room for any other construction.  Moreover, while this interpretation is not the ordinary construct, it is not an absurd result[8] and, therefore, the plain meaning must be applied, and the holders of the notes that are the subject of Cherokee Claim and the EFP Claims are not contractually entitled to benefit from the subordination provisions under the TOPRS Indentures.

---

[8]Under the TOPRS Indenture, existing bank debt would not be considered Senior Indebtedness.  However, when it is intended for existing-bank debt to receive the benefits of subordination, sophisticated parties would make that clear as was done in the 1987 Indenture by a specific reference to such debt or as was done in the 1993 and 1994 Loan Agreements where the language defining Senior Indebtedness is all encompassing of any debt other than trade debt.  To include existing bank debt as Senior Indebtedness under the TOPRS Indenture would require a contorted reading of the language.  First, the word "other" would have to be read out of the TOPRS Indenture.  In addition, the term "notes" which is listed in the context of "notes, debentures and bonds" would have to be interpreted to include bank loan agreements.  Such interpretation is not warranted and is clearly against principles of contract interpretation

        Further, as a practical matter, at the time of the creation of the TOPRS Indentures and continuing to the present, because of the structure of the 1987 Indenture and its definition of Senior Indebtedness, which includes bank debt not included in the TOPRS Indentures, such bank debt (assuming that the holders under the 1987 Indenture had not been satisfied prior to any event that would trigger the various subordination relationships) would be satisfied prior to the retention of any distribution by the TOPRS holders.  This results from the structural hierarchy of the various indentures.  Any holder of 1987 Indenture notes (i.e, the senior subordinated debt) would be entitled, under the TOPRS Indentures, to receive full satisfaction prior to any TOPRS holder being entitled to retain a distribution. In turn, the holders of the 1987 Indenture notes waived their right to retain a distribution until holders of Senior Indebtedness, which included bank debt under that indenture, were paid in full.  Therefore, the definition of Senior Indebtedness under the TOPRS Indentures does not provide for the "symmetrical" upward movement of rights to distributions that would have been present had the drafters of the TOPRS Indentures, in addition to making their issuance subordinated to the holders under the 1987 Indenture, incorporated the definition of Senior Indebtedness contained in the 1987 Indenture.  Nonetheless, at the time the TOPRS Indentures were structured, the then-existing debt structure of Enron would result in the type of bank debt referenced above being satisfied prior to the retention of any distribution by the TOPRS holders.  Moreover, as a legal matter, even if that were not the case, the Court's interpretation of Senior Indebtedness under the TOPRS Indentures is simply the plain meaning of the terms employed by the parties.

*The 1993 and 1994 Loan Agreements*

As part of a transaction to issue the MIPS preferred securities, on November 15, 1993, Enron and Enron Capital Resources L.P. ("Enron Capital"), its affiliate, entered into the 1993 Loan Agreement, which was a loan from the affiliate to Enron. Under that agreement Enron guaranteed payment of dividends on preferred shares and Enron Capital agreed to loan Enron a sum of money. On August 3, 1994, Enron and Enron Capital entered into the 1994 Loan Agreement, which agreement contained terms substantially similar to that in the 1993 Loan Agreement. In addition, however, the 1994 Loan Agreement expressly excluded indebtedness incurred under the 1993 Loan Agreement from its definition of Senior Indebtedness.

The Objecting Parties argue that although the terms of the 1993 and 1994 Loan Agreements do not specifically exclude Intercompany Claims, certain terms in those agreements, such as "indebtedness" and "money borrowed," are ambiguous and, therefore, extrinsic evidence is permissible to show whether intercompany claims were intended to be included as part of Senior Indebtedness. The Objecting Parties contend that prospectuses, which were provided to the buying public upon the issuance of the MIPS, show that Intercompany Claims were not intended to be included as part of Senior Indebtedness.

The holders of Intercompany Claims argue that the terms of the 1993 and 1994 Loan Agreements are not ambiguous, that the plain meaning must be applied, and that, therefore, extrinsic evidence cannot be introduced. They further assert that because the subordination provisions in those agreements are broadly defined to include as Senior Indebtedness "all indebtedness of Enron . . . for money borrowed, or evidenced by a note or similar instrument," their Claims based upon the relevant notes are entitled to benefit from the subordination

provisions contained in the 1993 and 1994 Loan Agreements.

The 1993 and 1994 Loan Agreements do not contain any express exclusion to the definition of Senior Indebtedness.[9]  Rather, the term is very broadly defined to include "all indebtedness," which is followed by various categories of indebtedness and the purpose for which it may have been incurred, including for money borrowed.  Although the terms "indebtedness" and "money borrowed" are not specifically defined in the 1993 and 1994 Loan Agreements, the terms are not ambiguous and must be applied in their ordinary sense and, therefore, represent debt.  Indeed, the Objecting Parties cannot seriously contend that they considered those terms ambiguous because they did not object to their use to represent debt under the TOPRS Indentures, which used those terms to describe the indebtedness included within Senior Indebtedness.

Further, the 1993 and 1994 Loan Agreements contain very broad language to define Senior Indebtedness which encompasses "all indebtedness . . . for money borrowed."  The use of the term "all" with no express exclusion encompasses intercompany debt.  Moreover, because the language used is not ambiguous, the Objecting Parties cannot introduce extrinsic evidence to

---

[9]The 1993 Loan Agreement defines Senior Indebtedness, in relevant part, as

the principal, premium, if any, and interest on (i) all indebtedness of Enron, whether outstanding on the date hereof or hereafter created, incurred or assumed, which is for money borrowed, or evidenced by a note or similar instrument given in connection with the acquisition of any business, properties or assets, including securities, (ii) any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or indirectly, contingently or non-contingently) as guarantor or otherwise, . . . (iv) amendments, renewals, extensions and refunding of any such indebtedness, unless in any instrument or instruments evidencing or securing such indebtedness or pursuant to which the same is outstanding, or in any such amendment, renewal extension or refunding, it is expressly provided that such indebtedness is not superior in right of payment to the Loans.

The 1994 Loan Agreement defines Senior Indebtedness using substantially similar language except it additionally excludes the indebtedness created under the 1993 Loan Agreement and any extensions or renewals thereof.

elaborate on what was intended by the use of unambiguous terms.  Based upon the unambiguous

and broad language used in the 1993 and 1994 Loan Agreements to define Senior Indebtedness

to include "all indebtedness . . . for money borrowed," the Court concludes that all of the

Intercompany Claims at issue benefit from the subordination provisions of the 1993 and 1994

Loan Agreements.[10]

*THE LOC CLAIMS*

The Objecting Parties argue that the LOC Claims are not properly categorized as "Senior

Indebtedness" under either the 1987 Indenture or the TOPRS Indentures.

A letter of credit is a mechanism to assure payment for some obligation.  3 James J.

White & Robert S. Summers, Uniform Commercial Code § 26-1 (4th ed. 1995).  Under a letter

of credit, an issuer, which is usually a bank, at the request of a customer (referred to as the

applicant), agrees to honor a draft or other demand for payment made by a third party (referred

to as the beneficiary), as long as the draft or demand complies with specified conditions, and

regardless of any disputes related to the underlying agreement between the customer and the

beneficiary. BLACK'S LAW DICTIONARY (8th ed. 2007).  In the context of the sale of goods, a

commercial letter of credit[11] is used as a payment method for goods sold.  3 White & Summers,

Uniform Commercial Code § 26-1.  A standby letter of credit[12] is used to assure other types of

---

[10]The Objecting Parties argue that this ruling would lead to an absurd result because it would not exclude insider indebtedness.  However, any such insider would still have to establish that the asserted obligation was actually for money borrowed and not otherwise subordinated.

[11]A commercial letter of credit is "used as a method of payment in a sale of goods (esp. in an international transaction), with the buyer being the issuer's customer and the seller being the beneficiary, so that the seller can obtain payment directly from the issuer instead of from the buyer." BLACK'S LAW DICTIONARY (4th ed. 1988).

[12]A standby letter of credit is "used to guarantee either a monetary or a nonmonetary obligation (such as the performance of construction work), whereby the issuing bank agrees to pay the beneficiary if the bank customer defaults on its obligation."  BLACK'S LAW DICTIONARY (4th ed. 1988).

obligations, both monetary and non-monetary. *Id*. Thus, in a commercial letter of credit transaction, "the issuer fully expects the letter to be drawn upon," however, in a standby letter of credit transaction, "the beneficiary draws on the letter only in the event of the customer's nonperformance." Anne Porter Browne, The Standby Letter of Credit and the Unsecured or Underliquidated Damages Clause, 9 U. Bridgeport L. Rev. 241, 254-255 (1988). See also, John F. Hilson, Asset-Based Lending: A Practical Guide to Secured Financing, Practising Law Institute § 9:2.1 (2006) (noting that with a standby letter of credit, "the parties expect that in the ordinary course of events the letter of credit will not be drawn upon [as the] performing party is expected to fulfill its obligations"). The standby letter of credit arrangement is more akin to a guarantee arrangement, in that it is only upon a default that the beneficiary has the right to draw. *See* Asset-based Lending: a Practical Guide to Secured Financing, Practising Law Institute § 6:5.2 (6th Ed. 2006) (noting that a standby letter of credit is designed to function as a guarantee of the payment by one or more parties to a transaction).

An arrangement that involves either type of letter of credit is ordinarily comprised of three separate relationships - two contracts and the letter of credit. 3 White & Summers, Uniform Commercial Code § 26-2. The first of the two contracts is the underlying agreement between two parties - for example, in the case of the commercial letter of credit transaction, for the purchase and sale of goods or, in the case of a standby letter of credit transaction, to undertake a certain performance obligation, either monetary or non-monetary. 3 White & Summers, Uniform Commercial Code § 26-1. Second, there is the letter of credit itself pursuant to which the issuer undertakes to honor drafts or other demands for payment by the beneficiary if the demand is accompanied by certain documents presented to the bank that conform with the

terms of the letter of credit.  *Id.*  The third relationship (and second contract) is between the applicant and issuer, pursuant to which the applicant agrees to reimburse the issuer for payments made on the letter of credit.  *Id.*

While the three relationships are all part of the same overall transaction, the obligations under each are independent of the others, inasmuch as the issuer of a letter of credit must honor a beneficiary's payment demand accompanied by conforming documents regardless of any dispute related to the underlying transaction between the beneficiary and the applicant and, in addition, the issuer's obligation to pay the beneficiary is independent of any obligation of the applicant to its issuer.  3 White & Summers, Uniform Commercial Code § 26-2.

### The LOC Claims and the 1987 Indenture

The Objecting Parties reference the specific exclusion from the definition of indebtedness in the 1987 Indenture of "indirect guarantees or other contingent obligations in connection with the indebtedness of others."  The Objecting Parties contend that, because Enron reimburses a letter of credit issuer only after the applicable letter of credit has been drawn down by the beneficiary, the agreement to reimburse necessarily constitutes a contingent obligation in connection with the indebtedness of others.  The Objection Parties maintain that the reimbursement agreement between Enron and the letter of credit issuer is, in effect, an "indirect guarantee" by Enron.  Alternatively, the Objecting Parties argue that the LOC Claims are not Senior Indebtedness because they are not evidenced by an "instrument for money borrowed."

Chase argues that Enron's obligations under the reimbursement agreements are not indirect guarantees or other contingent obligations even though the draw on the letter of credit may be a contingent event.  Chase asserts that once a draw is made under a letter of credit,

Enron's obligations to reimburse the issuing bank are "absolute, unconditional, and irrevocable." Chase argues that the noncontingent nature of Enron's obligations under the reimbursement agreements are evidenced by the fact that upon the issuance of any particular letter of credit pursuant to a reimbursement agreement, the available limit for funding letter of credit transactions was reduced under such reimbursement agreement. Chase emphasizes that the reduction occurs upon the issuance of the letter of credit rather than at the time it is drawn. In addition, Chase argues that, as a contract entered into by the parties, a reimbursement agreement is an "instrument." HVB repeats many of Chase's arguments and, in addition, argues that the text of the Master LOC Agreement specifically reflects that Enron's payment obligations to HVB under the agreement were intended to constitute Senior Indebtedness to the 1987 Indenture.

The Objecting Parties counter that the reimbursement obligations are contingent because Enron was only responsible to pay the letter of credit issuer the amount of any draw if and when a third-party beneficiary had drawn down the applicable letter of credit. They further assert that the issue of whether claims for reimbursement for amounts drawn under letters of credit are "contingent" must be measured at the time the obligation first arises, which is when each letter of credit is issued. The Objecting Parties urge that at that time, each claim for reimbursement was contingent upon a subsequent draw under the applicable letter of credit which might or might not subsequently occur. Thus, the Objecting Parties maintain that because the claims are based upon contingent obligations, they do not constitute Senior Indebtedness under the 1987 Indenture. The Objecting Parties also argue that Chase's construction would read the exclusion for contingent claims out of the agreement.

In addition, the Objecting Parties assert that the term "instrument" cannot be viewed in isolation but must be interpreted in the context in which it is used in the 1987 Indenture.  In the 1987 Indenture, indebtedness is defined, in relevant part, as "bonds, debentures, notes and other instruments representing obligations . . . for the repayment of money borrowed."  The Objecting Parties contend that because the term "instrument" is preceded by the terms "bonds" "debentures" and "notes" and because the term "other" immediately precedes the term "instrument,"the constructive canon of *ejusdem generis* requires that the term "instrument" be interpreted in the commercial law context of bonds, debentures and notes.

Finally, the Objecting Parties argue that the issue of whether Enron's debt obligations under the 1987 Indenture are subordinated to other debt is governed by the terms of the 1987 Indenture itself, and not the Master LOC Agreement.

First, with respect to HVB's claim that the text of the Master LOC Agreement specifically reflects that Enron's payment obligations to HVB under the Master LOC Agreement were intended to constitute Senior Indebtedness pursuant to the 1987 Indenture, the Court agrees with the Objecting Parties that a separate agreement subsequently entered into by Enron and HVB cannot be used to modify the terms of the 1987 Indenture or to subordinate the indebtedness under the 1987 Indenture to the indebtedness under Master LOC Agreement. Rather, the terms of the 1987 Indenture govern whether Enron's debt obligations under the 1987 Indenture are subordinated to other debt.[13]

---

[13]Further, to the extent that the text of the Master LOC Agreement was introduced to show Enron's intent at the time of entry into the 1987 Indenture, it would be barred as extrinsic evidence.  Moreover, an equally plausible interpretation of the inclusion of that provision in the Master LOC Agreement is that, at the time of entry into the Master LOC Agreement, the parties were concerned that the 1987 Indenture did not cover the reimbursement obligations and they were attempting to address that deficiency.

As previously noted, the 1987 Indenture includes a definition for the term "Senior Indebtedness and a definition for "indebtedness." As applied to Enron or any of its Subsidiaries, the 1987 Indenture provides, in relevant part, that indebtedness means "bonds, debentures, notes and other instruments representing obligations created or assumed by any such corporation for the repayment of money borrowed." The 1987 Indenture, however, carves out certain categories of debt from both the Senior Indebtedness definition and the indebtedness definition. The carve out from the indebtedness definition necessarily carries forward to the Senior Indebtedness definition which deals with certain forms of "indebtedness." While providing that certain contingent obligations are included within the definition of indebtedness, the 1987 Indenture provides that "no other contingent obligation of [Enron or any Subsidiary] in respect of indebtedness incurred by other persons shall for any purpose be deemed indebtedness of such corporation." It further explicitly excludes from the definition of indebtedness

> indirect guarantees or other contingent obligations in connection with the indebtedness of others, including agreements, contingent or otherwise, with such other persons or with third persons with respect to, or to permit or ensure the payment of, obligations of such other persons, including, without limitation, agreements to purchase or repurchase obligations of such other persons, agreements to advance or supply funds to or to invest in such other persons, or agreements to pay for property, products, or services of such other persons (whether or not conferred, delivered or rendered), and any demand charge, throughput, take-or-pay, keep-well, make-whole, cash deficiency, maintenance of working capital or earnings or similar agreements.

Chase and HVB argue that a reimbursement obligation for a draw on a letter of credit is not a contingent obligation in connection with the indebtedness of others. Chase contends that once a bank issues a letter of credit, the commitment is made and there is an absolute obligation to pay on any draw on the letter of credit. Chase maintains that the only thing that is uncertain is what the amount is, if any, that will have to be paid. HVB argues that while the letters of credit

36

issued by HVB provide credit support for obligations owed to third parties, nevertheless, as between Enron and HVB, Enron's indebtedness to HVB for the amount of that draw is direct and absolute and payable unconditionally once a draw occurs.

The Objecting Parties argue that in a reimbursement agreement, you are reimbursing a party, who has already paid somebody else, for which you have your own independent obligation. They maintain that it is a conditional obligation to ensure the payment to a third party. The Objecting Parties observe that any contingent obligation will at some future time become noncontingent, either the contingency will pass and there is no obligation or the contingency will come to fruition and there will be a liquidated obligation. However, they argue that the time to measure whether the obligation is contingent is the time when the reimbursement agreement is entered, not when the subsequent event, i.e., the draw comes to pass. The Objecting Parties assert that when the drafters of the 1987 Indenture contemplated future events impacting any definition, the agreement expressly referenced such potential future events - as was the case with the definition of Subsidiary and the impact of future events on the determination of voting control.

The 1987 Indenture provides that direct guarantees by Enron or a Subsidiary of a third-party's indebtedness incurred for money borrowed comes within the definition of indebtedness. However, any other contingent obligation of Enron or a Subsidiary in respect of indebtedness incurred by a third-party[14] is not within the definition of indebtedness under the 1987 Indenture.

---

[14] The indebtedness referred to in the carve out language of the 1987 Indenture is that of a third-party because the provision references the indebtedness "by other persons" or "of others." Thus, it cannot be referring to the indebtedness of either Enron or an Enron subsidiary as those entities are defined in the indenture, respectively, as the Company and Subsidiary. In addition, the definition of indebtedness in the 1987 Indenture is only applicable to the indebtedness of Enron or a Subsidiary as the definition start with the clause "[A]s applied to the Company or any Subsidiary." Therefore, the "indebtedness" of others would have its ordinary meaning of "the condition or state of owing money" or "something owed, a debt." BLACK'S LAW DICTIONARY at 783 (8th ed).

Thus, if Enron's reimbursement obligation to Chase, in respect of indebtedness Chase incurs, were contingent, the reimbursement obligations would not come within the definition of indebtedness under the 1987 Indenture.

Courts may refer to the dictionary to determine the plain and ordinary meaning of words under a contract.  See *Mazzola v. County of Suffolk*, 143 A.D.2d 734, 735, 533 N.Y.S. 297 (2d Dep't 1988) (citation omitted).  Contingent is defined as "likely but not certain to happen" or "dependent on or conditioned by something else."  "contingent."  *Merriam-Webster Online Dictionary*. 2006-2007. http://mw1.merriam-webster.com/dictionary/contingent (16 May 2007).  Thus, an event is contingent if it is conditioned on something else occurring or is conditional.  Conditional is defined as "subject to, implying, or dependent upon a condition."  "conditional." *Merriam-Webster Online Dictionary*. 2006-2007. http://mw1.merriam-webster.com/dictionary/conditional (16 May 2007).  Finally, condition is defined as "a premise upon which the fulfillment of an agreement depends" and "something essential to the appearance or occurrence of something else: prerequisite."  "condition." *Merriam-Webster Online Dictionary*. 2006-2007. http://mw1.merriam-webster.com/dictionary/condition (16 May 2007).

That the letters of credit were eventually drawn upon by the applicable beneficiaries does not negate the fact that prior to the draw, the reimbursement obligation was contingent on the occurrence of the draw.  If the draw had not occurred, there would be no reimbursement.  The draw was the prerequisite or condition upon which the reimbursement was dependent or conditioned.  Moreover, the analysis is not altered even if Chase actually may not be considered indebted to the beneficiary until the beneficiary has complied with the documentary terms and

conditions of the letter of credit, *see Supreme Merch. Co., Inc., v. Chemical Bank,* 70 N.Y.2d 344, 350 (N.Y. 1987) (citation omitted) (noting that "[i]n the absence of compliance with the terms and conditions of a letter of credit, the issuing bank owes nothing to the beneficiary"). Rather, it merely makes it a contingency upon a contingency, in that Chase has a contingent indebtedness to the beneficiary and Enron's obligation to Chase is contingent on Chase's obligation coming into being and then Chase making payment.

To avoid the ordinary application of the term contingent, Chase and HVB direct the Court's attention to the listing, in the 1987 Indenture, of examples of types of indirect guarantees or other contingent obligations in connection with the indebtedness of others that are excluded from the definition of indebtedness. They argue that a letter of credit reimbursement agreement does not resemble any of those examples.

However, because this list is preceded by the term "including," it is merely illustrative. Indeed, not only is the list preceded by the term "including" but it is also preceded by the term "without limitation" to further indicate that the listing is not intended to limit the types of contingent obligations that are excluded. More importantly, the previous sentence of the definition of indebtedness provides that although the definition of indebtedness includes "indebtedness for money borrowed incurred by other persons which is directly guaranteed as to payment of principal by [Enron] or any Subsidiary," it continues that "no other contingent obligation of [Enron or any Subsidiary] in respect of indebtedness incurred by other persons shall for any purpose be deemed indebtedness of such corporation." Thus, the only limitation as to the exclusion for contingent obligations in that clause is that for direct guarantees.[15]

---

[15] Chase also argues that financing through a letter of credit arrangement is similar to financing by the use of a revolving line of credit. Chase maintains that, in a letter of credit arrangement, there is a facility that the

Moreover, it has been observed that for reimbursement obligations related to letters of credit to be accorded senior debt status, specific reference must be made to them in the subordination agreement.  John F. Hilson, Asset-Based Lending: A Practical Guide to Secured Financing, Practising Law Institute § 9:2.1 (2006) (noting that specificity is required to expand the definition of senior debt definition "to include contingent credit not yet extended but contemplated or committed, or to cover reimbursement obligations with respect to letters of credit or other guarantees"); David W. Morse, Legal Issues in Leveraged Acquisitions from the Lenders Perspective, 1582 PLI/Corp 919, at *1036 (2007) (noting that "any subordination agreement should expressly address whether senior debt includes . . . reimbursement obligations of the debtor arising pursuant to letters of credit issued by the senior creditor or other contingent debt");  Peter H. Weil, Debt Subordination Provisions and Restructuring, 694 PLI/Corp 543 at *552 (1990) (noting that "if letter of credit obligations are to be given senior debt status, they

---

applicant can draw on every time a letter of credit is issued.  Moreover, it asserts that even if the letter of credit is not drawn down, the credit limit is reduced at the time of the issuance of the letter of credit and not at the time it is drawn down.

    A revolving line of credit is part of a lending facility under which a company in the normal course of its business pays its expenses.  In that regard, the use of a commercial letter of credit would seem to have certain similar features to a revolving line of credit, in that a commercial letter of credit is expected to be called upon to satisfy an obligation of a company in the normal course of its business.  Here, the agreements at issue involve standby letters of credit which are not usually called upon except in the event of a default in the underlying agreement.  Therefore, as previously noted, a standby letter of credit is more like a guarantee.

    While the issuance of a letter of credit under a reimbursement agreement may have certain similarities to a draw on a revolver, unlike the standby letter of credit arrangements at issue here, a draw on a revolving line of credit is generally at the borrower's discretion and not contingent on the actions of third-parties.  Further, the indebtedness at issue is Enron's obligation to reimburse the issuer and that obligation is contingent until the letter of credit is drawn and the issuer has made payment on it.  Although a letter of credit issuer may be deemed to have made a commitment to lend at the time the letter of credit is issued - and even if the issuer is obligated at that time to set funds aside under any applicable regulation or accounting practice for that purpose - it does not alter the contingent nature of the obligation.  It is similar to any reserve set aside for a contingent obligation.  The obligation to reimburse by its nature is a promise to pay upon the event of an expenditure by the other party to the reimbursement agreement.  But whether the other party will be called upon to expend funds is contingent on a draw and any obligation to reimburse awaits that event.  Thus, a reimbursement obligation is a contingent obligation because if there is no draw on the letter of credit, no payment is made by the issuer and, hence, no reimbursement payment must be made; and if there is a draw, the issuer pays only to the extent of the draw and the reimbursement obligation equals the amount of the draw.

must be specifically mentioned"). Here, the subordination agreements do not include any reference to letters of credit.

The Court concludes that the reimbursement obligation is a contingent obligation in connection with the indebtedness of others and, therefore, pursuant the 1987 Indenture is excluded from the definition of Senior Indebtedness.[16]

*The LOC Claims and the TOPRS Indentures*

The Objecting Parties argue that the LOC Claims do not constitute "Senior Indebtedness" under the TOPRS Indentures because under those indentures, the definition requires that the obligations be evidenced by a note, bond, debenture or other security that was sold by Enron for money borrowed. The Objecting Parties contend that Enron did not sell an obligation to reimburse the issuer of the LOC and that, in any event, the obligations to reimburse the issuer of the LOC's are not securities. The Objecting Parties maintain that none of the LOC Claims include rights under a promissory note, bond or debenture issued to the letter of credit claimants.

Chase argues that the reimbursement agreements are "bonds" because they are written promises of Enron to pay upon the occurrence of a draw being made on a letter of credit. As bonds, Chase argues that they are included as Senior Indebtedness. Unlike Chase, HVB argues that the TOPRS Indentures are ambiguous and that an evidentiary hearing is required. HVB contends that the TOPRS Indentures intended to distinguish trade debt from financial debt and that it is arguable that the type of financial obligation created by the Master LOC Agreement was intended to qualify as Senior Indebtedness under the TOPRS Indentures.

---

[16]In light of the exclusion of the reimbursement obligation from the definition of Senior Indebtedness based upon its contingent nature, it is not necessary to address the other arguments advanced by the parties as to whether it constitutes Senior Indebtedness.

The Objecting Parties respond that the reimbursement agreements cannot be bonds because they do not represent fixed obligations to pay a sum certain. Rather, they maintain that the reimbursement obligation is contingent on a draw being made and, further, that then the amount payable is not fixed but dependent upon the extent of any draw. The Objecting Parties alternatively argue that even if it could be considered as a bond, it was not sold by Enron as required in the TOPRS Indentures. Finally, the Objecting Parties argue that the TOPRS Indentures are not ambiguous and require that Senior Indebtedness be evidenced by a note, bond, debenture or other security sold by Enron for money borrowed.

As previously discussed in the analysis of the Intercompany Claims under the TOPRS Indentures, to qualify as indebtedness, the obligation must be evidenced by a note, debenture, bond or other security sold by Enron. As the reimbursement agreements were two-party agreements entered into by Enron and the respective issuing banks, such agreements could not be - nor has any party alleged that they should be - considered as having been sold by Enron.[17] Therefore, for the same reasons discussed in the Intercompany Claims analysis, they do not meet the definition of indebtedness or Senior Indebtedness under the TOPRS Indentures. Consequently, the letter of credit reimbursement agreements are not entitled to the benefit of

---

[17]Nor can the definition of Senior Indebtedness be considered to merely distinguish trade debt from other financial transactions because that would read the clause "evidenced by notes, debentures, bonds and other securities sold by Enron" out of the TOPRS Indentures. Moreover, although that clause already excludes trade debt, arguably making it unnecessary to explicitly exclude trade debt, nevertheless, the parties apparently saw the need to emphasize that exclusion. Indeed, although trade debt was already excluded from the definition of indebtedness of Enron or a Subsidiary under the language of the 1987 Indenture because it is not based on "bonds, debentures, notes and other instruments representing obligations created or assumed by [Enron or a Subsidiary] for the repayment of money borrowed," nevertheless, language was included in the 1987 Indenture explicitly excluding it from Senior Indebtedness as "indebtedness of or monies owed by [Enron] . . . for goods or material purchased in the ordinary course of business or for services." Therefore, the presence of an explicit reference to trade debt does not have the significance that HVB suggests.

42

subordination under the TOPRS Indentures.[18]

*CONCLUSION*

The Court concludes that EFP is a Subsidiary and because the EFP Claim is based upon an indebtedness of Enron to a Subsidiary, it is excluded from the definition of Senior Indebtedness and it does not benefit from subordination under the 1987 Indenture.

The Court further concludes that holders of the notes that are the subject of Cherokee Claim and the EFP Claims are not contractually entitled to benefit from the subordination provisions under the TOPRS Indentures because those claims are not evidenced by notes, debentures, bonds or other securities sold by Enron.

The Court also concludes that all of the Intercompany Claims at issue, i.e, the EEC Claims, the Cherokee Claims and the EFP Claims, are entitled to the benefit of subordination under the broad language of the 1993 and 1994 Loan Agreements.

Further, the Court concludes that the reimbursement obligations at issue related to the various letters of credit are contingent obligations in connection with the indebtedness of others and, as such, are not within the definition of indebtedness and, therefore, of Senior Indebtedness under the 1987 Indenture. In addition, because the reimbursement agreements were not sold by Enron, they also do not fall within the definition of Senior Indebtedness under the TOPRS Indentures. Consequently, the LOC Claims should be excluded from the benefit of subordination under the TOPRS Indentures.

---

[18]In light of its conclusion that, because they are not sold by Enron, the reimbursement agreements do not constitute Senior Indebtedness, the Court does not address whether those agreements meet the other criteria required to qualify as Senior Indebtedness.

The Objecting Parties are to settle an order consistent with this opinion.


Dated: New York, New York
      May 29, 2007

                                       **s/Arthur J. Gonzalez**
                                       UNITED STATES BANKRUPTCY JUDGE