# EXHIBIT 8

THIRD AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

ENRON FINANCE PARTNERS, LLC

A Delaware Limited Liability Company

**THIRD AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**ENRON FINANCE PARTNERS, LLC**
**A Delaware Limited Liability Company**

## TABLE OF CONTENTS

### ARTICLE 1
### DEFINITIONS

1.01   *Definitions* ........................................................................................2
*Act* ..............................................................................................................2
*Adjusted Capital Account* ..........................................................................2
*Affiliate* ......................................................................................................2
*Aggregate Liquidation Preference* .............................................................2
*Agreement* ..................................................................................................3
*Assignee* .....................................................................................................3
*Board of Directors* .....................................................................................3
*Book Value* .................................................................................................3
*Business Day* ..............................................................................................3
*Calculation Agent* ......................................................................................3
*Capital Account* ..........................................................................................3
*Capital Contribution* ..................................................................................3
*Caribbean* ...................................................................................................4
*Cash* ............................................................................................................4
*Cash Equivalents* ........................................................................................4
*Certificate* ...................................................................................................4
*Claim* ..........................................................................................................4
*Class A Member* .........................................................................................5
*Class B Members* ........................................................................................5
*Class C Member* .........................................................................................5
*Class A Membership Interest* ......................................................................5
*Class B Membership Interest* ......................................................................5
*Class C Membership Interest* ......................................................................5
*Class A Unit* ...............................................................................................5
*Class B Unit* ...............................................................................................5
*Class C Unit* ...............................................................................................5
*Closing Date* ..............................................................................................5
*Code* ............................................................................................................5
*Company* .....................................................................................................5
*Company Register* .......................................................................................5
*Company Subsidiaries* ................................................................................5

361302_8.DOC

*Company Subsidiary Asset No. 1* ...........................................................5
*Company Subsidiary Asset No. 2* ...........................................................6
*Company Subsidiary Asset No. 3* ...........................................................6
*Company Subsidiary Asset No. 4* ...........................................................6
*Competitor of Enron* .............................................................................6
*Confidential Information* .......................................................................6
*Control* ..................................................................................................6
*Core Permitted Assets* ...........................................................................7
*Core Permitted Assets Coverage Ratio* ..................................................8
*Day* .........................................................................................................9
*Delaware Certificate* .............................................................................9
*Depreciation* ..........................................................................................9
*Determination Date* ...............................................................................9
*Dispose, Disposing* or *Disposition* .....................................................10
*Dissolution Event* .................................................................................10
*Distribution Amounts* ...........................................................................10
*Distribution Dates* ...............................................................................10
*Dollars* or *$* .......................................................................................10
*ECIC* .....................................................................................................10
*Encumbrance* ........................................................................................10
*Enron* ....................................................................................................10
*Enron Affiliate* .....................................................................................10
*Enron Confirmation Letter* ..................................................................10
*Enron Securities* ..................................................................................10
*EOG Share Exchange Agreement* .........................................................11
*Financial Assets* ...................................................................................11
*First Amended LLC Agreement* ............................................................11
*Floating Rate CP Index* ........................................................................11
*Formation Date* ....................................................................................11
*Full Redemption* ...................................................................................11
*GAAP* ....................................................................................................11
*Global* ...................................................................................................11
*Governmental Authority* (or *Governmental*).......................................11
*Guarantee* .............................................................................................11
*including* ...............................................................................................12
*Indebtedness* .........................................................................................12
*Indemnification Agreement* ..................................................................12
*Indemnified Person* ..............................................................................12
*Insolvency Event* ..................................................................................12
*Investco* ................................................................................................13
*Investment Company Act* ......................................................................13
*Law* .......................................................................................................13
*LIBOR* ...................................................................................................13
*LIBOR Page* ..........................................................................................13
*Liquidation Preference* .........................................................................13

361302_8.DOC

*LLC Agreement* ........................................................13
*London Banking Day* ...............................................13
*Majority Class B Member* .........................................14
*Majority Class C Member* .........................................14
*Management* ...........................................................14
*Mandatory Redemption Date* .....................................14
*Mark-to-Market Event* ..............................................14
*Market Spread* ........................................................14
*Material Adverse Effect* .............................................14
*Member* .................................................................14
*Member Nonrecourse Debt* .........................................14
*Member Nonrecourse Debt Minimum Gain* ....................14
*Member Nonrecourse Deductions* ................................14
*Membership Interest* .................................................14
*Minimum Gain* ........................................................15
*Moody's* .................................................................15
*Nonrecourse Deductions* ............................................15
*Nonrecourse Liability* ...............................................15
*Other Assets* ...........................................................15
*Outstanding* ...........................................................15
*Parent Default* ........................................................15
*Partial Redemption* ..................................................17
*Partial Redemption Percentage* ..................................17
*Permitted Assets* .....................................................17
*Permitted Transfer* ...................................................17
*Person* ...................................................................18
*Potential Specified Event* ..........................................18
*Preferred Applicable Rate* .........................................18
*Preferred Distribution Amount* ...................................18
*Preferred Return* ......................................................18
*Profits* and *Losses* ....................................................18
*Property* .................................................................19
*Qualifying Enron CP* .................................................19
*Qualifying Percentage* ..............................................19
*Quarterly Period* ......................................................19
*Rating Agencies* ......................................................19
*Record Holder* .........................................................20
*Redemption* .............................................................20
*Relevant Documents* .................................................20
*S&P* .......................................................................20
*Second Amended LLC Agreement* ................................20
*Securities Act* ..........................................................20
*Sequoia* ..................................................................20
*Sequoia Documents* ..................................................20
*Sequoia LLC Agreement* ............................................20

*Sequoia Note Purchase Agreement*..................................................................20
*Sequoia Sale and Servicing Agreement* .........................................................20
*Sequoia Security Agreement*...........................................................................20
*Sharing Ratio* ..................................................................................................21
*Smith Street* .....................................................................................................21
*Specified Event* ................................................................................................21
*Specified Event Rate* .......................................................................................21
*Specified Price* .................................................................................................21
*Structured Security* or *Structured Securities*................................................21
*Sub Asset No. 1 Items* ......................................................................................21
*Sub Asset No. 2 Items* ......................................................................................21
*Sub Asset No. 3 Items* ......................................................................................21
*Sub Asset No. 4 Items* ......................................................................................22
*Subsidiary* ........................................................................................................22
*Tax Matters Partner* ........................................................................................22
*Term*..................................................................................................................22
*Termination Date* .............................................................................................22
*UCC* ..................................................................................................................22
*Units*..................................................................................................................22
*Unrecovered Liquidation Preference* ..............................................................22
*1935 Act*............................................................................................................22
1.02    *Construction* ........................................................................................22

### ARTICLE 2
### ORGANIZATION

2.01    *Formation; Continuation; Amendment and Restatement* ....................23
2.02    *Name*.....................................................................................................23
2.03    *Registered Office; Registered Agent; Principal Office in the United States;*
        *Other Offices* ........................................................................................23
2.04    *Purposes; Conduct of Business* ...........................................................23
2.05    *Foreign Qualification* ..........................................................................26
2.06    *Term*......................................................................................................26

### ARTICLE 3
### MEMBERSHIP; DISPOSITIONS OF INTERESTS; CERTIFICATES

3.01    *Members* ................................................................................................26
3.02    *Representations, Warranties and Covenants*........................................27
3.03    *Dispositions of Membership Interests* ..................................................30
3.04    *Liability to Third Parties*......................................................................31
3.05    *Access to Information* ...........................................................................31
3.06    *Confidential Information*.......................................................................32
3.07    *Redemptions at the Option of the Company* .........................................33
3.08    *Redemptions at the Option of the Class C Member*...............................35
3.09    *Certificates*...........................................................................................35

3.10   *Register, Registration of Transfer and Exchange* ...........................................36
3.11   *Mutilated, Destroyed, Lost or Stolen Certificates* .........................................37
3.12   *Pledge of Class B and Class C Units* ............................................................37
3.13   *Certain Amendments* .....................................................................................38

### ARTICLE 4
### CAPITAL CONTRIBUTIONS

4.01   *Initial Capital Contributions* .......................................................................38
4.02   *Capital Accounts* ...........................................................................................38
4.03   *Subsequent Capital Contributions* ...............................................................39
4.04   *Return of Contributions* ................................................................................39

### ARTICLE 5
### DISTRIBUTIONS

5.01   *Distributions* ..................................................................................................39
5.02   *Periodic Cash Distributions* .........................................................................39
5.03   *Calculation of Preferred Distribution Amount* ............................................40
5.04   *Conditions to Payment of Distributions* .......................................................40
5.05   *Specified Event; Specified Event Rate* ..........................................................40
5.06   *End of a Specified Event* ................................................................................43
5.07   *Record Dates, Etc.* .........................................................................................43
5.08   *Manner of Payment* ........................................................................................43
5.09   *Distributions on Dissolution and Winding Up* ..............................................43

### ARTICLE 6
### ALLOCATIONS

6.01   *Allocation of Profits.* .....................................................................................44
6.02   *Allocation of Losses.* ......................................................................................44
6.03   *Regulatory Allocations.* ..................................................................................45
6.04   *Tax Allocations.* ..............................................................................................46

### ARTICLE 7
### MANAGEMENT

7.01   *Management by Class A Member* ....................................................................47
7.02   *Reliance by Third Parties* ..............................................................................49
7.03   *Disclaimer of Duties.* ......................................................................................49
7.04   *Indemnification* ..............................................................................................51
7.05   *Consent Required for Insolvency Event* .........................................................53

### ARTICLE 8
### TAXES

8.01   *Tax Matters Partner; Tax Returns* ................................................................54
8.02   *Tax Elections.* .................................................................................................54

### ARTICLE 9
### BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

9.01   *Maintenance of Books* ................................................................................55
9.02   *Bank Accounts* ...........................................................................................55
9.03   *Information* .................................................................................................55

### ARTICLE 10
### [RESERVED]

### ARTICLE 11
### DISSOLUTION, WINDING-UP AND TERMINATION

11.01   *Dissolution*................................................................................................55
11.02   *Winding-Up and Termination* ...................................................................56
11.03   *Certificate of Cancellation*.......................................................................56

### ARTICLE 12
### GENERAL PROVISIONS

12.01   *Offset*.........................................................................................................57
12.02   *Notices* .......................................................................................................57
12.03   *Superseding Effect* .....................................................................................57
12.04   *Effect of Waiver or Consent* ......................................................................57
12.05   *Amendment or Restatement*........................................................................57
12.06   *Binding Effect* ............................................................................................57
12.07   *Governing Law; Severability* .....................................................................58
12.08   *Further Assurances* ....................................................................................58
12.09   *Counterparts*..............................................................................................58
12.10   *Submission to Jurisdiction* ........................................................................58

### SCHEDULE I FINAL MEMBERS

### EXHIBIT A-1 Enron Confirmation Letter

### EXHIBIT A-2 Enron Confirmation Letter

361302_8.DOC

### THIRD AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT
### OF
### ENRON FINANCE PARTNERS, LLC
A Delaware Limited Liability Company

This THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF ENRON FINANCE PARTNERS, LLC (this *"Agreement"*), dated as of November 28, 2000 (the *"Closing Date"*), is adopted, executed and agreed to, for good and valuable consideration, by Enron Corp., an Oregon corporation (*"Enron"*), Enron Finance Management, LLC, a Delaware limited liability company (*"Management"*), Smith Street Land Company, a Delaware corporation (*"Smith Street"*), Enron Capital Investments Corp., a Delaware corporation (*"ECIC"*), Enron Global Exploration & Production Inc., a Delaware corporation (*"Global"*), Enron Caribbean Basin LLC, a Delaware limited liability company (*"Caribbean"*), and Zephyrus Investments, LLC, a Delaware limited liability company (*"Investco"*).

### RECITALS

1.      Enron Finance Partners, LLC (the *"Company"*) was formed as a Delaware limited liability company on July 14, 2000 (the *"Formation Date"*) by the filing of a Certificate of Formation (the *"Delaware Certificate"*) with the Delaware Secretary of State. Enron, Smith Street, ECIC and Global were admitted to the Company as the initial Members, effective as of the Formation Date, pursuant to that certain Limited Liability Company Agreement of the Company, dated as of July 21, 2000 (the *"LLC Agreement"*). Caribbean was admitted as a Member pursuant to that certain First Amended and Restated Limited Liability Company Agreement dated as of October 4, 2000 (the *"First Amended LLC Agreement"*), which amended and restated the LLC Agreement in its entirety. Enron, Management, Smith Street, ECIC, Global and Caribbean entered into that certain Second Amended and Restated Limited Liability Company Agreement, dated as of November 21, 2000 (*"Second Amended LLC Agreement"*) in order to permit an additional capital contribution by Enron to the Company, to reclassify the membership interests of the Company into Class A Membership Interests and Class B Membership Interests, to admit Management as a Class A Member of the Company, and to exchange and convert the membership interests held by Enron, Smith Street, ECIC, Global and Caribbean into Class B Membership Interests and to evidence the change of such Members to Class B Members, and which Second Amended LLC Agreement amended and restated the First Amended LLC Agreement in its entirety.

2.      Management, Enron, Smith Street, ECIC, Global and Caribbean now desire to amend and restate the Second Amended LLC Agreement in its entirety to reclassify and convert the membership interests in the Company into three classes consisting of Class A Members, Class B Members and Class C Members and, in connection therewith, to evidence (a) Management as the Class A Member of the Company, (b) Enron, Smith Street, ECIC, Global and Caribbean as Class B Members; and (c) the admission of Investco as the initial Class C Member of the Company.

NOW THEREFORE, for good and valuable consideration, the Members hereby amend and restate the Second Amended LLC Agreement in its entirety as follows:

## ARTICLE 1
## DEFINITIONS

1.01    *Definitions.* As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Sections referred to below (and grammatical variations of such terms have correlative meanings):

*Act* - the Delaware Limited Liability Company Act, as amended from time to time.

*Additional Transaction Costs* – with respect to any Quarterly Period, (a) all costs incurred by Investco during such Period in excess of $10,000 which are attributable to (A) maintaining the status of Investco as a limited liability company formed under the law of the State of Delaware or (B) the provision of legal, accounting and other appropriate services and necessary licenses, filings or other approvals required for the operation and legal maintenance of Investco, **provided** that such Additional Transaction Costs shall not include any costs for legal, accounting and other appropriate services that are not reasonable and customary for the type of services provided and (b) any costs required to be paid by Investco during such Quarterly Period pursuant to the Funding Agreement or the Security Agreement other than (i) payments of principal, liquidation preference, interest or dividends under the Funding Agreement and (ii) costs arising (A) under Section 5.3 of the Funding Agreement as a result of the sale of the Class C Units by Investco or (B) as a result of the breach of a representation or covenant of Investco in the Funding Agreement or the Security Agreement (other than a breach resulting from a failure of the Company to comply with any of its obligations in respect of the Class C Units).

*Adjusted Capital Account* - the Capital Account determined and maintained for each Member modified as follows:

(a)    increased by any amount that such Member is obligated to restore, or is treated as obligated to restore pursuant to Treasury Regulation Sections 1.704-1(b)(2)(ii)(c) and (d), 1.704-2(g)(1), and 1.704-2(i)(5); and

(b)    decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) with respect to such Member.

*Affiliate* - with respect to any Person, (a) each Person that is an entity that such Person Controls; (b) each Person that Controls such Person; and (c) each Person that is an entity that is under common Control with such Person.

*Aggregate Liquidation Preference* - the aggregate liquidation preference of the Class C Units which shall be initially equal to U.S.$500,000,000, as such amount may be (a) increased pursuant to Section 3.01(c) or (b) reduced from time to time by the amount of any Partial Redemption pursuant to Section 3.07.

*Agreement* - introductory paragraph.

*Assignee* - any Person that acquires a Unit or any portion thereof through a Disposition; provided, however, that an Assignee shall have no right to be admitted to the Company as a Member except in accordance with Section 3.03(b).

*Board of Directors* - Section 7.01(b).

*Book Value* - with respect to any Property, such Property's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Book Value of any Property contributed by a Member to the Company shall be the fair market value of such Property as determined by the Class A Member;

(b)    The Book Values of all Property shall be adjusted to equal their respective fair market values as determined in accordance with Section 7.01(d) in connection with a Mark-to-Market Event;

(c)    The Book Value of any Property distributed to any Member shall be the fair market value of such Property as determined in accordance with Section 7.01(d); and

(d)    The Book Values of all Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (f) of the definition of Profits and Losses.

If the Book Value of Property has been determined or adjusted pursuant to clauses (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Property for purposes of computing Profits and Losses and other items allocated pursuant to Article 6.

*Business Day* - any day other than a Saturday, a Sunday, or a holiday on which commercial banks in the State of New York or the State of Texas are closed.

*Calculation Agent* - The Chase Manhattan Bank, or such other commercial bank, trust company or financial institution mutually acceptable to the Class A Member and the Majority Class C Member.

*Capital Account* - Section 4.02.

*Capital Contribution* - with respect to any Member, the Cash and the Book Value of any assets (other than Cash) contributed to the Company by the Member. Any reference in this

Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

*Caribbean* - Introductory paragraph.

*Cash* - such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

*Cash Equivalents* - (a) direct obligations of the United States of America, or of any agency thereof, or obligations Guaranteed as to principal and interest by the United States of America, or by any agency thereof, in either case maturing not more than 90 days from the date of acquisition thereof, (b) certificates of deposit issued by any bank or trust company organized under the laws of the United States of America, Canada, England, France, Germany, Japan, The Netherlands or Switzerland, or any political subdivision thereof, and having capital, surplus and undivided profits of at least U.S.$500,000,000 (or its equivalent in any other currency) and whose commercial paper or short-term deposit obligations are rated "A-1" or better by S&P or "P-1" by Moody's, respectively, maturing not more than 90 days from the date of acquisition thereof and not more than 183 days from the date of original issuance thereof, (c) commercial paper rated "A-1" or better by S&P or "P-1" by Moody's, respectively, maturing not more than 90 days from the date of acquisition thereof and not more than 183 days from the date of original issuance thereof, (d) Qualifying Enron CP and (e) shares in money market mutual funds so long as, with respect to each such fund, (i) the aggregate net asset value of such fund on the date of acquisition of any shares thereof is not less than U.S.$500,000,000 (or its equivalent in any other currency), (ii) not less than 95% (measured by market value) of the portfolio of such fund consists entirely of obligations described in one or more of clauses (a), (b) or (c) above or of other debt securities whose credit quality and liquidity are not less than the credit quality and liquidity of the obligations described in such clauses, (iii) the shares issued by such fund represent proportionate and undivided interests in the portfolio of assets owned by such fund, (iv) the principal amount represented by the shares in such fund may at any time be redeemed at par within 30 days after a notice of redemption and (v) on the date of investment, the principal amount invested by the Company in such fund does not exceed 10% of the aggregate net asset value of such fund; provided that Cash Equivalents shall not include (i) any obligations providing for the payment of interest or principal only (other than obligations referred to in clause (c) above issued at a discount), (ii) any obligations containing an express contingency regarding the repayment of all or any of the principal thereof or (iii) any "swap agreement" within the meaning given to such term in Section 101(53B) of the United States Bankruptcy Code.

*Certificate* - Section 3.09.

*Claim* - any and all judgments, claims, causes of action, demands, lawsuits, suits, proceedings, Governmental investigations or audits, losses, assessments, fines, penalties, administrative orders, obligations, costs, expenses, liabilities and damages (whether actual, consequential or punitive), including interest, penalties, reasonable attorneys' fees, disbursements and costs of investigations, deficiencies, levies, duties and imposts.

*Class A Member* - Management and any other Person hereafter admitted to the Company as a Class A Member as provided in this Agreement, but such term does not include any Person who has ceased to be a Class A Member in the Company. In the event that there is more than one Class A Member, actions to be taken by the Class A Member on behalf of the Company shall be taken by Management, any transferee of Management's Class A Unit (provided that such transferee has been admitted as a Class A Member in accordance with the terms of this Agreement) or any other Class A Member designated by Management (upon notification to each other Member).

*Class B Members* - Enron, Smith Street, ECIC, Global, Caribbean and any other Person hereafter admitted to the Company as a Class B Member as provided in this Agreement, but such term does not include any Person who has ceased to be a Class B Member in the Company.

*Class C Member* - Investco and any other Person hereafter admitted to the Company as a Class C Member as provided in this Agreement, but such term does not include any Person who has ceased to be a Class C Member in the Company.

*Class A Membership Interest* - each Membership Interest evidenced by a Class A Unit.

*Class B Membership Interest* - each Membership Interest evidenced by a Class B Unit.

*Class C Membership Interest* - each Membership Interest evidenced by a Class C Unit.

*Class A Unit* - Section 3.01(b).

*Class B Unit* – Section 3.01(b).

*Class C Unit* – Section 3.01(b).

*Closing Date* - Introductory paragraph.

*Code* - Internal Revenue Code of 1986, as amended from time to time.

*Company* - Recital 1.

*Company Register* – the register and transfer book relating to the Units maintained by the Class A Member pursuant to Section 3.10(a).

*Company Subsidiaries* - Enron Asset Holdings, LLC and Enron Intermediate Holdings, LLC, and any other Subsidiaries formed by the Company to acquire, own, operate, finance and Dispose of Other Assets and to which certain of the assets contributed to the Company by the Members have been contributed, including Company Subsidiary Asset No.1, Company Subsidiary Asset No.2, Company Subsidiary Asset No. 3 and Company Subsidiary Asset No. 4.

*Company Subsidiary Asset No. 1* - the shares of capital stock held by a Company Subsidiary and identified to Investco as "*Company Asset No. 1.*"

361302_8.DOC

*Company Subsidiary Asset No. 2* - the shares of capital stock held by a Company Subsidiary and identified to Investco as "*Company Asset No. 2.*"

*Company Subsidiary Asset No. 3* - the shares of capital stock held by a Company Subsidiary and identified to Investco as "*Company Asset No. 3.*"

*Company Subsidiary Asset No. 4* - the shares of capital stock held by a Company Subsidiary and identified to Investco as "*Company Asset No. 4.*"

*Competitor of Enron* - any Person who conducts any significant operations in (or that has any Subsidiary or Affiliate that is a "*significant subsidiary*" within the meaning of Rule 1-02(w) of Regulation S-K promulgated by the Securities and Exchange Commission conducting operations in) energy and energy or commodity related businesses, including, without limitation, exploration, production and transportation of natural gas, crude oil and other hydrocarbons worldwide, the generation, transmission and distribution of electricity, the marketing of natural gas, electricity and other energy and energy intensive commodities, including production and marketing of pulp and paper, lumber and steel, and related risk management and finance services worldwide, the development, construction and operation of power plants, pipelines and other energy and commodity related assets worldwide, the retail and wholesale energy services business and businesses relating to the provision of communications, telecommunications, fiber optics, internet and commodities trading and intermediation products and services, except in each case for Persons whose primary business is banking, insurance, investment banking, investment management or other investing and financial services.

*Confidential Information* - all information and data (whether oral, written, or electronic, and including all copies thereof) that are furnished or submitted to a Member or its Affiliates with respect to the Company and its Subsidiaries. Notwithstanding the foregoing, the term "*Confidential Information*" shall not include any information that (a) is in the public domain at the time of its disclosure or thereafter, or (b) has been independently acquired or developed by a Member or its Affiliates, in each case other than as a result of a disclosure or use by a Person in contravention of a duty not to disclose or use such information.

*Control* - the possession, directly or indirectly, through one or more intermediaries, of either of the following:

(a)    (i) in the case of a corporation, more than 50% of the outstanding voting securities thereof; (ii) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); (iii) in the case of a trust or estate, including a business trust, more than 50% of the beneficial interest therein; and (iv) in the case of any other entity, more than 50% of the economic or beneficial interest therein; or

(b)    in the case of any entity, the power or authority, through ownership of voting securities, by contract or otherwise, to exercise control over the business affairs of the entity.

361302_8.DOC

*Core Permitted Assets* -

    (a)    Cash;

    (b)    Cash Equivalents;

    (c)    debt securities issued by a corporation organized under the laws of the United States of America pursuant to an effective registration statement under the Securities Act rated "A" or better by S&P or "A2" or better by Moody's (and, if rated by both S&P and Moody's, rated "A" or better by S&P and "A2" or better by Moody's) maturing not more than one year from the date of acquisition thereof;

    (d)    Indebtedness for borrowed money owing to the Company by Enron provided that (i) the unsecured, unguaranteed senior long-term debt obligations of Enron are rated "BBB-" or better by S&P or "Baa3" or better by Moody's (and, if rated by both S&P and Moody's, "BBB-" or better by S&P and "Baa3" or better by Moody's), (ii) Enron has, on or prior to the date on which such Indebtedness is acquired by the Company, delivered an Enron Confirmation Letter in substantially the form of Exhibit A-1 hereto confirming that such Indebtedness constitutes a *"Subject Asset"* under and as defined in such Enron Confirmation Letter, (iii) such Indebtedness bears interest at a rate not less than the sum of the lesser of LIBOR for the current Quarterly Period and the Floating Rate CP Index plus the Market Spread and (iv) such Indebtedness is payable on demand of the holder thereof, notwithstanding that such Indebtedness also provides for a stated maturity date;

    (e)    Indebtedness for borrowed money owing to the Company by any Subsidiary of Enron provided that (i) the unsecured, unguaranteed senior long-term debt obligations of Enron are rated "BBB-" or better by S&P or "Baa3" or better by Moody's (and, if rated by both S&P and Moody's, "BBB-" or better by S&P and "Baa3" or better by Moody's); (ii) Enron has, on or prior to the date on which such Indebtedness is acquired by the Company, delivered an Enron Confirmation Letter in substantially the form of Exhibit A-2 hereto confirming that such Indebtedness constitutes a *"Subject Asset"* under and as defined in such Enron Confirmation Letter, (iii) such Indebtedness bears interest at a rate not less than the sum of the lesser of LIBOR for the current Quarterly Period and the Floating Rate CP Index plus the Market Spread and (iv) such Indebtedness is payable on demand of the holder thereof, notwithstanding that such Indebtedness also provides for a stated maturity date;

    (f)    Indebtedness for borrowed money owing to the Company by Enron provided that (i) such Indebtedness matures within 90 days of acquisition thereof and not more than 183 days after the date of creation or incurrence thereof, (ii) the commercial paper of Enron is at such time rated "A-2" or better by S&P or "P-2" or better by Moody's (and, if rated by both S&P and Moody's, "A-2" or better by S&P and "P-2" or better by Moody's), respectively, and (iii) such Indebtedness is fully transferable by the holder thereof without any consent by Enron or any other Person (subject to compliance with the registration or qualification requirements of the Securities Act and any state securities laws);

(g)    Indebtedness for borrowed money owing to the Company by any Subsidiary of Enron provided that (i) such Indebtedness matures within 90 days of acquisition thereof and not more than 183 days after the date of creation or incurrence thereof, (ii) Enron has, on or prior to the date on which such Indebtedness is acquired by the Company, delivered an Enron Confirmation Letter in substantially the form of Exhibit A-2 hereto confirming that such Indebtedness constitutes a "*Subject Asset*" under and as defined in such Enron Confirmation Letter, (iii) the commercial paper of Enron is at such time rated "A-2" or better by S&P or "P-2" or better by Moody's (and, if rated by both S&P and Moody's, "A-2" or better by S&P and "P-2" or better by Moody's), respectively, and (iv) such Indebtedness is fully transferable by the holder thereof without any consent by Enron or any other Person (subject to compliance with the registration or qualification requirements of the Securities Act and any state securities laws); and

(h)    so long as (i) the unsecured, unguaranteed senior long-term debt obligations of Enron are rated "BBB-" or better by S&P or "Baa3" or better by Moody's (and, if rated by both S&P and Moody's, "BBB-" or better by S&P and "Baa3" or better by Moody's) and (ii) no change shall have been made in the rating system employed by Servicer (as defined in the Sequoia Sale and Servicing Agreement) on the date hereof in order to assign any rating referred to in the definition of "E-Rating" in the Sequoia Sale and Servicing Agreement with the result that, after giving effect to such change, Account Obligors (as so defined) assigned the rating of "E-5" or higher by the Servicer would to any material extent (assuming such Account Obligors are rated) fail to be rated at least "*investment grade*" (i.e., "Baa3/BBB-" or higher) by one or more nationally recognized statistical rating organizations (whether or not then actually rated by any such organization), the Qualifying Percentage of Structured Securities.

"*Core Permitted Assets*" will not include any obligations or ~~securities~~ denominated in a currency other than Dollars. In addition, none of the proceeds from any Indebtedness for borrowed money owing to the Company by any Subsidiary of Enron shall be applied for any purpose that entails a violation of Regulation U issued by the Board of Governors of the Federal Reserve System.

*Core Permitted Assets Coverage Ratio* - on any date, the ratio of (a) the aggregate outstanding principal amount of Core Permitted Assets held by the Company on such date to (b) the sum of (i) the Aggregate Liquidation Preference on such date **plus** (ii) accumulated and unpaid Preferred Distribution on such date **plus** (iii) the aggregate outstanding principal amount of all Indebtedness of the Company outstanding on such date. In computing the Core Permitted Assets Coverage Ratio:

(A) If and for so long as the obligor on any Core Permitted Asset fails to make, when due, any payment of principal thereof or interest thereon (subject to the satisfaction of any applicable notice requirement and the lapse of any applicable grace period), the Core Permitted Asset Coverage Ratio will be computed as if the outstanding principal amount of such Financial Asset were equal to zero. A failure of a primary obligor to make any such payment will not be deemed to be a failure for purposes of this clause (A) to the extent such payment is timely made by any guarantor thereof.

(B) If and for so long as a Parent Default has occurred and is continuing (but subject to paragraph (A) above), the Core Permitted Assets Coverage Ratio will, insofar as Core Permitted Assets consist of Indebtedness owing by Enron or any of its Subsidiaries to the Company, be computed as if the outstanding principal amount of such Indebtedness were equal to zero.

(C) If and for so long as a Parent Default has occurred and is continuing (but subject to paragraph (A) above), the Core Permitted Assets Coverage Ratio will, insofar as Core Permitted Assets consist of Structured Securities, be computed as if the outstanding principal amount of such Structured Securities were equal to zero.

(D) If and for so long as an Insolvency Event has occurred with respect to (i) Enron or (ii) any Subsidiary of Enron, in each case, that is an obligor on (x) any Indebtedness owing to the Company or (y) any Account, Instrument or General Intangible (each, as defined in the UCC) to the extent payments in respect of Structured Securities held by the Company depend, in whole or in part, on cashflows therefrom, then the outstanding principal amount of such Indebtedness will be deemed to be equal to zero or the outstanding principal amount of such Structured Securities held by the Company will be deemed not to exceed the aggregate principal amount of Accounts, Instruments and General Intangibles (determined without duplication) owing by obligors not subject to an Insolvency Event.

*Day* - a calendar day; provided, however, that, if any period of Days referred to in this Agreement shall end on a Day that is not a Business Day, then the expiration of such period shall be automatically extended until the end of the first succeeding Business Day.

*Delaware Certificate* - Recital 1.

*Depreciation* - for each fiscal year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to Property for such fiscal year, except that (A) with respect to any Property the Book Value of which differs from its adjusted tax basis for Federal income tax purposes and which difference is being eliminated by use of the *"remedial method"* pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such fiscal year shall be the amount of book basis recovered for such fiscal year under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2), and (B) with respect to any other Property the Book Value of which differs from its adjusted tax basis at the beginning of such fiscal year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any Property at the beginning of such fiscal year is zero, Depreciation with respect to such Property shall be determined with reference to such beginning value using any reasonable method selected by the Class A Member.

*Determination Date* - the date which is two London Banking Days prior to the first day of any Quarterly Period.

*Dispose, Disposing* or *Disposition* - with respect to any asset (including a Unit or any portion thereof), a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by operation of Law, including the following: (a) in the case of an asset owned by a natural person, a transfer of such asset upon the death of its owner, whether by will, intestate succession or otherwise; (b) in the case of an asset owned by an entity, (i) a merger or consolidation, share exchange or other business combination of or involving such Person (except where such entity is the survivor thereof other than as a subsidiary of another Person), (ii) a conversion of such entity into another type of entity, or (iii) a distribution of such asset, including in connection with the dissolution, liquidation, winding-up or termination of such entity (other than a liquidation solely for tax purposes); and (c) a disposition in connection with, or in lieu of, a foreclosure of an Encumbrance; but such terms shall not include the creation of an Encumbrance.

*Dissolution Event* - Section 11.01.

*Distribution Amounts* - any amount distributed in respect of a Unit, including in the case of a Class C Unit the Preferred Distribution Amount.

*Distribution Dates* - February 28, May 28, August 28 and November 28 of each year, commencing with February 28, 2001 and ending with the Termination Date; provided that if any Distribution Date would otherwise fall on a day that is not a Business Day, then the relevant Distribution Date will be the first following day that is a Business Day unless that day falls in the next calendar month, in which case that date will be the first preceding day that is a Business Day.

*Dollars* or *$* - lawful currency of the United States of America.

*ECIC* - introductory paragraph.

*Encumbrance* - with respect to any property, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such property. For purposes hereof, a Person shall be deemed to own subject to an Encumbrance any property that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such property.

*Enron* - introductory paragraph.

*Enron Affiliate* - Section 3.01(c).

*Enron Confirmation Letter* - form of confirmation letter attached as Exhibit A-1 or Exhibit A-2.

*Enron Securities* - any debt or equity securities issued by Enron or any Enron Affiliate, including any shares issued in connection with any subdivision, consolidation or reclassification of such securities or upon conversion thereof or exchange therefor, or any distribution or dividend of any securities or other Property (other than Cash) thereon.

*EOG Share Exchange Agreement* - that certain Share Exchange Agreement dated as of July 19, 1999 by and between Enron and Enron Oil & Gas Company (now called EOG Resources Inc.).

*Financial Assets* - means (a) Core Permitted Assets; (b) Structured Securities; and (c) other debt obligations or debt securities; provided that *"Financial Assets"* will not include (i) any obligations or securities that provide for the extension of the original stated maturity thereof without the consent of any holder thereof affected thereby, (ii) any obligations or securities that require the holder thereof to make advances to, or to purchase additional obligations or securities issued by, the issuer of such obligations or securities after the original date of issuance of such obligations or securities or (iii) any obligation or security (other than any Structured Security or any Qualifying Enron CP) for which the original issue price or the discounted purchase price (expressed as a percentage of the stated principal amount thereof) is less than 95%.

*First Amended LLC Agreement* - Recital 1.

*Floating Rate CP Index* - *"USD-CP-H.15"* as defined in Section 7.1(s)(xi) of the 2000 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. with a Designated Maturity (as defined in such 2000 Definitions) not longer than three months and a Reset Date (as so defined) occurring not less frequently than every three months.

*Formation Date* - Recital 1.

*Full Redemption* - Section 3.07(a).

*GAAP* - Generally accepted accounting principles consistently applied and maintained, as in effect from time to time in the United States of America.

*Global* - introductory paragraph.

*Governmental Authority* (or *Governmental*) - a federal, state, local or foreign governmental authority; a state, province, commonwealth, territory or district thereof; a county or parish; a city, town, township, village or other municipality; a district, ward or other subdivision of any of the foregoing; any executive, legislative or other governing body of any of the foregoing; any agency, authority, board, department, system, service, office, commission, committee, council or other administrative body of any of the foregoing; any court or other judicial body; and any officer, official or other representative of any of the foregoing.

*Guarantee* - a guarantee, an endorsement, a contingent agreement to purchase or to furnish funds for the payment or maintenance of, or otherwise to be or become contingently liable under or with respect to, the Indebtedness, other obligations, net worth, working capital or earnings of any Person, or a guarantee of the payment of dividends or other distributions upon the shares or equity interests of any Person, or an agreement to purchase, sell or lease (as lessee or lessor) Property, products, materials, supplies or services primarily for the purpose of enabling a debtor to make

payment of such debtor's obligations or an agreement to assure a creditor against loss, and including causing a bank or other financial institution to issue a letter of credit or other similar instrument for account of the guaranteeing Person for the benefit of another Person, but excluding endorsements for collection or deposit in the ordinary course of business. The words *Guarantee* and *Guaranteed* used as a verb shall have a correlative meaning.

     *including* - including, without limitation.

     *Indebtedness* - with respect to any Person, (a) obligations of such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person), (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable arising in the ordinary course of business so long as such trade accounts payable are payable within 90 days of the date the respective Property is delivered or the respective services are rendered, (c) indebtedness of others secured by a lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person, (d) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for account of such Person, (e) capital lease obligations of such Person, and (f) indebtedness of others Guaranteed by such Person.

     *Indemnification Agreement* - the Indemnification Agreement between Enron and the Company dated the Closing Date related to representations, warranties and indemnities made by Enron in respect of Other Assets.

     *Indemnified Person* - Section 7.04.

     *Insolvency Event* - with respect to any Person, such Person (1) shall be dissolved or liquidated under and in accordance with the statutory procedures of its jurisdiction of formation or organization; (2) shall be adjudged insolvent or generally unable to pay its debts as they become due; (3) shall make a general assignment, arrangement or composition with or for the benefit of its creditors; (4) shall institute or have instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency Law or other similar Law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 90 days of the institution or presentation thereof; (5) shall have a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger or a liquidation or winding up primarily for purposes of applicable tax Laws and regulations); (6) shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its Property; (7) shall have a secured party take possession of all or substantially all its Property or have a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its Property and such secured

party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) shall cause or become subject to any event with respect to it which, under the applicable Laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

*Investco* - introductory paragraph.

*Investment Company Act* - The Investment Company Act of 1940, as amended from time to time.

*Law* - any applicable constitutional provision, statute, act, code (including the Code), law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a Governmental Authority having valid jurisdiction.

*LIBOR* - with respect to any Quarterly Period, the rate per annum determined by reference to the London Interbank Offered Rate for Dollar deposits for the relevant Quarterly Period as set forth on the LIBOR Page at 11:00 a.m., London time, on the applicable Determination Date; provided that (a) if such rate is determined by reference to the Reuter's Screen LIBO Page, such rate shall be the arithmetic average of the rates quoted on such page (rounded upward, if necessary, to the nearest 1/100th of 1%) and (b) if such rate is not available on any given Determination Date, LIBOR for such period shall be determined with reference to the arithmetic average (rounded upward, if necessary, to the nearest 1/16th of 1%), as computed by the Calculation Agent, of the rates at which deposits in Dollars are offered by three Reference Banks at approximately 11:00 a.m., London time, on such Determination Date to prime banks in the London interbank market for such Quarterly Period. For the purposes of this definition, "*Reference Banks*" means three major banks in the London interbank market for Dollar deposits as selected by the Class C Member. "*LIBOR*" for the first Quarterly Period shall be the rate mutually agreed by the Class A Member and the Majority Class C Member on or prior to the Closing Date.

*LIBOR Page* - the display designated as Page 3750 on the Bridge Information Systems Service and, if such page is not available, the Reuter's Screen LIBO Page (or such other page as may replace such pages on such services for the purpose of displaying London interbank offered rates of major banks).

*Liquidation Preference* – with respect to any Class C Unit on any date of determination, (a) the Aggregate Liquidation Preference on such date divided by (b) the number of all Outstanding Class C Units on such date.

*LLC Agreement* - Recital 1.

*London Banking Day* - any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

*Majority Class B Member* - one or more Class B Members holding more than 50% of the Outstanding Class B Units.

*Majority Class C Member* - one or more Class C Members holding more than 50% of the Outstanding Class C Units.

*Management* - Introductory paragraph.

*Mandatory Redemption Date* - Section 3.08.

*Mark-to-Market Event* - any of the following: (a) the acquisition of a Unit in the Company by any new or existing Member or the increase in a Member's Capital Account in exchange for more than a *de minimis* capital contribution to the Company; (b) the distribution by the Company to a Member of more than a *de minimis* amount of Property as consideration for a Unit in the Company or the increase in a Member's Capital Account; and (c) the liquidation of the Company within the meaning of U.S. Treasury Regulations Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Code); provided that adjustments pursuant to clauses (a) and (b) above shall be made only if the Class A Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

*Market Spread* - 1.25% per annum.

*Material Adverse Effect* - a material adverse effect on (a) the business, Property, operations or condition, financial or otherwise, of the Company, (b) the ability of the Company to perform any of its obligations under this Agreement or any of the other Relevant Documents to which it is a party or (c) the rights of or benefits available to any Class C Member under this Agreement or any of the other Relevant Documents.

*Member* - any Class A Member, Class B Member, or Class C Member.

*Member Nonrecourse Debt* - the meaning assigned to the term *"partner nonrecourse debt"* in Treasury Regulation Section 1.704-2(b)(4).

*Member Nonrecourse Debt Minimum Gain* - the meaning assigned to the term *"partner nonrecourse debt minimum gain"* in Treasury Regulation Section 1.704-2(i)(2).

*Member Nonrecourse Deductions* - the meaning assigned to the term *"partner nonrecourse deductions"* in Treasury Regulation Section 1.704-2(i)(1).

*Membership Interest* - with respect to any Member, (a) that Member's status as a Member; (b) that Member's right to receive distributions from the Company; (c) all other rights, benefits and privileges enjoyed by that Member (under the Act, this Agreement, or otherwise) in its capacity as a Member of any class, including that Member's rights to vote, consent and approve and otherwise to participate in the management of the Company; and (d) all obligations, duties and liabilities imposed on that Member (under the Act, this Agreement or otherwise) in its

361302_8.DOC                    14

capacity as a Member, including any obligations to make Capital Contributions. Each Member's Interest is represented by the Units owned by that Member.

*Minimum Gain* - the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

*Moody's* - Moody's Investors Service, Inc. and its successors.

*Nonrecourse Deductions* - the meaning assigned to that term in Treasury Regulation Section 1.704-2(c).

*Nonrecourse Liability* - the meaning assigned to that term in Treasury Regulation Section 1.752-1(a)(2).

*Other Assets* - the Company's ownership interests in the Company Subsidiaries and, while held by the Company prior to their contribution or other transfer to a Company Subsidiary, Company Subsidiary Asset No. 1, Company Subsidiary Asset No. 2, Company Subsidiary Asset No. 3, Company Subsidiary Asset No. 4 and any other assets, securities or interests (including Enron Securities) received by the Company from time to time from a Class A Member or Class B Member or acquired by the Company for transfer to a Company Subsidiary and which are thereafter contributed or otherwise transferred to a Company Subsidiary, including any interest in, of or with respect to any Person (debt, equity, residual or otherwise), provided that *"Other Assets"* shall not include any equity investment which does not have as one of its constituent characteristics a limitation on the liability of the owner thereof to the amount of the investment involved therein and whether or not subject to any related liability).

*Outstanding* - as of any date, Units theretofore issued by the Company except (a) any Units theretofore cancelled or delivered to the Company for cancellation, or redeemed by the Company and (b) any Units as to which the Company or any Subsidiary of the Company is the Record Holder.

*Parent Default* - means Enron or any of its Principal Subsidiaries (as defined below) shall (i) fail to pay any principal of or premium or interest on any Debt (as defined below) that is outstanding in the principal amount of at least $100,000,000 in the aggregate, of Enron or such Principal Subsidiary (as the case may be), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or (ii) default in the observance or performance of any covenant or obligation contained in any agreement or instrument relating to any such Debt or permit or suffer any other event to occur or condition to exist under any agreement or instrument relating to any such Debt that in substance is customarily considered a default in loan documents (in each case, other than a failure to pay specified in clause (i) of this definition) and such default or other event or condition shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect thereof is to accelerate the maturity of such Debt or require such Debt to be prepaid prior to the stated maturity thereof; for the avoidance of doubt the parties acknowledge and agree that (A) the "other" events or conditions referred to in clause (ii) of this definition do not include (1) mandatory

prepayments required on borrowing base or similar loans, (2) changes in law or judicial, executive or administrative interpretation, or the tax, accounting, regulatory or other treatment of the payments or transactions under or in connection with any such agreement or instrument or the failure or inability of any Person to achieve its desired tax, accounting or regulatory treatment in connection with such transactions, (3) increased costs or the failure or inability of any Person to limit costs in connection with such transactions, (4) the sale, other disposition or collection of any assets or collection of any insurance, condemnation or other proceeds, (5) the failure of any Person to achieve or maintain specified credit ratings published or issued by credit rating agencies, (6) fluctuations in interest rates, stock market prices, commodities or other prices or indexes, or (7) any other prepayment provision in such agreement or instrument that is of a type customarily included in loan documents if the prepayment is not required as a result of a failure to meet any financial test and (B) any payment required to be made under a guaranty of payment or collection described in clause (c) of the definition of Debt below shall be due and payable at the time such payment is due and payable under the terms of such guaranty (taking into account any applicable grace period) and such payment shall be deemed not to have been accelerated or required to be prepaid prior to its stated maturity as a result of the obligation guaranteed having become due.

For purposes of this definition only, the capitalized terms used herein shall have shall have the following meanings:

- <u>Consolidated</u> refers to the consolidation of the accounts of Enron and its Subsidiaries in accordance with GAAP.

- <u>Debt</u> of any Person means, at any date, without duplication, its (a) obligations for the repayment of money borrowed that are or should be shown on a balance sheet as debt in accordance with GAAP, (b) obligations as lessee under leases which, in accordance with GAAP, are capital leases, and (c) guaranties of payment or collection of any obligations described in clauses (a) and (b) of other Persons, provided, that clauses (a) and (b) include, in the case of obligations of Enron or any Subsidiary, only such obligations as are or should be shown as debt or capital lease liabilities on a Consolidated balance sheet in accordance with GAAP; provided, further, that the liability of any Person as a general partner of a partnership for Debt of such partnership, if such partnership is not a Subsidiary of such Person, shall not constitute Debt.

- <u>GAAP</u> means United States generally accepted accounting principles and policies consistent with those applied in the preparation of the audited consolidated financial statements of Enron and its Subsidiaries as of December 31, 1999.

- <u>Person</u> means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, firm or other entity, or a government or any political subdivision or agency, department or instrumentality thereof.

- Principal Subsidiary means as of any date of determination, any Subsidiary having consolidated assets (less any debt of such Subsidiary and any of such Subsidiary's consolidated subsidiaries with respect to which Enron has not guaranteed payment) equal to or greater than 5% of Enron's consolidated assets; provided that, as of any date of determination, each of the following named entities shall be deemed to be a Principal Subsidiary (but only if such entity is a "Subsidiary" as of such date of determination) without regard to the consolidated assets test described above in this definition:  Houston Pipe Line Company, Transwestern Pipeline Company, Northern Natural Gas Company, Enron North America Corp., and Enron Pipeline Company.  For purposes of this definition, (a) consolidated assets of a Subsidiary shall be determined based on the most recent quarterly or annual consolidated financial statements of such Subsidiary available prior to such determination, and (b) consolidated assets of Enron shall be determined based on the most recent quarterly or annual consolidated financial statements of Enron available prior to such determination.

- Subsidiary of any Person means any corporation, partnership, joint venture, or other entity of which more than 50% of the outstanding capital stock or other equity interests having ordinary voting power (irrespective of whether or not at the time capital stock or other equity interest of any other class or classes of such corporation, partnership, joint venture, or other entity shall or might have voting power upon the occurrence of any contingency) is at the time owned directly or indirectly by such Person; provided, however, that no such corporation, partnership, joint venture or other entity shall (a) constitute a Subsidiary of Enron, unless such entity is a Consolidated Subsidiary of Enron, or (b) constitute a Subsidiary of any other Person, unless such entity would appear as a consolidated subsidiary of such Person on a consolidated balance sheet of such Person prepared in accordance with GAAP.  Unless otherwise provided or the context otherwise requires, the term "Subsidiary" when used herein shall refer to a Subsidiary of Enron.

*Partial Redemption* - Section 3.07(a).

*Partial Redemption Percentage* – with respect to any Partial Redemption, the percentage reduction in the Aggregate Liquidation Preference of all Outstanding Class C Units, as specified in the notice of redemption delivered to each Class C Member in accordance with Section 3.07.

*Permitted Assets* - Financial Assets and Other Assets provided that no Other Asset (including the Company's ownership interest in the Company Subsidiaries) shall constitute a *"Permitted Asset"* unless the Company shall be indemnified by Enron for any and all losses, costs, liabilities, damages or expenses that may arise from the Company's acquisition, ownership or Disposition of such Other Asset pursuant to the Indemnification Agreement.

*Permitted Transfer* - Section 3.03(a)(ii).

*Person* - the meaning assigned that term in Section 18-101(12) of the Act and also includes a Governmental Authority and any other entity.

*Potential Specified Event* – any event or condition that, with the giving or lapse of time or both, would result in the occurrence of a Specified Event

*Preferred Applicable Rate* - with respect to each Quarterly Period, LIBOR for such Quarterly Period plus 1.0202% per annum; provided that so long as a Specified Event shall have occurred and be continuing, the Preferred Applicable Rate will increase to the Specified Event Rate as provided in Section 5.05.

*Preferred Distribution Amount* - Section 5.03.

*Preferred Return* - with respect to Class C Units for any Quarterly Period, an amount equal to (a) the Preferred Applicable Rate for such Quarterly Period multiplied by (b) a fraction, the numerator of which is the number of days in such Quarterly Period and the denominator of which is 360 multiplied by (c) the sum of (i) the Liquidation Preference attributable to such Class C Unit as of the beginning of such Quarterly Period and (ii) all unpaid Preferred Return accumulated prior to such Quarterly Period in respect of such Class C Unit (whether or not payment is limited in accordance with Section 5.03) provided that, for so long as Investco holds Class C Units, the Preferred Return for any Quarterly Period shall be increased by an amount equal to the Additional Transaction Costs for such Quarterly Period (as identified in a certificate furnished by Investco to the Company setting forth in reasonable detail the basis and amount of each request for compensation for Additional Transaction Costs).

*Profits* and *Losses* - for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of *"Profits"* and *"Losses"* shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to U.S. Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of *"Profits"* and *"Losses"* shall be subtracted from such taxable income or loss;

(c)     In the event the Book Value of any asset is adjusted pursuant to a Mark-to-Market Event, the amount of such adjustment shall be treated as an item of gain (if the adjustment

increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the Disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d)    Gain or loss resulting from any Disposition of Property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the Property Disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Book Value;

(e)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year, computed in accordance with the definition of Depreciation;

(f)    To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's Unit in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the Disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(g)    Any items that are allocated pursuant to Section 6.03 shall not be taken into account in computing Profits and Losses.

*Property* - any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

*Qualifying Enron CP* - any Indebtedness referred to in clause (f) or (g) of the definition of "*Core Permitted Assets*".

*Qualifying Percentage* - with respect to any Structured Securities, the ratio (expressed as a percentage) of (a) the sum of (i) the aggregate principal amount of Qualifying Enron CP securing such Structured Securities plus (ii) the aggregate principal amount of Accounts rated "E-5" or better in accordance with Enron's internal "E" rating system securing such Structured Securities (in each case, to the extent such security is secured by first priority perfected security interest, subject to no other liens, adverse claims or other encumbrances) to (b) the aggregate principal amount of such Structured Securities.

*Quarterly Period* - each period from, and including, one Distribution Date to, but excluding, the next following Distribution Date, provided that (a) the initial Quarterly Period will commence on, and include, the Closing Date and end on the first Distribution Date, and (b) the final Quarterly Period will end on, but exclude, the Termination Date.

*Rating Agencies* - Moody's and S&P.

*Record Holder* - A Person who is listed as the beneficial owner of any Unit in the Company Register.

*Redemption* - Section 3.07.  The words *Redeem* and *Redeemed*  shall have a correlative meaning.

*Relevant Documents* -  (a) this Agreement, (b) any documentation evidencing or otherwise relating to any Core Permitted Asset (including the Sequoia Documents and any Enron Confirmation Letter), and (c) any other documents entered into by any Member in connection with the foregoing.

*S&P* -  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

*Second Amended LLC Agreement* - Recital 1.

*Securities Act* - the Securities Act of 1933, as amended.

*Sequoia* -  Sequoia Financial Assets, LLC.

*Sequoia Documents* - the Certificated Note (as defined in the Sequoia Note Purchase Agreement), the Sequoia LLC Agreement, the Sequoia Note Purchase Agreement, the Sequoia Security Agreement and the Sequoia Sale and Servicing Agreement.

*Sequoia LLC Agreement* – the Limited Liability Company Agreement of Sequoia dated as of May 28, 1999, as amended and restated in connection with the execution and delivery of the Sequoia Note Purchase Agreement and as further modified and supplemented and in effect from time to time.

*Sequoia Note Purchase Agreement* -  the Note Purchase Agreement to be entered into between Sequoia and the Company, as modified and supplemented and in effect from time to time, provided that the Company shall not enter into any such Note Purchase Agreement unless the Majority Class C Member shall have approved the form and substance of such Note Purchase Agreement and each of the other Sequoia Documents (in the case of each other Sequoia Document other than the Certified Note, as amended and restated in connection with the execution and delivery thereof).

*Sequoia Sale and Servicing Agreement* - the Sale and Servicing Agreement dated May 28, 1999 between Sequoia, Enron, Enron Capital and Trade Resources Corp.(now Enron North America Corp.), Enron Power Marketing, Inc. and the other Enron Affiliates that may become a party thereto from time to time, as amended and restated in connection with the execution and delivery of the Sequoia Note Purchase Agreement and as further modified and supplemented and in effect from time to time.

*Sequoia Security Agreement* – the Security Agreement of Sequoia dated as of May 28, 1999, as amended and restated in connection with the execution and delivery of the Sequoia Note Purchase Agreement and as further modified and supplemented and in effect from time to time.

*Sharing Ratio* - subject in each case to adjustments in accordance with this Agreement or in connection with Dispositions of Units, the percentage specified for a Class A Member or Class B Member as its Sharing Ratio on Schedule I; provided, however, that the total of all Sharing Ratios shall always equal 100%. No Class C Member shall have a Sharing Ratio as such, its rights to receive Preferred Distribution Amounts and allocations of Profits and Losses being determined by the express provisions of Articles 5 and 6, and its rights and obligations regarding Redemptions being determined pursuant to Section 3.07.

*Smith Street* - introductory paragraph.

*Specified Event* - Section 5.05.

*Specified Event Rate* - with respect to a Class C Unit, the sum of (i) the Preferred Applicable Rate (determined as if no Specified Event had occurred and was continuing) in effect on such date plus (ii) 2%.

*Specified Price* - with respect to any Class C Unit, the sum of (a) the Liquidation Preference of such Class C Unit plus (b) all unpaid Preferred Return with respect to such Class C Unit accumulated to but excluding the date of payment of the Specified Price; provided that, in connection with a Partial Redemption of Class C Units, the *"Specified Price"* shall be the sum of (i) the Partial Redemption Percentage of the Liquidation Preference for such Class C Unit (calculated prior to giving effect to such Partial Redemption) plus (ii) all unpaid Preferred Return with respect to such Class C Unit accumulated to but excluding the date of payment of the Specified Price.

*Structured Security* or *Structured Securities* - Monthly Notes and Interim Notes (each, as defined in the Sequoia Note Purchase Agreement) issued from time to time by Sequoia to the Company pursuant to the Sequoia Note Purchase Agreement and the Sequoia Sale and Servicing Agreement and represented by the Certificated Note (as defined in the Sequoia Note Purchase Agreement).

*Sub Asset No. 1 Items* - all items of income, gain, loss, deduction and credit and other tax items arising from or related to any securities or property of Company Subsidiary Asset No. 1 held from time to time by the Company.

*Sub Asset No. 2 Items* - all items of income, gain, loss, deduction and credit and other tax items arising from or related to any securities or property of Company Subsidiary Asset No. 2 held from time to time by the Company.

*Sub Asset No. 3 Items* - all items of income, gain, loss, deduction and credit and other tax items arising from or related to any securities or property of Company Subsidiary Asset No. 3 held from time to time by the Company.

*Sub Asset No. 4 Items* - all items of income, gain, loss, deduction and credit and other tax items arising from or related to any securities or property of Company Subsidiary Asset No. 4 held from time to time by the Company.

*Subsidiary* - with respect to any Person (and whether or not consolidated for financial reporting purposes), any corporation, association, joint venture, partnership, limited liability company or other business entity (whether now existing or hereafter organized) of which at least (i) a majority of the voting stock or other ownership interests having ordinary voting power for the election of directors (or the equivalent) is, at the time as of which any determination is being made, owned or controlled or (ii) the right to manage the business and affairs is possessed, by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

*Tax Matters Partner* – Section 8.01.

*Term* Section 2.06.

*Termination Date* - the 15th anniversary of the Closing Date.

*UCC* - the Uniform Commercial Code as in effect from time to time in the State of Delaware.

*Units* – the Class A Units, Class B Units and Class C Units.

*Unrecovered Liquidation Preference* - with respect to any Class C Unit at any time, the Liquidation Preference less any Redemptions made prior to such time in respect of such Class C Unit.

*1935 Act* - the Public Utility Holding Company Act of 1935, as amended.

Other terms defined herein have the meanings so given them.

1.02    *Construction.* Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) references to Articles and Sections refer to Articles and Sections of this Agreement; (c) references to an Exhibit or Schedule refer to the Exhibits or Schedules attached to this Agreement, which are made a part hereof for all purposes; (d) references to Laws refer to such Laws as they may be amended from time to time, and references to particular provisions of a Law include any corresponding provisions of any succeeding Law; (e) references to money refer to legal currency of the United States of America; (f) references to *"in its sole discretion"* refer to the sole discretion of the specified Person, without taking into consideration any other interests than its own; and (g) references to any Person by name (whether as a defined term or otherwise) shall also be deemed to include such person's successors by merger, consolidation, share exchange, concession or other operation of Law, and by the transfer of all or substantially all of such Person's business or assets and such Person's permitted assigns.

## ARTICLE 2
## ORGANIZATION

2.01  *Formation; Continuation; Amendment and Restatement.*  The Company was formed as a Delaware limited liability company by the filing of the Delaware Certificate, as of the Formation Date. Enron, Smith Street, ECIC and Global were admitted as the Company's initial members pursuant to the LLC Agreement. Caribbean was admitted as a Member pursuant to the First Amended LLC Agreement. Management was admitted as a Member pursuant to the Second Amended LLC Agreement. Management, Enron, Smith Street, ECIC, Global and Caribbean hereby continue the Company, pursuant to the terms and conditions of this Agreement, and Investco shall become a Member of the Company as provided herein. This Agreement amends and restates in its entirety and supersedes the Second Amended LLC Agreement which shall have no further force or effect.

2.02  *Name.*  The name of the Company shall be and continue to be "*Enron Finance Partners, LLC*" and all Company business must be conducted in that name or such other names that comply with Law as the Class A Member may select. The Class A Member shall give each other Member 10 days' prior written notice of any such change.

2.03  *Registered Office; Registered Agent; Principal Office in the United States; Other Offices.*  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 and the registered agent for service of process on the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 or such other Person or Persons as the Class A Member may designate in the manner provided by Law. The principal place of business of the Company in the United States shall be 1400 Smith Street, Houston, Texas, 77002 or other such place as the Class A Member may designate, and the Company shall maintain records there or such other place as the Class A Member shall designate. The Company may have such other offices as the Class A Member may designate.

2.04  *Purposes; Conduct of Business.* (a) The sole purposes of the Company shall be (i) to form, own, hold, operate and dispose of the Membership Interests of the Company Subsidiaries, (ii) to acquire Other Assets (other than the ownership interests in the Company Subsidiaries) and promptly to contribute or Dispose of such Other Assets to the Company Subsidiaries, (iii) to purchase, loan money or credit evidenced by, own, hold, make investments in, participate in, exercise rights with respect to, exploit and dispose of Financial Assets in accordance with this Agreement and to enter into and perform contracts and agreements with respect thereto, (iv) to issue the Units in accordance with this Agreement, (v) to execute, deliver and perform its obligations under, and the Company is hereby authorized by the Members to enter into and to consummate the transactions contemplated by, the Relevant Documents to which it is a party and to perform obligations under its other contracts and **agreements,** including the EOG Share Exchange Agreement in connection with the contribution of certain shares of common stock of EOG Resources Inc. to the Company (which the Company has, in turn, contributed to the Company Subsidiaries) and any

361302_8.DOC

23

documents executed by the Company in connection therewith or in adoption thereof, (vi) to incur or assume Indebtedness (to the extent permitted herein), and (vii) to make distributions to its Members in accordance with this Agreement provided that after the Class C Units have been redeemed in full, the Company may engage in any lawful business for which limited liability companies may be organized under the Laws of the State of Delaware. In addition, the Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary, advisable or convenient to the attainment of the foregoing business purposes of the Company.

(b)    Each of the Members agrees that, so long as the Class C Units are outstanding and unless otherwise directed by the Majority Class C Member, the Company shall:

(i)    not take any action that would result in the occurrence or continued existence of a Specified Event;

(ii)    preserve and maintain its permits, licenses, approvals, privileges and franchises; provided that the Company shall not be required to preserve any permit, license, approval, privilege or franchise if the Class A Member shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and that the loss thereof is not disadvantageous in any material respect to the Company or the Members;

(iii)    comply with the requirements of all applicable Laws, rules, regulations and orders of all Governmental Authorities if the failure to comply with such requirements could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(iv)    maintain adequate books, records, financial statements, accounting records (in which complete entries will be made in accordance with GAAP), bank accounts, if any, and other organizational documents and records separate from those of any other Person and otherwise conduct its business and represent itself to the public as an entity separate from any other Person;

(v)    not enter into any transactions directly or indirectly with or for the benefit of any Affiliate of the Company (including Guarantees and assumptions of obligations of an Affiliate) or acquire obligations or securities of its Affiliates except for (a) transactions relating to the ownership of the Company Subsidiaries and the acquisition of and contribution or Disposition to the Company Subsidiaries of Other Assets, (b) transactions relating to Financial Assets, (c) other transactions expressly contemplated by this Agreement or any of the other Relevant Documents, (d) transactions relating to the incurrence or assumption of Indebtedness (to the extent permitted herein), and (e) transactions entered into by the Company Subsidiaries or another Person with respect to which the Company is not directly or contingently liable;

(vi)    preserve, protect and enforce its rights under each Relevant Document (including, (A) if there occurs or exists (i) a default, event of default or other similar condition or event (however described) in respect of Enron or any of its Subsidiaries under

one or more agreements or instruments relating to Indebtedness of any of them owing to the Company which has resulted in such Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable, (ii) a default by Enron or any of its Subsidiaries in making one or more payments on the due date thereof under any such agreement or instrument (subject to the satisfaction of any applicable notice requirement and the lapse of any applicable grace period) or (iii) a Parent Default and (B) its rights under Section 8.8 of the Sequoia Note Purchase Agreement);

(vii)    preserve, protect and enforce its rights against Enron or any of its Subsidiaries in the event that any of them defaults in its obligations with respect to any Indebtedness owing to the Company;

(viii)    preserve its existence as a limited liability company duly formed, validly existing and in good standing under the law of the State of Delaware;

(ix)    retain internationally recognized independent certified public accountants;

(x)    not use any of the proceeds received by the Company from the issuance of the Class C Units for any purpose that would entail a violation of Regulation U issued by the Board of Governors of the Federal Reserve System;

(xi) not invest in any Structured Securities unless the Majority Class C Member shall have approved the form and substance of such Structured Securities;

(xii)    maintain separate books of account;

(xiii)    observe all its limited liability company formalities (including conducting its business in its own name);

(xiv)    hold itself out to creditors and the public as a legal entity separate and distinct from any other Person, and not hold out its credit as being able to satisfy the obligations of any other Person;

(xv)    pay its own liabilities and obligations from its own separate Property;

(xvi)    maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xvii)    not commingle its Property or funds with the Property or funds of any other Person, participate in a cash management system with any other Person or fail to use its own separate stationery, invoices and checks;

(xviii)    correct any known misunderstandings regarding its separate legal existence or identity; and

(xix)    maintain its Property in such a manner that it is not costly or difficult to segregate, identify or ascertain such Property.

361302_8.DOC

25

2.05  *Foreign Qualification.*  Prior to the Company's conducting business in any jurisdiction other than Delaware, the Class A Member shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Class A Member, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Class A Member, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.06  *Term.*  The period of existence of the Company (the "*Term*") commenced on the Formation Date and shall end at such time as a certificate of cancellation is filed with the Secretary of State of Delaware in accordance with Section 11.03.

## ARTICLE 3
## MEMBERSHIP; DISPOSITIONS OF INTERESTS; CERTIFICATES

3.01  *Members.* (a) Enron, ECIC, Smith Street and Global were admitted to the Company as the initial Members, effective as of the Formation Date, pursuant to the LLC Agreement. Caribbean was admitted as a Member pursuant to the First Amended LLC Agreement. Management was admitted as a Member pursuant to the Second Amended LLC Agreement. Investco is hereby admitted to the Company as Member, effective as of the Closing Date, pursuant to this Agreement.

(b)  Effective as of the Closing Date, there are hereby created three classes of Members in the Company, Class A Members, Class B Members and Class C Members, and each shall have the respective rights accorded it under this Agreement.  Management's Unit shall continue as the Class A Member holding a Class A Unit in the Company; Enron, ECIC, Smith Street, Global and Caribbean shall continue as the Class B Members, each holding a Class B Unit in the Company; and Investco is hereby admitted as the initial Class C Member holding a Class C Unit in the Company.

Each Class A Member shall be issued one membership unit evidencing its Class A Membership Interest (each, a "*Class A Unit*") and each Class B Member shall be issued one membership unit evidencing its Class B Membership Interest (each, a "*Class B Unit*").  One Class A Unit shall be issued to the Class A Member on the Closing Date, subject in each case to receipt by the Company, on or prior to the Closing Date, of such Member's Capital Contribution.  One Class B Unit shall be issued to each Class B Member on the Closing Date, subject in each case to receipt by the Company (except as set forth in the following sentence), on or prior to the Closing Date, of such Member's Capital Contribution.  Enron hereby irrevocably covenants and agrees to make or to cause an Enron Affiliate to make a Capital Contribution, in Cash or in kind in any form of property, tangible or intangible (including a promissory note), having a value not less than US$5,000,000 on or before December 31, 2000.  With respect to each Class B Member so covenanting and agreeing, this Agreement shall constitute such Member's obligation to make a Capital Contribution to the Company with the meaning of Section 18-502 of the Act.  On the Closing Date, subject to receipt by

the Company of the Class C Members' Capital Contribution, 10 membership units evidencing the Class C Membership Interest (each, a *"Class C Unit"*) shall be issued to the initial Class C Members, each representing U.S.$50,000,000 of their capital contribution on the Closing Date. Additional Class A Units and Class B Units may be issued upon the admission of an additional Class A Member or Class B Member in accordance with Section 3.01(c). Except as set forth in Section 3.01(c), no additional Class C Units shall be issued without the consent of each Class C Member. The Units of the Company shall be represented by Certificates as provided in Section 3.09 and record ownership thereof shall be recorded on a Company Register maintained by the Class A Member for such purpose.

(c)     Additional Class A Members and Class B Members, (individually, an *"Additional Member"* and collectively, the *"Additional Members"*) may be admitted to the Company with the consent of the Class A Member provided that no Person other than Enron or an Affiliate of Enron, including any Subsidiary of Enron (each, an *"Enron Affiliate"*), shall be admitted as an Additional Member without the consent of the Majority Class C Member. Additional Class C Members holding Class C Units may be admitted with the consent of the other Class C Members; provided, that the terms of such additional Class C Units shall be identical in all respects to the existing Class C Units and upon the admission of additional Class C Members, the definition of "Aggregate Liquidation Preference" shall be amended (without the necessity of any consent of any Member) to reflect the aggregate liquidation preference of the Class C Units so issued. Such Members may have such preferences, limitations, restrictions and voting and other rights and privileges as the Class A Member shall determine; provided that no such Additional Members shall have rights or privileges (including rights to distributions or voting rights) ranking prior to those of any Class C Member without the consent of the Majority Class C Members as provided in Section 7.01(c). The Class A Member shall give prompt written notice to each Member of the admission of the Additional Member pursuant to this Section 3.01(c). The admission of an Additional Member shall be reflected in an amendment to this Agreement that makes appropriate changes to the Sharing Ratios set forth herein, but any such amendment which does no more than reflect the admission of each Additional Member contemplated by this Section 3.01(c) and the changes in Sharing Ratios associated therewith shall not require the approval of any other Member pursuant to Section 7.01(c).

(d)     Each Unit and the Certificate evidencing such Unit shall constitute *"securities"* within the meaning of and governed by Article 8 of the Uniform Commercial Code as in effect in the States of Delaware, New York, Texas and any other States of the United States.

3.02    *Representations, Warranties and Covenants.* Each Member hereby represents, warrants and covenants to the Company and each other Member that the following statements are true and correct as of the Closing Date:

(a)     it is a corporation, limited partnership, limited liability company or other entity duly incorporated or formed, validly existing, and (if applicable) in good standing under the laws of the United States or a political subdivision thereof, with all requisite power to enter into and to perform its obligations under this Agreement, and is duly qualified or registered and in good standing in each other jurisdiction in which the character of the business conducted by it or permitted to be conducted by it requires such qualification or registration, except where the failure to be so

361302_8.DOC

27

qualified would not have a Material Adverse Effect on the business operations or financial condition of the Company;

(b)    its execution, delivery, and performance of this Agreement have been duly authorized by all appropriate action by it and (if required) its stockholders, partners, members or other owners, and this Agreement has been duly executed and delivered;

(c)    its authorization, execution, delivery and performance of this Agreement do not (i) violate its organizational, charter or other constituent documents, (ii) conflict with, result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any other material ("*material*" for purposes of this representation as to Enron meaning creating a liability of $100,000,000 or more) agreement or arrangement to which it is a party or by which it is bound or with any provision of Law to which it is subject or with any permit or license which it has been granted, or (iii) require the filing or registration with, or the approval, authorization or consent of any Governmental Authority other than filings under the Act and state qualification or similar laws contemplated by Section 2.05 and filings which may be required or permitted under applicable securities laws or regulations;

(d)    this Agreement constitutes its valid, binding and enforceable agreement, except to the extent such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as general principles of equity (regardless of whether considered in a proceeding in equity or in law);

(e)    there is no action, suit or proceeding pending, or, to its knowledge is any of such threatened, against it, seeking any injunction, award or other relief that (i) would impair its ability to perform its obligations under this Agreement in any material respect, (ii) questions or challenges the validity or purpose of the Company, or (iii) could materially and adversely affect the Company's operations, properties or business;

(f)    it is acquiring its Unit(s) for its own account and not with a view to the resale or distribution of all or any part thereof in violation of applicable securities Laws; it understands that the Unit(s) being acquired by it have not been registered under the Securities Act or applicable state securities laws and, therefore, it will be necessary for it to continue to hold the Unit(s) being acquired by it and continue to bear the economic risk of the investment therein unless such Unit(s) are registered under the Securities Act and applicable state securities Laws or an exemption from registration is available;

(g)    it is a "*qualified purchaser*" as such term is defined in Section 3(c)(7) of the Investment Company Act and the rules and regulations adopted thereunder;

(h)    it understands that it may not sell or transfer its Unit(s), except in accordance with Section 3.03;

(i)    it acknowledges that it has no right to require the Company to register the offering and sale of its Unit(s) under the Securities Act or any applicable state securities Laws and that the Class A Member has no plan or intention to effect such a registration;

(j)    it has carefully reviewed this Agreement and any other relevant information furnished to it in writing by the Class A Member or any of its Affiliates, and it understands the risks of, and other considerations relating to, an investment in its Unit(s);

(k)    it has been furnished all materials, if any, that it requested relating to the Company and the purchase of Units, and it has been afforded the opportunity to obtain any additional information and to ask all questions it deemed necessary regarding information about the Units, the Company, the Class A Member, its Affiliates, and the Company's business activities, and the Class A Member has given it such answers concerning those matters as it deems sufficient to make an informed investment decision with respect to its investment in the Company;

(l)    it has such knowledge and experience (based on actual participation) in financial and business matters that it is capable of evaluating the merits and risks of an investment in Units and of making an informed investment decision;

(m)    it understands that it may be liable, under certain circumstances as provided in the Act and other applicable Law, to return distributions it has received from the Company;

(n)    it understands that any information furnished to it concerning the federal income tax consequences arising from an investment in the Company is necessarily general in nature, and the specific tax consequences to it of an investment in the Company will depend on its individual circumstances, and it affirms that it has been advised to seek appropriate legal counsel with respect to such tax consequences;

(o)    it understands that the Company is relying on its representations and warranties in selling the Units or recognizing their transfer without registration under the securities Laws;

(p)    in the case of a Class C Member, at the time of its investment in the Company and at all times during the existence of the Company it (A) does not and will not own or operate any facility used for the generation, transmission or distribution for sale of electric energy or any facility used for the retail distribution of natural or manufactured gas, each within the meaning of the Public Utility Holding Company Act of 1935, as amended and the rules and regulations of the Securities and Exchange Commission thereunder (the *"1935 Act"*), (B) is not and will not be an *"electric utility company"* or a *"gas utility company"* within the meaning of the 1935 Act, (C) is not and will not be (1) a *"holding company,"* (2) a *"subsidiary company,"* an *"affiliate"* or *"associate company"* of a *"holding company"* or (3) an *"affiliate"* of a *"subsidiary company"* of a *"holding company,"* each within the meaning of the 1935 Act, and (D) is not and will not be subject to regulation as a public utility, public utility holding company (except to the extent certain acquisitions may be subject to the regulatory approval of the Securities and Exchange Commission pursuant to Section 9(a)(2) of the 1935 Act) or public service company (or similar designation) by any state in the United States, by

361302_8.DOC

the United States, by any foreign country or by any agency or instrumentality of any of the foregoing; and

(q)    at the time of its investment in the Company and at all times during the existence of the Company, it does not and will not constitute an employee benefit plan (as defined in Section 3(3) of ERISA), or a plan (as defined in Section 4975(e) of the Code), or a trustee of any such plan acting on behalf of such plan, or an entity whose underlying assets include plan assets by reason of a plan's investment in the entity other than a governmental plan (as defined in Section 3(32) of ERISA or Section 414(d) of the Code); and if it constitutes a governmental plan, such Class B Member or Class C Member, as the case may be, does not treat itself as subject to the Department of Labor Regulations Section 2510.3-101 or interpret applicable state Law as incorporating similar rules.

3.03    *Dispositions of Membership Interests.* (a)    *General Restriction.*    Neither the Class B Members nor the Class C Members may Dispose of any portion of their Membership Interests without the consent of the Class A Member (which shall not be unreasonably withheld or delayed) and unless all of the requirements of Sections 3.03(b) and (c) are satisfied; provided that (i) if a Specified Event shall have occurred and be continuing, any Class C Member may Dispose of Class C Membership Interests without the consent of the Class A Member (provided the requirements of Section 3.03(b) and 3.03(c) are satisfied) and (ii) any Member may Dispose of its Membership Interests to Enron or an Enron Affiliate (a *"Permitted Transfer"*). Notwithstanding the foregoing, under no circumstances may a Class C Membership Interest be Disposed to a Competitor of Enron. Except as provided in mandatory provisions of the Act and pursuant to this Section 3.03, no right is given to any Member to withdraw from the Company.

No Class A Membership Interest may be transferred to a Person other than Enron or an Enron Affiliate without the consent of the Majority Class C Member.

(b)    *Admission of Assignee as a Member.*    An Assignee has the right to be admitted to the Company as a Member, with the Unit (and attendant Sharing Ratio) so transferred to such Assignee, only if such Disposition is effected in strict compliance with this Section 3.03. An Assignee shall become a substituted Member automatically upon a transfer that complies with this Section 3.03.

(c)    *Requirements Applicable to All Dispositions and Admissions.*    In addition to the requirements set forth in Sections 3.03(a) and 3.03(b), any Disposition of a Unit and any admission of an Assignee as a Member shall also be subject to the following requirements, and such Disposition (and admission, if applicable) shall not be effective unless such requirements are complied with; provided, however, that the non-Disposing Members may waive any of the following requirements:

(i)    *Disposition Documents.* The following documents must be delivered to the non-Disposing Members and must be reasonably satisfactory, in form and substance, to the non-Disposing Members:

(A)    *Disposition Instrument.* A copy of the instrument pursuant to which the Disposition is effected.

(B)    *Ratification of this Agreement.* An instrument, executed by the Disposing Member and its Assignee, containing the following information and agreements, to the extent they are not contained in the instrument described in Section 3.03(c)(i)(A): (I) the notice address of the Assignee; (II) the Sharing Ratios after the Disposition of the Disposing Member and its Assignee (which together must total the Sharing Ratio of the Disposing Member before the Disposition); (III) the Assignee's ratification of this Agreement and agreement to be bound by it, and its confirmation that the representations and warranties in Section 3.02 are true and correct with respect to it; and (IV) representations and warranties by the Disposing Member and its Assignee that the Disposition and admission is being made in accordance with all applicable Laws.

(C)    *Securities Law Opinion.* Unless each Unit subject to the Disposition is registered under the Securities Act and any applicable state securities Law, a favorable opinion of the Company's legal counsel, or of other legal counsel acceptable to the non-Disposing Members, to the effect that (I) the Disposition and admission is being made pursuant to a valid exemption from registration under those Laws and in accordance with those Laws, and (II) that the Disposition and admission will not result in or cause the Company to be required to register as an investment company under the Investment Company Act.

(ii)    *Payment of Expenses.* The Disposing Member and its Assignee shall pay, or reimburse the Company for, all reasonable costs and expenses incurred by the Company in connection with the Disposition and admission, including the legal fees incurred in connection with the legal opinion referred to in Section 3.03(c)(i)(C), on or before the tenth Day after the receipt by that Person of the Company's invoice for the amount due.

(iii)    *No Release.* No Disposition of a Unit shall effect a release of the Disposing Member from any liabilities to the Company or the other Members arising from events occurring prior to the Disposition.

3.04    *Liability to Third Parties.* No Member shall be liable for the debts, obligations or liabilities of the Company.

3.05    *Access to Information.* Each Member shall be entitled to receive any information that it may reasonably request concerning the Company (but not with respect to the Company Subsidiaries or any information precluded by confidentiality or other agreements restricting disclosure); provided, however, that this Section 3.05 shall not obligate the Company or any Member to create any information that does not already exist at the time of such request (other than to convert existing information from one medium to another, such as providing a printout of information that is stored in a computer database). Each Member shall also have the right, upon reasonable notice, and at all reasonable times during usual business hours to inspect the assets of the Company and to audit,

examine and make copies of the books of account and other records of the Company. Such right may be exercised through any agent or employee of such Member designated in writing by it or by an independent public accountant, attorney or other consultant so designated. The Member making the request shall bear all costs and expenses incurred in any inspection, examination or audit made on such Member's behalf. Confidential Information obtained pursuant to this Section 3.05 shall be subject to the provisions of Section 3.06.

3.06    *Confidential Information.*  (a)  Except as permitted by Section 3.06(b), (i) each Member, other than Enron or any Enron Affiliate, shall keep confidential all Confidential Information and shall not disclose any Confidential Information to any Person, including any of its Affiliates, and (ii) each Member, other than Enron or any Enron Affiliate, shall use the Confidential Information only in connection with the business and affairs of the Company.

(b)    Notwithstanding Section 3.06(a), but subject to the other provisions of this Section 3.06, a Member that is subject to Section 3.06(a) may make the following disclosures and uses of Confidential Information (except to the extent the Company or such Member is restricted from such disclosure by contractual provisions or provisions of applicable law):

(i)    disclosures to another Member in connection with the Company;

(ii)    disclosures to a purchaser or its financing parties and their respective advisors and representatives in connection with the Disposition of a Permitted Asset or to a financing party or its advisors and representatives in connection with a financing involving a Permitted Asset;

(iii)    disclosures and uses that are approved by the Class A Member;

(iv)    disclosures that a Member is legally compelled to make by deposition, interrogatory, request for documents, subpoena, civil investigative demand, order of a court of competent jurisdiction, or similar process, or otherwise by Law or securities exchange requirements; provided, however, that, prior to any such disclosure, such Member shall, to the extent legally permissible:

(A)    provide the Class A Member with prompt notice of such requirements so that the Class A Member may seek a protective order or other appropriate remedy or waive compliance with the terms of this Section 3.06(b)(iv);

(B)    consult with the Class A Member on the advisability of taking steps to resist or narrow such disclosure; and

(C)    cooperate with the Class A Member in any attempt to obtain a protective order or other appropriate remedy or assurance that confidential treatment will be afforded the Confidential Information; and in the event such protective order or other remedy is not obtained, or the Class A Member waives compliance with the provisions hereof, such Member agrees (I) to furnish only that portion of the

Confidential Information that it is legally required to furnish and (II) to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information; and

(v)    disclosures to legal, financial and other advisors and lenders (and affiliates of lenders) of such Member, if such Persons have agreed to abide by the terms of this Section 3.06.

(c)    Each Member that is subject to Section 3.06(a) shall take such precautionary measures as may be required to ensure (and such Member shall be legally responsible to each other Member for) compliance with this Section 3.06 by any of its Affiliates, legal and financial advisors, and its and their respective directors, officers, employees and agents.

(d)    Each Member that is subject to Section 3.06(a) and that subsequently ceases to be a Member shall promptly destroy (and provide a certificate of destruction to the Company with respect to), or return to the Company, as directed by the Company, all Confidential Information and copies thereof in its possession.

(e)    Each Member agrees that no adequate remedy at law exists for a breach or threatened breach of any of the provisions of this Section 3.06, the continuation of which unremedied will cause the Company and the other Members to suffer irreparable harm. Accordingly, each Member agrees that the Company and the other Members shall be entitled, in addition to other remedies that may be available to them, to immediate injunctive relief from any breach of any of the provisions of this Section 3.06 and to specific performance of their rights hereunder, as well as to any other remedies available at law or in equity.

(f)    The provisions of this Section 3.06 shall terminate on the second anniversary of the end of the Term.

3.07    *Redemptions at the Option of the Company.* Each Member hereby grants to the Company the right to redeem, or to cause its designee to purchase (which right to purchase the Company hereby transfers in its entirety to Enron), upon exercise as provided in this Section 3.07 (any such purchase or redemption being referred to herein as a *"Redemption"*), all (a *"Full Redemption"*) or any part (a *"Partial Redemption"*) of the Units as provided herein.

(a)    The Company may cause a Full Redemption or Partial Redemption of the Class C Units held by the Class C Members on any Distribution Date on or after the second anniversary of the Closing Date at a price equal to the Specified Price; provided that (i) on the date of any Partial Redemption, the Aggregate Liquidation Preference shall be reduced by an amount equal to the Partial Redemption Percentage multiplied by the Aggregate Liquidation Preference in effect immediately prior to such Partial Redemption, (ii) if at the time of such Redemption there is more than one Record Holder of the Class C Units, any such Redemption shall be made on a pro rata basis (according to proportion of the Aggregate Liquidation Preference represented by the Class C Unit(s) held by each such Record Holder) among the Record Holders of the Class C Units on the record date for such purpose, which record date shall be the Business Day next preceding the