Distribution Date on which such Redemption occurs, and (iii) no Partial Redemption shall be made if a Specified Event has occurred and is continuing or would result therefrom. The Class A Member must give irrevocable written notice to the Class C Member(s) of its exercise of such option not later than 1:00 p.m. New York City time on the date five Business Days prior to the relevant Distribution Date (which notice shall identify the acquiror of the Class C Units (or the Partial Redemption Percentage thereof), if other than a Redemption by the Company). On the Distribution Date on which such Redemption is to be effected as provided above, (i) the Company or the acquiror of the Class C Units (or the Partial Redemption Percentage thereof), as the case may be, shall pay to the Disposing Class C Member an amount equal to the Specified Price; provided, that if the Company is effecting the Redemption, no amounts that represent the proceeds of (1) Sub Asset No. 1 Items shall be used to effect such Redemption until an aggregate of 12.5% of the proceeds of such Sub Asset No. 1 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (2) Sub Asset No. 2 Items shall be used to effect such Redemption until an aggregate of 51% of the proceeds of such Sub Asset No. 2 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (3) No Sub Asset No. 3 Items shall be used to effect such Redemption, or (4) Sub Asset No. 4 Items shall be used to effect such Redemption until an aggregate of such percentage, if any, as the Class A Member has determined to be necessary pursuant to Section 6.01(d) of the proceeds of such Sub Asset No. 4 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, and (ii) against such payment, the Disposing Class C Member shall deliver to such acquiror such transfer documentation as may be reasonably specified by such acquiror and the Class A Member, without recourse, representation or warranty except as provided in Section 8-108 of the Uniform Commercial Code.

(b)     The Company may cause a Full Redemption (but not a Partial Redemption) of the Class B Units held by any Class B Member on any date on or after the fifth anniversary of the Closing Date at a price equal to the balance in such Member's Capital Account at the date fixed for redemption. Any such Full Redemption shall be in the Class A Member's sole discretion, and the Company does not need to afford any other Class B Member the right to participate therein. The Class A Member must give irrevocable written notice to the affected Class B Member of its exercise of such option not later than 1:00 p.m. New York City time on the date five Business Days prior to the relevant date fixed for Redemption (which notice shall state the redemption date and identify the acquiror of the Class B Units, if other than a Redemption by the Company). On the redemption date, (i) the Company or the acquiror of the Class B Units, as the case may be, shall pay to the Disposing Class B Member an amount equal to the Capital Account balance at the redemption date applicable to the Class B Unit being Redeemed from such Disposing Class B Member; provided, that if the Company is effecting the Redemption (unless the Disposing Class B Member is Enron), no amounts that represent the proceeds of (1) Sub Asset No. 1 Items shall be used to effect such Redemption until an aggregate of 12.5% of the proceeds of such Sub Asset No. 1 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (2) Sub Asset No. 2 Items shall be used to effect such Redemption until an aggregate of 51% of the proceeds of such Sub Asset No. 2 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (3) No Sub Asset No. 3 Items shall be used to effect such Redemption, or (4) Sub Asset No. 4 Items shall be used to

effect such Redemption until an aggregate of such percentage, if any, as the Class A Member has determined to be necessary pursuant to Section 6.01(d) of the proceeds of such Sub Asset No. 4 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, and (ii) against such payment, the Disposing Class B Member shall deliver to such acquiror such transfer documentation as may be reasonably specified by such acquiror and the Class A Member, without recourse, representation or warranty except as provided in Section 8-108 of the Uniform Commercial Code.

(c)     The payment of Cash to a Class B Member in connection with a Redemption in accordance with the provisions of Section 3.07(b) constitutes (to the extent of the Redemption) a return to such Class B Member of its Capital Contributions and a distribution to such Class B Member of its Unit and the Company's assets and constitutes a compromise to which all Members have consented pursuant to Section 18-502(b) of the Act.

3.08    *Redemptions at the Option of the Class C Member.*  On the Distribution Date occurring in February, 2001 (if, but only if, the Capital Contributions required to be made pursuant to Section 3.01(b) are not made on or before December 31, 2000), and on the Distribution Date occurring in November, 2005 and on any Distribution Date thereafter, any Class C Member shall have the option, exercisable by notice to the Class A Member on or before the 60th day prior to the Distribution Date on which such Class C Member wants its Class C Unit to be Redeemed (in the case of the Distribution Date occurring in February, 2001, if applicable, on or before January 15, 2001), to require the Company to make Full Redemption (or to cause one of its Affiliates to make Full Redemption), of all of the Class C Units held by such Class C Member at a price equal to the Specified Price.  On the Distribution Date fixed for Redemption (the "*Mandatory Redemption Date*"), (i) the Company or the acquiror of the Class C Units, as the case may be, shall pay to the Disposing Class C Member an amount equal to the Specified Price; provided, that if the Company is effecting the Redemption, no amounts that represent the proceeds of (1) Sub Asset No. 1 Items shall be used to effect such Redemption until an aggregate of 12.5% of the proceeds of such Sub Asset No. 1 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (2) Sub Asset No. 2 Items shall be used to effect such Redemption until an aggregate of 51% of the proceeds of such Sub Asset No. 2 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, or (3) No Sub Asset No. 3 Items shall be used to effect such Redemption, or (4) Sub Asset No. 4 Items shall be used to effect such Redemption until an aggregate of such percentage, if any, as the Class A Member has determined to be necessary pursuant to Section 6.01(d) of the proceeds of such Sub Asset No. 4 Items shall have been distributed to or set aside for distribution to Enron or any Member that is a wholly-owned Enron Affiliate, and (ii) against such payment, the Disposing Class C Member shall deliver to such acquiror such transfer documentation as may be reasonably specified by such acquiror and the Class A Member, without recourse, representation or warranty except as provided in Section 8-108 of the Uniform Commercial Code.

3.09    *Certificates.*  Certificates ("*Certificates*") evidencing Units shall be in such form, not inconsistent with that required by the Act or any other Law and this Agreement, as shall be approved by the Class A Member.  The Company shall issue to each Member who has so requested a Certificate, one or more Certificates, signed by the Class A Member on behalf of the Company

361302_8.DOC

certifying the number of Units and the class and series of such Units owned by such Member; provided, however, that the signature on the Certificate may be facsimile. In case the Class A Member who shall have signed or whose facsimile signature shall have been placed upon any such Certificate or Certificates shall have ceased to be such Class A Member before such Certificate is issued by the Company, such Certificate may nevertheless be issued by the Company with the same effect as if such person were such Class A Member at the date of issue. Certificates shall be consecutively numbered and shall be entered in the Company Register as they are issued and shall exhibit the Record Holder's name and number of Units.

    3.10    *Register, Registration of Transfer and Exchange.* (a) The Class A Member shall keep or cause to be kept on behalf of the Company a register (the "*Company Register*") that, subject to the provisions of Section 3.10(b), will provide for the registration and transfer of Units. The Company shall not recognize Dispositions of Units unless the same are effected in the manner described in this Section 3.10 and in accordance with Section 3.03. Upon surrender for registration of transfer of any Certificate, and subject to the provisions of Section 3.10(b), the Class A Member of the Company shall execute and deliver on behalf of the Company, in the name of the Record Holder or the designated transferee or transferees, as required pursuant to the Record Holder's instructions, one or more new Certificates evidencing the same aggregate number and type of Units as was evidenced by the Certificate so surrendered.

        (b)    The Company shall not recognize any Disposition of Units until the Certificates evidencing such Units are surrendered to the Company for registration of transfer and the non-Disposing Member receives the documents required to be delivered pursuant to Section 3.03(c)(i). No charge shall be imposed by the Company for such transfer, provided, that, as a condition to the issuance of any new Certificate under this Section 3.10, the Company may require the payment of a sum sufficient to cover any tax or other Governmental charge that may be imposed with respect thereto.

        (c)    The Company shall not recognize any Disposition of any Unit if as a result of such Disposition (i) the Company would be treated as a publicly traded partnership for Federal income tax purposes or (ii) the Company would be an "*investment company*" required to register as such under the Investment Company Act.

        (d)    By transfer of Units in accordance with Section 3.03 and this Section 3.10, the transferor shall be deemed to have given the transferee the right to be admitted to the Company as a Member, and each transferee of Units shall become a Member with respect to the Units so transferred to such Person when any such transfer and admission is reflected in the books and records of the Company.

        (e)    The Company shall be entitled to recognize the Record Holder as the owner of Units and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person, whether or not the Company shall have actual or other notice thereof, except as otherwise provided by Law.

361302_8.DOC

(f)     Each distribution in respect of Units shall be paid by the Company, directly or through any other Person or agent, only to the Record Holders thereof as of the record date set for the Distribution. Such payment shall constitute full payment and satisfaction of the Company's liability in respect of such payment, regardless of any Claim of any Person who may have an interest in such payment by reason of an assignment or otherwise.

3.11     *Mutilated, Destroyed, Lost or Stolen Certificates.*  (a) If any mutilated Certificate is surrendered to the Company, then the Class A Member on behalf of the Company shall execute and deliver in exchange therefor, a new Certificate evidencing the same aggregate number and type of Units as the Certificate so surrendered.

(b)     The Class A Member on behalf of the Company shall execute and deliver, a new Certificate in place of any Certificate previously issued if the Record Holder of the Certificate:

(i)     makes proof by affidavit, in form and substance satisfactory to the Class A Member, that a previously issued Certificate has been lost, destroyed or stolen;

(ii)     requests the issuance of a new Certificate before the Company has notice that the Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse Claim;

(iii)     if requested, delivers to the Company a bond, in form and substance satisfactory to the Class A Member, with surety or sureties and with fixed or open penalty as the Class A Member may reasonably direct, in its sole discretion, to indemnify the Company against any Claim that may be made on account of the alleged loss, destruction or theft of the Certificate; and

(iv)     satisfies any other reasonable requirements imposed by the Class A Member on behalf of the Company.

If a Member fails to notify the Company within a reasonable time after he has notice of the loss, destruction or theft of a Certificate, and a transfer of the Units represented by the Certificate is registered before the Company, the Member shall be precluded from making any Claim against the Company for such transfer or for a new Certificate.

(c)     As a condition to the issuance of any new Certificate under this Section 3.11, the Company may require the payment of a sum sufficient to cover any tax or other Governmental charge that may be imposed in relation thereto and any other expenses reasonably connected therewith.

3.12     *Pledge of Class B and Class C Units.*  The Company and each other Member hereby acknowledges that any Class B Member or Class C Member may grant an Encumbrance on its Class B Units or Class C Units as collateral security for such Class B Member's or Class C Member's obligations under any Indebtedness incurred by such Class B Member or Class C Member

361302_8.DOC

provided that any Disposition of such Class B Units or Class C Units upon the sale or realization thereon in accordance with such Encumbrance shall be subject to the provisions this Article 3.

3.13    *Certain Amendments.* Investco agrees, so long as Investco holds Class C Units, not to amend the Funding Agreement dated as of November 28, 2000 or the Limited Liability Company Agreement of Investco dated as of November 28, 2000 to permit transfers of Loans (as defined therein) in a principal amount of less than US$10,000,000 or the transfer of Certificate Advances (as defined therein) in any Base Amount (as so defined) if, as a result thereof, the transferee thereof would own, in the aggregate Certificate Advances having a Base Amount less than US$3,500,000.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.01    *Initial Capital Contributions.* At or prior to the execution by such Member of this Agreement, each Member shall make a Capital Contribution or Capital Contributions to the Company which shall be reflected in such Member's Capital Account as described in the Schedules hereto. Except as expressly provided for in this Agreement (including Sections 4.02 and 4.03), no Member shall make or be required to make additional Capital Contributions to the Company.

4.02    *Capital Accounts.* The Company shall maintain a capital account (a *"Capital Account"*) for each Member. Each Member's Capital Account shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the fair market value of Property contributed by that Member to the Company (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to within the meaning of Code Section 752), and (iii) allocations to that Member of Profits (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-1(b)(4)(i), and shall be decreased by (iv) the amount of money distributed to that Member by the Company, (v) the fair market value of Property distributed to that Member by the Company (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under Code Section 752), (vi) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (vii) allocations of Loss (or items thereof), including loss and deduction described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in (vi) above and loss or deduction described in Treasury Regulation Section 1.704-1(b)(4)(i) or 1.704-1(b)(4)(iii). The Members' Capital Accounts shall also be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of Depreciation and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g). A Member who has more than one Unit in the Company shall have a single Capital Account that reflects all such Units, regardless of the class of Units owned by such Member and regardless of the time or manner in which such Units were acquired. Upon the Disposition of all or part of a Unit in the Company, the Capital Account of the transferor that is attributable to the Disposed Unit in the Company shall carry

over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

4.03    *Subsequent Capital Contributions.*  Any Member may make additional Capital Contributions of Permitted Assets at any time with the consent of the Class A Member if, after giving effect to such Capital Contribution, the Company is in compliance with the Core Permitted Assets Coverage Ratio.

4.04    *Return of Contributions.*  Except as expressly provided herein, a Member is not entitled to the return of any part of its Capital Contributions.  A Member is not entitled to be paid interest in respect of its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or assets to the Company to enable the Company to return any Member's Capital Contributions.

## ARTICLE 5
## DISTRIBUTIONS

5.01    *Distributions.*  The Company shall not distribute any cash or Property held by it which is reasonably necessary for the operation of the Company (or as a reserve determined by the Class A Member to be reasonable for the contingencies faced by the Company) or which would otherwise be in violation of any applicable Law.  With respect to any distributions of Sub Asset No. 1 Items, the first 12.5% of all such distributions shall be distributed to Enron or any Member that is a wholly-owned Enron Affiliate and the balance shall be distributed in accordance with Section 5.02. With respect to any distributions of Sub Asset No. 2 Items, the first 51% of all such distributions shall be distributed to Enron or any Member that is a wholly-owned Enron Affiliate and the balance shall be distributed in accordance with the provisions of Section 5.02.  With respect to any distribution of Sub Asset No. 3 Items, the first 95% of all such distributions shall be distributed to Enron or any Member that is a wholly-owned Enron Affiliate and the balance shall be distributed to the Class A Member or any transferee of the Class A Member's Class A Unit. With respect to any distributions of Sub Asset No. 4 Items, such percentage, if any, as the Class A Member has determined to be necessary pursuant to Section 6.01(d) of all such distributions shall be distributed to Enron or any Member that is a wholly-owned Enron Affiliate and the balance shall be distributed in accordance with the provisions of Section 5.02.

5.02    *Periodic Cash Distributions.*  Subject to the other provisions of this Article 5, on each Distribution Date, the Company shall distribute Cash in the following order of priority:

(a)    *first*, to each Class C Member an amount equal to the Preferred Distribution Amount multiplied by the number of Class C Units held by such Class C Member; and

(b)    *second*, to each Class A Member and Class B Member such other amount as the Class A Member shall designate in its sole discretion, in proportion to their Sharing Ratios.

If the Company has insufficient available funds to make any distribution called for by clause (a) of the preceding sentence, funds payable pursuant to such clause shall be allocated to the Class C Members *pro rata* in accordance with the number of Units held by each Class C Member.

5.03    *Calculation of Preferred Distribution Amount.* The distribution payable in respect of each Class C Unit on any Distribution Date shall be the unpaid Preferred Return with respect to such Class C Unit accumulated to such Distribution Date (any such amount, a *"Preferred Distribution Amount"*). Any payments of Preferred Distribution Amounts made on Class C Units shall first be credited against the Preferred Return accumulated with respect to the earliest Quarterly Period for which any Preferred Return has not been paid in full (and shall be applied to accumulated Preferred Returns for subsequent Quarterly Periods in chronological order).

In addition to the foregoing, the Preferred Distribution Amount in respect of any Class C Unit for any Quarterly Period shall be increased by an amount equal to the Additional Transaction Costs of the Class C Member holding such Class C Units; provided that the Company shall have received a certificate from such Class C Member setting forth in reasonable detail the basis and amount of each request for additional yield in respect of such Additional Transaction Costs.

5.04    *Conditions to Payment of Distributions.*

(a)    In no event shall a distribution (or any portion thereof) be paid to a Member if payment of such distribution (or any portion thereof) would create a deficit in such Member's Capital Account balance in excess of the amount (if any) that such Member is obligated or deemed obligated under this Agreement to restore to the Company.

(b)    No distribution shall be paid with respect to the Class A Units and the Class B Units if any Specified Event or Potential Specified Event shall have occurred and be continuing.

5.05    *Specified Event; Specified Event Rate.* During the period that any of the hereinafter described events or conditions (a *"Specified Event"*) shall have occurred and be continuing, the Preferred Applicable Rate shall increase to the Specified Event Rate:

(a)    the Company fails on any Distribution Date to pay as provided herein the full amount of any Preferred Distribution Amount in respect of any Class C Units and such failure continues for three Business Days;

(b)    the Company fails to comply with or perform any obligation under the Relevant Documents (except to the extent provided for in clause (a) above and clauses (c) and (d) below) and such failure continues for 15 or more days after notice to the Company by any Member;

(c)    so long as any Class C Units are outstanding, the Company:

(i)    makes or retains investments other than in Permitted Assets;

(ii)    permits the Core Permitted Assets Coverage Ratio on any date to be less than 1.25 to 1;

(iii)    issues Units having any right of payment prior to the rights of the Class C Units or having rights or preferences that would reduce the absolute or relative voting rights of the Class C Members or issue any Units convertible or exchangeable into any other Units of the Company which are Class C Units or have rights which, upon issuance, would have rights of payment prior to the rights of the Class C Units or rights or preferences that would reduce the absolute or relative voting rights of the Class C Units (provided that nothing herein shall restrict the issuance of additional Class C Units to the extent permitted by Section 3.01(a));

(iv)    creates, incurs or suffers to exist Indebtedness (other than Indebtedness assumed in association with a contribution of assets for which the Company is released in writing immediately following such assumption) of the Company or trade accounts payable of the Company (including assuming or Guaranteeing any obligation of any other Person) in an aggregate principal amount exceeding U.S.$750,000 at any one time outstanding or which is secured by an Encumbrance that has attached under applicable Law;

(v)    declares or makes any payments in respect of any Units other than (A) the Class C Units or (B) so long as no Specified Event or Potential Specified Event has occurred and is continuing, payments (whether in cash or in kind) in respect of the Class A Units or Class B Units from proceeds of and dividends or other distributions on or of Other Assets;

(vi)    (A) enters into any transaction of merger or consolidation, (B) except as provided in Article 11, liquidates, winds up or dissolves itself, (C) conveys, sells, leases, transfers or otherwise disposes of all or substantially all of the Property of the Company (provided that this clause (C) shall not be construed to limit in any respect the rights of the Company to exchange Core Permitted Assets for other Core Permitted Assets or to dispose of Other Assets);

(vii)    so long as it holds any Structured Securities,

(A)    consents to the addition of any *"Seller"* under the Sequoia Sale and Servicing Agreement unless documents comparable to those delivered under Section 2.5 of the Sequoia Sale and Servicing Agreement on the date hereof are delivered with respect to the new *"Seller"* and such documents are satisfactory to the Majority Class C Member;

(B)    fails to direct the Servicer (as defined in the Sequoia Sale and Servicing Agreement) to distribute the payments referred to in Sections 4.2(b) and 4.2(c) of the Sequoia Sale and Servicing Agreement unless each of the applicable conditions specified in Article 3 of the Sequoia Note Purchase Agreement is satisfied on the related Asset Purchase Date or Reinvestment Date (as defined in the Sequoia Sale and Servicing Agreement);

361302_8.DOC

41

(C)    expresses its satisfaction with the cure of any breach of representations and warranties under Section 2.7 of the Sequoia Sale and Servicing Agreement;

(D)    fails to exercise its rights under Section 4.3 of the Sequoia Sale and Servicing Agreement to receive Additional Amounts (as defined therein);

(E)    fails to object to any form of guarantee agreement or of any written assumption contemplated by Sections 6.3 and 6.7 of the Sequoia Sale and Servicing Agreement if so requested by the Majority Class C Member;

(F)    fails to exercise rights under Section 8.2(g) of the Sequoia Sale and Servicing Agreement if so requested by the Majority Class C Member;

(G)    consents to any transfer of a membership interest pursuant to Section 7.1 of the Sequoia LLC Agreement without the consent of the Majority Class C Member; and

(H)    fails to exercise any right or remedy under any Sequoia Document, which failure has a Material Adverse Effect;

(viii)    (A) institutes proceedings to be adjudicated bankrupt or insolvent; or consents to the institution of bankruptcy or insolvency proceedings against it, (B) files a petition seeking, or consents to, reorganization or relief under any applicable Law relating to bankruptcy or insolvency, including any moratorium on the payment of its debts, (C) consents to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or similar official) of the Company or a substantial part of its Property, (D) makes any assignment for the benefit of creditors or (E) admits in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action;

(ix)    (A) except as provided in Article 11, liquidates, winds up or dissolves itself (other than a liquidation solely for United States federal income tax purposes), or (B) fails to maintain its legal existence in the State of Delaware;

(x)    consents to any amendment, modification, or waiver of the or termination of any provisions of any Relevant Document, without the consent of the Majority Class C Member; or

(xi)    fails to deliver to the Members (A) notice of any event or circumstance giving rise to a Specified Event or (B) notice of any legal or arbitration proceeding that could reasonably be expected to have a Material Adverse Effect;

(d)    a representation or warranty made by the Class A Member or any Class B Member, or any of their respective Subsidiaries under or in connection with the Relevant Documents

361302_8.DOC

42

proves to have been incorrect or misleading when made and such incorrect or misleading representation or warranty, either individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect;

(e)    except as expressly provided in Article 11, an Insolvency Event occurs with respect to the Company or Enron;

(f)    the rating by either Rating Agency of the unsecured senior long-term debt obligations owing by Enron is withdrawn or downgraded below BBB- (in the case of S&P) or Baa3 (in the case of Moody's); or

(g)    the happening of any event which makes it unlawful, impossible or impractical to carry on the business of the Company.

5.06    *End of a Specified Event.* Once all events that have caused a Specified Event have been cured or have ceased to exist (and provided that no other Specified Event shall have occurred and be continuing), (a) such Specified Event shall end, (b) the rate of return on the Class C Units shall, beginning the next day after the end of such Specified Event, revert to the Preferred Applicable Rate that would have been in effect had such Specified Event not occurred and (c) the right of the Majority Class C Member to appoint the Board of Directors, and the power of the Board of Directors to act as such pursuant to Section 7.01(b) by reason of such Specified Event shall, beginning the next day after the end of such Specified Event, cease to be applicable (absent the subsequent occurrence of a Specified Event).

5.07    *Record Dates, Etc.* Subject to Section 5.04, not later than 9:00 a.m., New York City time, on each Distribution Date, the Company shall deposit or cause to be deposited to the Company's bank account maintained for such purposes sufficient funds for the payment of the Preferred Distribution Amounts payable on such Distribution Date and shall give the bank where such account is located irrevocable instructions to apply such funds to the payment of such Preferred Distribution Amounts on such Distribution Date.

5.08    *Manner of Payment.* Each payment made with respect to a Unit (including redemption, liquidation and repurchase payments) shall be made, without deduction, set-off or counterclaim, in Dollars by wire transfer of immediately available funds to any Dollar account maintained by the Member or Assignee entitled to receive such payment with a bank in the United States of America and identified by such Member or Assignee in a written notice given to the Company at its registered office not later than three Business Days prior to the relevant Distribution Date.

5.09    *Distributions on Dissolution and Winding Up.* Upon the dissolution and winding up of the Company, all available assets shall be distributed to the Members in proportion to their respective positive Capital Account balances in accordance with Section 11.02.

361302_8.DOC

## ARTICLE 6
## ALLOCATIONS

6.01    *Allocation of Profits.*  Profits (or items thereof) shall be allocated by the Class A Member on behalf of the Company to the Capital Accounts of the Members as follows:

(a)    The first 12.5% of all Sub Asset No. 1 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit.

(b)    The first 51% of all Sub Asset No. 2 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit.

(c)    The first 95% of all Sub Asset No. 3 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit, and the remaining 5% of all Sub Asset No. 3 Items shall be allocated to the Class A Member and any transferee of the Class A Member's Class A Unit.

(d)    If the Class A Member determines that any such allocation is necessary for the Company or any Company Subsidiary to comply with any agreements to which such Company Subsidiary or any of its direct or indirect Subsidiaries is bound or by which it is effected, the requisite percentage of Sub Asset No. 4 Items shall be allocated to ECIC and any transferee of ECIC's Class B Units.

(e)    All other Profits shall be allocated as follows:

(i)    *First*, 100% to the Class C Members to reverse Losses previously allocated to the Class C Members pursuant to Section 6.02(e)(ii) pro rata in accordance with losses previously allocated to each Class C Member;

(ii)    *Second*, 100% to the Class A Member and the Class B Members to reverse Losses previously allocated to the Class A Member and the Class B Members pursuant to Section 6.02(e)(i) and (iii);

(iii)    *Third*, 100% to each Class C Member up to the Preferred Distribution Amount for each Class C Unit held by such Class C Member; and

(iv)    The balance to the Class A Member and the Class B Members in proportion to their Sharing Ratios.

6.02    *Allocation of Losses.*  Losses (or items thereof) shall be allocated by the Class A Member on behalf of the Company to the Capital Accounts of the Members as follows:

(a)    The first 12.5% of all Sub Asset No. 1 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit.

(b)     The first 51% of all Sub Asset No. 2 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit.

(c)     The first 95% of all Sub Asset No. 3 Items shall be allocated to ECIC and any transferee of ECIC's Class B Unit, and the remaining 5% of all Sub Asset No. 3 Items shall be allocated to the Class A Member and any transferee of the Class A Member's Class A Unit.

(d)     If the Class A Member determines that any such allocation is necessary for the Company or any Company Subsidiary to comply with any agreements to which such Company Subsidiary or any of its direct or indirect Subsidiaries is bound or by which it is effected, the requisite percentage of Sub Asset No. 4 Items shall be allocated to ECIC and any transferee of ECIC's Class B Units.

(e)     All other Losses shall be allocated as follows:

(i)     *First*, 100% to the Class A Member and the Class B Members to the extent of, and in proportion to, their respective Adjusted Capital Accounts;

(ii)     *Second*, 100% to each Class C Member to the extent of, and in proportion to, its Adjusted Capital Account; and

(iii)     The balance to the Class A Member and the Class B Members in proportion to their Sharing Ratios.

6.03     *Regulatory Allocations.*  The following allocations shall be made in the following order:

(a)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a taxable year (or if there was a net decrease in Minimum Gain for a prior taxable year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.03(a)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)). This Section 6.03(a) is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the economic risk of loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4). If more than one Member bears the economic risk of loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the economic risk of loss. This Section 6.03(b) is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(c)     Notwithstanding any provision hereof to the contrary except Section 6.03(a) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for a taxable year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior taxable year and the Company did not have sufficient amounts of income and gain during prior years to allocate among the Members under this Section 6.03(c), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)). This Section 6.03(c) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except Sections 6.03(a) and (c) (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the taxable year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible. This Section 6.03(d) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Nonrecourse Deductions shall be allocated to the Class A Member and the Class B Members in proportion to their Sharing Ratios.

6.04     *Tax Allocations.*

(a)     All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as provided in Section 6.04(b).

(b)     In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Book Value. In the event the Book Value of any Property is adjusted by reason of a Mark-to-Market Event, subsequent allocations of income, gain, loss, and deduction with respect to such Property shall take account of any variation between the adjusted basis of such Property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Regulations thereunder. For purposes of such allocations, the Company shall elect the remedial method (within the meaning of Treasury Regulation Section 1.704-3(d)), and in applying the remedial method to depreciable Property, the Company shall use such methods and recovery periods available under Treasury Regulation Section 1.704-3 as the Class A Member shall determine. Allocations pursuant to this Section 6.04 are solely for purposes of Federal and, to the extent allowed by law, state and local taxes and shall not affect, or in any way be taken

into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

## ARTICLE 7
## MANAGEMENT

7.01    *Management by Class A Member.* (a)  The management of the Company is fully vested in the Class A Member, and except as otherwise provided in this Agreement, (i) such Class A Member shall be the *"manager"* (within the meaning of Section 18-101(10) of the Act) of the Company with full power and authority to manage the business and affairs of the Company in accordance with Section 2.04, and (ii) no other Member shall have any such management power and authority. The Class A Member shall cause the Company to comply to the extent required by the Company with the obligations of Enron under the EOG Share Exchange Agreement.

(b)    (i)    At any time after the occurrence, and during the continuation, of a Specified Event, the Majority Class C Member may cause the management responsibilities with respect to the Company granted to the Class A Member pursuant to this Agreement to be assumed during the continuance of such Specified Event by a board of directors composed of three members (the *"Board of Directors"*); provided, however, that the Board of Directors shall not amend this Agreement in any respect or dispose of any interest in any Company Subsidiary, in each case without the prior written consent of the Class A Member. The assumption of management responsibility by the Board of Directors shall be effective five Business Days following the receipt by the Class A Member of written notice signed by the Majority Class C Member naming two persons to act as directors and as representatives of the Majority Class C Member on the Board of Directors. Within the five Business Day period following the receipt by the Class A Member of the notice described above, the Class A Member shall notify the Class B Members and the Class C Member(s) in writing of the identity of one person selected by the Class A Member to act as director and as representative of the Class A Member and the Class B Members on the Board of Directors.

(ii)    Except as set forth at the end of this subparagraph (ii), upon appointment and for so long as such Specified Event has occurred and is continuing (but only for such period), the Board of Directors shall have all of the management powers and responsibilities with respect to the Company granted to the Class A Member pursuant to this Agreement and shall automatically and with no further action being required by any Member have the same obligations as those imposed upon the Class A Member by this Agreement, and from and after the appointment of the Board of Directors, this Agreement shall be so construed and interpreted. At all times notwithstanding the appointment of the Board of Directors, all decisions relating to Company Subsidiary Asset No. 1, Company Subsidiary Asset No. 2, Company Subsidiary Asset No. 3 and Company Subsidiary Asset No. 4 shall be made by the director appointed by the Class A Member without participation therein of the directors appointed by the Majority Class C Member.

(iii)    The Class A Member shall have the exclusive right from time to time to select, appoint and remove (with or without cause) the director acting as its representative on the Board of Directors. The Majority Class C Member shall have the exclusive right from time to time to select, appoint and remove (with or without cause) the directors acting as its representatives on the

Board of Directors. Any vacancy occurring on the Board of Directors due to the death, disability, removal or resignation of a director shall be filled by the Member who appointed the director and as whose representative the deceased, disabled, removed or departing director served. In the event a Member fails or refuses to appoint representatives to the Board of Directors for any reason (and has actual notice of the death, resignation or other refusal to serve of any person previously acting as a member of the Board of Directors and representing such Member), so that for a period of thirty days or more there is no representative of such Member acting as a member of the Board of Directors, then such Member shall be deemed to have consented to any actions taken by the Board of Directors after the expiration of such thirty day period and prior to the appointment by such Member of a director or directors to act as the representative of such Member on the Board of Directors as provided herein and the quorum and voting requirements in Section 7.01(b)(iv) below shall be modified accordingly. The Board of Directors shall have the power to establish its own procedures for meeting and voting and to appoint one or more committees, in each case subject to the requirements of this Section 7.01(b).

(iv)    Except as provided in Section 7.01(b)(ii) with respect to certain activities involving the representatives of the Class A Member, a quorum for the conduct of business by the Board of Directors on behalf of the Company shall be no less than a majority of the total number of directors then appointed and acting. For quorum purposes, a director may be present in person, or by conference telephone, teleconference or any other means wherein each director can hear each other director. No action may be conducted at a meeting unless prior written or telephonic notice has been given to each director (in the case of telephonic notice, personally) at least 48 hours prior to the time fixed for such meeting, unless such notice has been waived in writing by each director who did not receive notice as required hereby. No action taken by written consent of the Board of Directors shall be (i) taken in any period during which there is a vacancy on the Board of Directors, or (ii) effective unless prior to such action being effected or effective a written consent to such action has been executed by each member of the Board of Directors.

(v)    Except as provided in Section 7.01(b)(ii) with respect to certain action that may be taken by the representative of the Class A Member without the participation of the other directors, the Board of Directors may take action only by the vote of a majority of the entire number of directors then appointed and acting at a meeting at which a quorum is present. The term "*majority*" for this purpose shall mean more than 50% of the entire number of directors then appointed and acting. Notwithstanding the provisions of Section 18-404(d) of the Act, no action may be taken without notice and a meeting unless a consent in writing setting forth the action so taken is executed by each member of the Board of Directors.

(vi)    From and after their appointment and prior to (A) their death, resignation or removal, or (B) the cure or other expiration of the Specified Event which caused the Board of Directors to be appointed, the members of the Board of Directors shall be deemed to be managers of the Company for all purposes of the Act. After the cure or other expiration of the Specified Event, the Class A Member shall again become the manager of the Company as provided in Section 7.01(a).

361302_8.DOC

48

(c)    Notwithstanding Sections 7.01(a) and (b), the consent of each Class C Member as to matters affecting such Class C Member shall be required for the Company to amend, waive, modify or terminate any of the Relevant Documents in any respect which is material and adverse to the interests of such Class C Member.

(d)    The Class A Member shall determine the fair market value of the Property of the Company to be determined (i) upon the occurrence of any Mark-to-Market Event; and (ii) in the case of all Property held by the Company (but solely for the purpose of determining compliance with the Core Permitted Asset Coverage Ratio), on the first Business Day of each calendar quarter. The Class A Member shall notify each of the Members forthwith in the event that such determination reveals the non-compliance by the Company with the Core Permitted Asset Coverage Ratio, which notice shall include calculations in reasonable detail of each such ratio and shall describe the extent of non-compliance.

7.02    *Reliance by Third Parties.*  Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Class A Member, or, during the time the Board of Directors is appointed and acting, the Board of Directors set forth in this Agreement.

7.03    *Disclaimer of Duties.* (a) Except for express contractual obligations under other provisions of this Agreement or under other existing or future agreements with the Company and except for obligations that any Person unrelated to the Company also has to the Company, neither Enron, any Class A Member, nor any Class B Member or Class C Member nor any Affiliate of any of them shall have any obligation, fiduciary or otherwise, to the Company, including any obligation (i) to offer business opportunities to the Company, (ii) to refrain from pursuing business opportunities that may have a competitive impact upon the Company or (iii) to refrain from taking any other action that will or may be detrimental to the Company, and neither Enron, any Class A Member nor any Class B Member or Class C Member nor any Affiliate of any of them shall, by virtue of the relationships established pursuant to this Agreement, have any other obligation to take or refrain from taking any other action that may impact the Company. The provisions of this Section 7.03(a) constitute an agreement to modify or eliminate fiduciary duties pursuant to the provisions of Sections 18-403, 18-405 and 18-1101 of the Act.

(b)    As a result of the transactions contemplated by this Agreement, certain directors, officers or employees of Enron or Enron Affiliates may serve as representatives, agents or directors of the Company (any such Person being referred to herein as a *"Designee"*). Each Member recognizes that any Designee could be regarded as owing duties both to the Company and to Enron or its Affiliates. The Members agree and acknowledge that they expect to benefit from the transactions contemplated by this Agreement. Enron, however, is unwilling to, or to cause the Class A Member to, enter into this Agreement and to cause the Class A Member and its Affiliates to consummate the transactions contemplated hereby unless the Members agree to the following provisions:

(i)    Each of the Members (A) acknowledge and agree that Enron and the Enron Affiliates and Designees (1) participate and will continue to participate in businesses and in transactions that are in the businesses conducted by the Company (or businesses similar

thereto), directly and through Affiliates, (2) may have interests in, participate with, and maintain seats on the boards of directors or serve as officers or employees of other Persons engaged in the businesses conducted by the Company (or businesses similar thereto) and (3) may develop business opportunities for Enron and Enron and its Affiliates and such other Persons. Each of the Members acknowledge and agree that neither Enron, the Class A Member, their respective Affiliates, Designees nor any such other Person shall be restricted or prohibited by this Agreement or the relationships created hereby, or by serving as a representative, agent or director of the Company, from engaging in transactions in businesses conducted by the Company or otherwise, regardless of whether such business activity is in direct or indirect competition with the business or activities of the Company and its Affiliates, on any basis other than actions that are inconsistent with the standards set forth in Section 7.03(b)(ii); (B) acknowledge and agree that, as long as their activities are conducted in accordance with the standards set forth in Section 7.03(b)(ii), neither Enron, Enron Affiliates, the Class A Member, its Affiliates, any Designee nor any such other Person shall have any obligation to offer the Company or any Member or any of their respective Affiliates any business opportunity, (C) renounces any interest or expectancy in any business opportunity pursued by Enron, Enron Affiliates, the Class A Member, its Affiliates, any Designee or any such other Person in accordance with the standards set forth in Section 7.03(b)(ii) and (D) waives any claim that any business opportunity pursued by Enron, Enron Affiliates, the Class A Member or its Affiliates, any Designee or any such Person constitutes a partnership or corporate opportunity of the Company, any Member or any of their respective Affiliates that should have been presented to the Company, any Member or any of their respective Affiliates, unless such business opportunity was pursued in violation of the standards set forth in Section 7.03(b)(ii).

      (ii)     Enron, Enron Affiliates, the Class A Member, its Affiliates, any Designee, or any other Person in which Enron has an interest or of which a Designee is a director, officer or employee shall be deemed to meet the standards set forth in this Section 7.03(c)(ii) if its business is conducted through the use of its own personnel and assets and not with the use of any assets of the Company other than the Company's ownership interest of the Company Subsidiaries or any assets thereof. Nothing in this Agreement shall be interpreted to allow a Designee to pursue a business opportunity solely for his or her personal benefit (as opposed to for the benefit of Enron, Enron Affiliates, the Class A Member, or its Affiliates or any such other Person).

      (c)     Except as provided otherwise in this Agreement, the Class A Member shall conduct the affairs of the Company in accordance with prudent industry standards toward the best interests of the Company. The Class A Member is liable for errors or omissions in performing its duties with respect to the Company only in the case of gross negligence, willful misconduct, or fraud, but not otherwise, IT BEING SPECIFICALLY AGREED THAT THE CLASS A MEMBER IS NOT LIABLE FOR ITS OWN SIMPLE, PARTIAL, OR CONCURRENT NEGLIGENCE. In no event shall the Class A Member be liable for any action or course of conduct approved or consented to by the Class C Members or any action or course of conduct based on a determination by the Class C Members, INCLUDING SPECIFICALLY MATTERS FOR WHICH THE CLASS A MEMBER WOULD BE LIABLE IN THE ABSENCE OF THIS

**SECTION 7.03, SUCH AS ITS OWN SIMPLE, PARTIAL OR CONCURRENT NEGLIGENCE**, absent a material misstatement or omission or fraud in obtaining the approval; provided, that notwithstanding the existence of a material misstatement or omission, in no event shall the Class A Member be liable for any such action or course of conduct if the Class A Member, at the time of the Class C Members' consent, approval or determination, did not know of, and in the exercise of a standard of care not constituting gross negligence, willful misconduct or fraud could not have known of, the material misstatement or omission. The Class A Member shall devote such time and effort to the Company business and operations as is necessary to promote fully the interests of the Company. In no event shall the provisions of this Section 7.03(c) relieve the Class A Member from liability pursuant to the provisions of any **contract** or transaction that may be entered into hereafter between the Company and the Class A Member.

(d)    The Company may **transact business** with any Member or Affiliate of a Member, provided, that the terms of transactions with the Class A Member or one of its Affiliates are comparable to, or at least as favorable to the Company as, the terms of transactions at arms' length between unaffiliated parties. Any transaction between the Company and a Member or its Affiliates that has been approved by the Class C Members after full disclosure shall be deemed to have satisfied the standard set forth in the previous sentence. A Member or Affiliate that transacts business with the Company owes no duty to the Company or the other Members to exercise or to refrain from exercising in any particular manner its rights or powers as a participant in that transaction, including those arising under any contract with the Company, and (subject to the proviso in the preceding sentence) such Member or such Affiliate of a Member may realize profits from that transaction.

(e)    The Class B Members and Class C Members acknowledge that Enron and the Enron Affiliates do not guarantee the performance of the Company or the Class A Member. In the absence of gross negligence, willful misconduct or fraud, neither Enron nor any of the Enron Affiliates (other than the Class A Member) shall have any liability for the acts, omissions or courses of conduct of the Company or the Class A Member. As a result of the foregoing, Enron and the Enron Affiliates (other than the Class A Member) shall have **NO LIABILITY FOR THE SIMPLE, PARTIAL OR CONCURRENT NEGLIGENCE OF THE CLASS A MEMBER, ENRON OR ANY OF THE ENRON AFFILIATES** in connection with the acts, omissions or courses of conduct of the Company or the Class A Member. Nothing herein shall (i) in any way limit any express guaranty or indemnity provided by Enron or any Enron Affiliate to the Company or any Member under this Agreement or in connection with the transactions contemplated hereby or (ii) prohibit a Class B Member or Class C Member or the Company from asserting valid claims other than as provided in this Section 7.03. In no event shall the provisions of this Section 7.03(e) relieve the Class A Member, Enron or any Enron Affiliate from liability pursuant to the provisions of any contract or transaction that may be entered into hereafter between the Company and Enron or any Enron Affiliate.

7.04    *Indemnification.* (a) To the fullest extent permitted by Law, the Company shall indemnify the Class A Member, each Designee and their respective officers, directors, employees, agents and controlling Persons, any Person who served at the request of the Class A Member as an officer, director, employee or agent of another Person, each director appointed to the Board of

Directors and each other Member and its officers, directors, employees, agents and controlling Persons (each, an "*Indemnified Person*"), on request by the Indemnified Person, and hold each of them harmless from and against all Claims any of them may incur as a Member of the Company or as a controlling Person of such Member or in serving at the request of the Class A Member as an officer, director, employee or agent of another Person, in performing the obligations of the Class A Member or a member of the Board of Directors with respect to the Company, in exercising rights of a Member, **INCLUDING ANY MATTER ARISING OUT OF OR RESULTING FROM THE INDEMNIFIED PERSON'S OWN SIMPLE, PARTIAL, OR CONCURRENT NEGLIGENCE**, except for any such Claim primarily attributable to the Indemnified Person's gross negligence, willful misconduct or fraud. If an Indemnified Person becomes involved in any action, proceeding or investigation with respect to which indemnity may be available under this Section 7.04, the Company may reimburse the Indemnified Person for its reasonable legal and other expenses (including the cost of investigation and preparation) as they are incurred, provided, that the Indemnified Person shall promptly repay to the Company the amount of any such expense paid if it is ultimately determined that the Indemnified Person was not entitled to indemnification hereunder. Any amounts payable in respect of indemnification hereunder shall be recoverable only from the assets of the Company.

(b)     Promptly after receipt by an Indemnified Person of notice of any Claim or the commencement of any action with respect to which indemnity may be available under this Section 7.04, the Indemnified Person shall, if a claim in respect thereof is to be made against the Company under this Section 7.04, notify the Company in writing of the Claim or the commencement of the action; provided, that the failure to notify the Company shall not relieve it from any liability which it may have to an Indemnified Person under this Section 7.04 except to the extent that the Company is prejudiced thereby. If any such Claim or action shall be brought against an Indemnified Person, and it shall notify the Company thereof, the Company shall be entitled to participate therein, and, to the extent that it wishes, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Person. After notice from the Company to the Indemnified Person of its election to assume the defense of such Claim or action, the Company shall not be liable to the Indemnified Person under this Section 7.04 for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof other than reasonable costs of investigation; provided, that all of the Indemnified Persons shall have the right to employ one counsel to represent them if, in the opinion of counsel to the Indemnified Persons there are available to them defenses not available to the Company and in that event the fees and expenses of such separate counsel shall be paid by the Company. In no event shall the Company be required to indemnify an Indemnified Person with respect to amounts paid in settlement of a Claim unless such Claim was settled with the consent of the Company.

(c)     In further consideration of the benefits received and to be received by the Company pursuant to this Agreement and the transactions contemplated hereunder, the Company acknowledges and agrees that with respect to any business opportunity presented to or identified by Enron as described in Section 7.03 (which term shall include, for purposes of this Section 7.04(c), Enron's predecessors and successors in interest, and all of Enron's and its respective predecessors and successors in interests' respective Affiliates, stockholders, directors, officers, employees, agents, attorneys, servants, invitees, contractors, licensees, legal representatives, successors, and assigns),

which is pursued in accordance with the standards in Section 7.03(c)(ii), Enron may pursue such opportunity and conduct the business related thereto without any obligation to offer it to the Company. The Company acknowledges and agrees that in such case, to the extent that a court might hold that the pursuit of such opportunity or the conduct of such activity is a breach of any standard of care, a duty of loyalty, or other duty owed to the Company (and without admitting that the pursuit of such opportunity or the conduct of such activity is such a breach of any such standard or duty), the Company hereby fully and irrevocably renounces, releases and waives, to the extent permitted by Law, any interest or expectancy in such opportunity or activity pursued by Enron in accordance with the standards in Section 7.03(c)(ii) and any and all Claims that the Company or any Person claiming by, through, or under the Company may have to Claim that such business opportunity is a partnership or corporate opportunity of the Company or any Member or that the pursuit by Enron of any such business opportunity or the conduct of the business related thereto is a breach of any standard of care, duty of loyalty, or other duty owed to the Company (including, to the extent permitted by applicable Law, any and all Claims arising either directly or derivatively, and whether brought by, through, or under the Company, or by any stockholder, creditor, subsidiary or Affiliate of the Company). Further, the Company, for itself and its successors and assigns, hereby agrees to indemnify, defend, and hold harmless, to the extent permitted by applicable Law, Enron and its predecessors and successors in interest, and all of Enron's and its respective predecessors and successors in interests' respective Affiliates, stockholders, directors, officers, employees, agents, attorneys, servants, invitees, contractors, licensees, legal representatives, successors, and assigns, from any and all such Claims that may be asserted (a) by any Person whomsoever claiming by, through, or under the Company or (b) by any successors or assigns of the Company. It is the express intention of the Company that, to the extent permitted by Law, the indemnity to Enron herein provided covers any such Claims asserted by, through, or under the Company, notwithstanding that such Persons are not signatories to this Agreement, and whether or not the release provisions are directly enforceable against any Persons who are not signatories to this Agreement. This indemnity applies for the benefit of Enron regardless of whether such Claims are based in whole or in part upon the alleged partial or sole negligence or strict liability of Enron (or its predecessors or successors in interest, or Enron's or its respective predecessors or successors in interests' respective Affiliates, stockholders, directors, officers, employees, agents, attorneys, servants, invitees, contractors, licensees, legal representatives, successors, and assigns). The renunciations, waivers and agreements herein apply equally to activities to be conducted in the future and activities that have been conducted in the past.

7.05    *Consent Required for Insolvency Event.* Notwithstanding any other provision hereof to the contrary, the unanimous written consent of each Member shall be required for the Company to take any action that would cause the Company to be the subject of an Insolvency Event.

## ARTICLE 8
## TAXES

8.01   *Tax Matters Partner; Tax Returns.* The Class A Member shall be the "tax matters partner" of the Company pursuant to Code Section 6231(a)(7) (the *"Tax Matters Partner"*). The Tax Matters Partner shall take such action as may be necessary to cause the other Members to become a "notice partner" within the meaning of Code Section 6231(a)(8).  The Tax Matters Partner shall inform the other Members of all significant matters that may come to its attention in its capacity as Tax Matters Partner by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within such time, shall forward to the other Members copies of all significant written communications it may receive in such capacity. The Tax Matters Partner shall not take any action contemplated by Code Sections 6222 through 6231 without the consent of the other Members, but this sentence does not authorize the Tax Matters Partner to take any action left to the determination of an individual Member under Code Sections 6222 through 6231. The Tax Matters Partner shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including the elections described in Section 8.02. Each Member shall furnish to the Tax Matters Partner all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

8.02   *Tax Elections.* The Company shall make the following elections on the appropriate tax returns:

(a)   to adopt the calendar year as the Company's fiscal year;

(b)   to adopt the accrual method of accounting and to keep the Company's books and records on the accrual method;

(c)   to adjust the basis of Company Property pursuant to Code section 754;

(d)   to elect to amortize the organizational expenses of the Company under Code Section 709(b) and the startup expenditures of the Company under Code Section 195, in each case ratably over a period of 60 months; and

(e)   any other election the Class A Member may deem appropriate and in the best interest of the Members.

It is the intent of the Members that the Company be treated as a partnership for federal income tax purposes and, to the extent permitted by applicable Law, for state, local and foreign franchise and income tax purposes. Neither the Company nor any Member may make an election for the Company to be treated other than as a partnership for such purposes or excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state or local Law, and no provision of this Agreement shall be construed to sanction or approve such an election.

## ARTICLE 9
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

9.01    *Maintenance of Books.* The Class A Member shall keep or cause to be kept at the principal office of the Company or at such other location the Class A Member deems appropriate complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business and minutes of the proceedings of its Members, and any other books and records that are required to be maintained by applicable Law.

9.02    *Bank Accounts.* Funds of the Company shall be deposited in such banks or other depositories as shall be designated from time to time by the Class A Member. All withdrawals from any such depository shall be made only as authorized by the Class A Member and shall be made only by check, wire transfer, debit memorandum or other written instruction.

9.03    *Information.* Each Member will receive audited annual financial reports of the Company and quarterly unaudited financial reports of the Company. Each Member shall have reasonable right of access to information regarding the Company's tax returns and distributions and visitation rights to permit each Member (and, in the case of any Class C Member, and Person or representative of a Person providing financing to such Class C Member) to inspect such information. In addition, the Class A Member shall provide to each Class C Member promptly after receipt thereof copies of all financial statements and default notices relating to Enron or any of its Subsidiaries received under or in connection with any Indebtedness owing by Enron or any of its Subsidiaries to the Company.

## ARTICLE 10
## [RESERVED]

## ARTICLE 11
## DISSOLUTION, WINDING-UP AND TERMINATION

11.01 *Dissolution.* The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "*Dissolution Event*"):

(a)    upon consent of the Class A Member and each Class C Member, or, at any time the Board of Directors has been appointed and is acting, by resolution of the Board of Directors acting with the consent of the representative of the Class A Member;

(b)    the 30th day following the Termination Date; or

(c)    entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act or upon the occurrence of any other act or event requiring dissolution under the Act.

11.02  *Winding-Up and Termination.* (a) On the occurrence of a Dissolution Event, the Class A Member shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Company expense. Until final distribution, the Class A Member shall continue to operate the Company's assets with the same power and authority it had prior to the dissolution. The steps to be accomplished by the Class A Member are as follows:

    (i)    as promptly as possible after dissolution and again after final winding up, the Class A Member shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

    (ii)    the Class A Member shall determine which Property of the Company should be distributed in kind, and dispose of all other Property of the Company at the best cash price obtainable therefor;

    (iii)    the Class A Member shall discharge from the Company's funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the Class A Member may reasonably determine); and

    (iv)    all remaining assets of the Company (including cash) shall be distributed among the Members in accordance with their positive Capital Account balances.

    (b)    The distribution of cash or other assets to a Member in accordance with the provisions of this Section 11.02 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Unit and all the Company's assets and constitutes a compromise to which all Members have consented pursuant to Section 18-502(b) of the Act. To the extent that a Member returns funds to the Company, such Member has no claim against any other Member for those funds.

11.03  *Certificate of Cancellation.* On completion of the distribution of Company assets as provided herein, the Members (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.05, and take such other actions as may be necessary to terminate the existence of the Company. Upon the filing of such certificate of cancellation, the existence of the Company shall terminate (and the Term shall end), except as may be otherwise provided by the Act or other applicable Law.

**ARTICLE 12**
**GENERAL PROVISIONS**

12.01  *Offset.*.  Whenever the Company is to pay any sum to any Member, any Capital Contributions that Member owes the Company may be deducted from that sum before payment.

12.02  *Notices.*  All notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile or other electronic transmission.  A notice, request or consent given under this Agreement is effective on receipt by the Member to receive it; provided, however, that a facsimile or other electronic transmission that is transmitted after the normal business hours of the recipient shall be deemed effective on the next Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Schedule I, or such other address as that Member may specify by notice to the other Members.  Any notice, request or consent to the Company must be given to all of the Members.  Whenever any notice is required to be given by Law, the Delaware Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

12.03  *Superseding Effect.*  This Agreement supersedes all provisions and concepts contained in all prior contracts or agreements among the Members with respect to the Company and the transactions contemplated hereby, whether oral or written.

12.04  *Effect of Waiver or Consent.*  A waiver or consent, express or implied, to or of any breach or default by any Member in the performance by that Member of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Member of the same or any other obligations of that Member with respect to the Company. Failure on the part of a Member to complain of any act of any Member or to declare any Member in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Member of its rights with respect to that default until the applicable statute-of-limitations period has run.

12.05  *Amendment or Restatement.*  This Agreement or the Delaware Certificate may be amended or restated only by the Class A Member except to the extent that such amendment or restatement would adversely affect any Class B Member or any Class C Member including, without limitation, by reducing the aggregate Liquidation Preference, except in accordance with the terms of this Agreement, amending the definition of Specified Price, Preferred Return, Preferred Applicable Rate, Core Permitted Assets Coverage Ratio or Core Permitted Assets, or amending Sections 3.08. 5.05, 6.01 or 6.02 of this Agreement, in which case such Class C Member's and/or such Class B Member's written consent would be required.

12.06  *Binding Effect.*  This Agreement is binding on and shall inure to the benefit of the Members and their respective successors and permitted assigns.

361302_8.DOC

57

**12.07** *Governing Law; Severability.* THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE. In the event of a direct conflict between the provisions of this Agreement and any mandatory, non-waivable provision of the Act, such provision of the Act shall control. If any provision of the Act provides that it may be varied or superseded in a limited liability company agreement (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter. If any provision of this Agreement or the application thereof to any Member or circumstance is held invalid or unenforceable to any extent, (a) the remainder of this Agreement and the application of that provision to other Members or circumstances is not affected thereby, and (b) the Members shall negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Members in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

**12.08** *Further Assurances.* In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**12.09** *Counterparts.* This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**12.10** *Submission to Jurisdiction.* The parties hereto hereby submit to the non-exclusive jurisdiction of the Commercial Division of the Supreme Court of the State of New York, Civil Branch sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York or the Eastern District of New York and of any Delaware or U.S. Federal court located in the State of Delaware, and of any appellate court therefrom, in any action or proceeding arising out of or relating to this Agreement and agree that all claims in respect of such action or proceeding may be determined in such New York, Delaware or U.S. Federal court.

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first set forth above.

CLASS A MEMBER:                    ENRON FINANCE MANAGEMENT, LLC

                                   BY:    ENRON CORP., Sole Member


                                   By: _____
                                   Name: _Ben F. Glisan, Jr._____
                                         Vice President, Finance and
                                   Title: __Treasurer_____


INITIAL CLASS B MEMBERS:           ENRON CORP.


                                   By: _____
                                   Name: __Ben F. Glisan, Jr._____
                                          Vice President, Finance and
                                   Title: ___Treasurer_____


                                   ENRON CAPITAL INVESTMENTS CORP.


                                   By: _____
                                   Name: ___Ben F. Glisan, Jr._____
                                          Vice President, Finance and
                                   Title: ___Treasurer_____


                                   SMITH STREET LAND COMPANY


                                   By: _____
                                   Name: ___Ben F. Glisan, Jr._____
                                          Vice President, Finance and
                                   Title: ___Treasurer_____


                                   ENRON GLOBAL EXPLORATION &
                                   PRODUCTION INC.


                                   By: _____
                                   Name: ___Ben F. Glisan, Jr._____
                                          Vice President, Finance and
                                   Title: ___Treasurer_____

ENRON CARIBBEAN BASIN LLC

By:     Atlantic Commercial Finance, Inc.,
        its sole member

By: _____

Name: ___Ben F. Glisan, Jr._____

Title: ___Vice President, Finance and___
        ___Treasurer_____

CLASS C MEMBER:                    ZEPHYRUS INVESTMENTS, LLC

                                   By:_____,
                                   its managing member


                                   By:_____
                                   Name:_____
                                   Title:_____

ENRON CARIBBEAN BASIN LLC

By:    Atlantic Commercial Finance, Inc.,
       its sole member

By:_____
Name:_____
Title:_____


ZEPHYRUS INVESTMENTS, LLC

CLASS C MEMBER:

By:    The Chase Equipment Leasing, Inc.,
       its managing member

By:_____
Name: MICHAEL O'HERN
Title: Senior Vice President

## SCHEDULE I
## FINAL MEMBERS

| Member | Initial Sharing Ratio | Initial Capital Contribution |
|---|---|---|
| **CLASS A MEMBER:** | | |
| Enron Finance Management, LLC<br>1400 Smith Street<br>Houston, Texas 77002<br>Attn: Vice President, Finance and<br>Treasurer<br>Fax: (713) 646-3422 | 0% | Property Previously Contributed |
| **CLASS B MEMBERS:** | | |
| Enron Capital Investment Corp.<br>("*ECIC*")<br>1400 Smith Street<br>Houston, Texas 77002<br>Attn: Vice President, Finance and<br>Treasurer<br>Fax: (713) 646-3422 | 98.84% | Property Previously Contributed |
| Smith Street Land Company ("Smith<br>Street")<br>1400 Smith Street<br>Houston, Texas 77002<br>Attn: Vice President, Finance and<br>Treasurer<br>Fax: (713) 646-3422 | .437% | Property Previously Contributed _ |
| Enron Global Exploration & Production,<br>Inc. ("Global")<br>1400 Smith Street<br>Houston, Texas 77002<br>Attn: Vice President, Finance and<br>Treasurer<br>Fax: (713) 646-3422 | .366% | Property Previously Contributed |
| Enron Corp ("Enron")<br>1400 Smith Street<br>Houston, Texas 77002<br>Attn: Vice President, Finance and<br>Treasurer<br>Fax: (713) 646-3422 | .269% | Property Previously Contributed |

| Member | Initial Sharing Ratio | Initial Capital Contribution |
|---|---|---|
| Enron Caribbean Basin LLC ("Caribbean") 1400 Smith Street Houston, Texas 77002 Attn: Vice President, Finance and Treasurer Fax: (713) 646-3422 | .091% | Property Previously Contributed |
| **CLASS C MEMBER:** | | |
| Zephyrus Investments, LLC | 0 | $500,000,000 |
| Total | 100% | $_____ |

Schedule I-2

## EXHIBIT A-1 Enron Confirmation Letter

_____, _____

Enron Finance Partners, LLC
c/o The Chase Manhattan Bank

_____

_____

Ladies and Gentlemen:

Reference is made to the Third Amended and Restated Limited Liability Company Agreement (the *"LLC Agreement"*) of Enron Finance Partners, LLC (the *"Company"*). The Company is on the date hereof acquiring, or proposes to acquire promptly after the date hereof, [describe Core Permitted Asset] (the *"Subject Asset"*). Terms used but not defined herein have the respective meanings given to such terms in the LLC Agreement. This letter is an *Enron Confirmation Letter* referred to in the LLC Agreement. In order to induce the Company to acquire the Subject Asset and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Enron Corp. (*"Enron"*) hereby confirms and represents that the Subject Asset is a Core Permitted Asset described in clause (d) of the definition of *Core Permitted Assets* in the LLC Agreement and, accordingly, agrees with the Company as follows:

Section 1. **Obligor on the Subject Asset.** The Subject Asset is an obligation of Enron.

Section 2. **Status of Obligations of Enron Hereunder.** Enron hereby represents to the Company that:

(a) It is duly organized or formed, validly existing and (if applicable) in good standing under the laws of the jurisdiction of its formation.

(b) It has the corporate power to execute and deliver this Confirmation Letter and to perform its obligations under this Confirmation Letter and has taken all necessary action to authorize such execution, delivery and performance.

(c) Such execution, delivery and performance do not violate or conflict with any Law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any material (*"material"* for the purpose of this representation meaning creating a liability of $100,000,000 or more) contractual restriction binding on it or any of its assets.

(d) All governmental and other consents that are required to have been obtained by it with respect to the execution, delivery and performance of this Confirmation Letter have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

361302_8.DOC

Exhibit A-1-1

(e)  Its obligations under this Confirmation Letter constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(f)  Each amount that Enron is obligated to pay under this Confirmation Letter will be paid free and clear of, and without reduction by reason of, any United States withholding tax, deduction, set-off or counterclaim. If any such withholding tax, deduction, set-off or counterclaim is required to be made under applicable Law, then Enron shall (i) increase the amount payable under this Confirmation Letter so that after making all required deductions (including deductions with respect to additional sums payable under this Section 2(f)), the Company receives an amount equal to the sum it would have received had no such deduction been made, (ii) make such required deduction and (iii) pay the full amount deducted to the relevant Governmental or other authority.

Section 3.  **Status of Subject Asset.**  In addition, Enron hereby represents to the Company that:

(a)  The obligations of Enron under each agreement, instrument or other document evidencing or relating to the Subject Asset to which Enron is a party (collectively, the "*Subject Asset Documents*") constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)  Immediately following the acquisition by the Company of the Subject Asset, the Company will have good and marketable title to the Subject Asset, free and clear of all Encumbrances.

(c)  All amounts payable by Enron under the Subject Asset Documents will be paid free and clear of, and without reduction by reason of, any deduction, set-off or counterclaim.

(d)  In the event of any inconsistency between the provisions of the Subject Asset Documents and the provisions of this Confirmation Letter, the provisions of this Confirmation Letter will prevail for the purposes hereof.

Section 4.  **Provision of Financial Information.**  If Enron is not at any time subject to the reporting requirements of Sections 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended (the "*Reporting Requirements*"), then, so long as the Subject Asset is outstanding, Enron will deliver to the Company periodic financial information with respect to Enron and its consolidated Subsidiaries of the type required under the Reporting Requirements.

361302_8.DOC

Exhibit A-1-2

Section 5.  **Transferability; Benefit of Confirmation Letter.**

(a)  This Confirmation Letter shall inure to the benefit of the Company and its permitted successors and permitted transferees of the Subject Asset, in each case in accordance with the LLC Agreement.  Subject to the provisions of the LLC Agreement, the Subject Asset is freely transferable without the consent of Enron or any other Person, except that (i) no such transfer may be effected that would require registration or qualification under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or any state securities laws, and (ii) the Subject Asset shall not be transferred to a Person that is not a "United States person" within the Code Section 7701(a)(30).

(b)  Except as provided in Section 5(a), neither this Confirmation Letter nor any interest or obligation in or under this Confirmation Letter may be transferred (whether by way of security or otherwise) by Enron or the Company without the prior written consent of the other.

Section 6.  **Amendment.** No amendment, modification or waiver in respect of this Confirmation Letter will be effective unless in writing and executed by each of Enron and the Company.

Section 7.  **Indemnity and Expenses.** Enron hereby indemnifies and holds harmless the Company from and against any losses, claims, damages or liabilities incurred by the Company that are related to or arise out of (a) any misrepresentation by Enron under this Confirmation Letter or (b) the assertion against the Company by any creditor of Enron or any Enron Affiliates (other than the Company) of any Claim that may be asserted against the Company by reason of control of the Company (whether due to substantive consolidation or otherwise) by Enron and/or Enron Affiliates.  In addition, Enron hereby agrees to reimburse the Company for all reasonable expenses, including reasonable legal fees, by reason of the enforcement and protection of its rights under this Confirmation Letter, including, but not limited to, costs of collection. Notwithstanding the foregoing or any other provision hereof to the contrary, Enron shall not be liable for any amounts or damages constituting treble, punitive, exemplary, consequential or indirect damages or for loss of anticipated profit.  If (a) an Indemnified Party has become liable to a third party (that is not another Indemnified Party) for losses constituting damages specified in the preceding sentence, and (b) such Indemnified Party would be entitled to indemnification under this Agreement but for the limitation set forth in the preceding sentence, then such Indemnified Party shall nonetheless be entitled to indemnification for such losses incurred to such third party.

Section 8.  **Governing Law.** This Confirmation Letter will be governed by and construed in accordance with the law of the State of New York.

**IN WITNESS WHEREOF** Enron has executed this Confirmation Letter with effect from the date specified on the first page hereof.

**ENRON CORP.**

By:_____
    Name:
    Title:

361302_8.DOC

Exhibit A-1-4

**EXHIBIT A-2 Enron Confirmation Letter**

_____, _____

Enron Finance Partners, LLC
c/o The Chase Manhattan Bank

_____
_____
_____

Ladies and Gentlemen:

Reference is made to the Third Amended and Restated Limited Liability Company Agreement (the "*LLC Agreement*") of Enron Finance Partners, LLC ("*the Company*"). The Company is on the date hereof acquiring, or proposes to acquire promptly after the date hereof, [describe Core Permitted Asset] (the "*Subject Asset*"). Terms used but not defined herein have the respective meanings given to such terms in the LLC Agreement. This letter is a *Enron Confirmation Letter* referred to in the LLC Agreement. In order to induce the Company to acquire the Subject Asset and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Enron Corp. ("*Enron*") hereby confirms and represents that the Subject Asset is a Core Permitted Asset described in clause (e) of the definition of *Core Permitted Assets* in the LLC Agreement and, accordingly, agrees with the Company as follows:

Section 1.  **Obligor on the Subject Asset**. The Subject Asset is an obligation of [Identify Affiliate of Enron] (the "*Subject Asset Obligor*").

Section 2. **Guarantee.**

(a) Enron hereby guarantees to the Company the prompt payment when due (whether when stated to become due, by acceleration or mandatory prepayment or otherwise) of all amounts from time to time owing to the Company by the Subject Asset Obligor under each agreement, instrument or other document evidencing or relating to the Subject Asset to which the Subject Asset Obligor is a party (collectively, the "*Subject Asset Documents*"), in each case (subject to Section 2(b) below) strictly in accordance with the terms of the Subject Asset Documents (such obligations, collectively, the "*Guaranteed Obligations*"); provided, however, Enron shall not be obligated to pay any amounts under this Confirmation Letter until 5 Business Days after Enron has received written demand for payment therefor from the Company, which demand shall set forth in reasonable detail the Guaranteed Obligations or other amounts due and for which demand for payment is being made.

(b) The obligations of Enron under this Section 2 are absolute and unconditional, irrespective of the value, validity or enforceability of the obligations of the Subject Asset Obligor under the Subject Asset Documents or any other agreement or instrument referred to therein and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor in its capacity as such. Without limiting the generality of the

Exhibit A-2-1

foregoing, to the fullest extent permitted by applicable Law, the occurrence of one or more of the following shall not (x) preclude the exercise by the Company of any right, remedy or power hereunder or (y) alter or impair the obligations or liability of Enron hereunder, which will remain absolute and unconditional as described above:

(i) at any time or from time to time, without notice to Enron, the time for any performance of or compliance with any of the Guaranteed Obligations shall be waived, extended or renewed;

(ii) any of the acts mentioned in the Subject Asset Documents or any other agreement or instrument referred to therein shall be done or omitted;

(iii) any of the Guaranteed Obligations shall become due prior to their stated maturity (whether by acceleration or mandatory prepayment or otherwise), or any of the Guaranteed Obligations shall be amended or otherwise modified in any respect, or any right under the Subject Asset Documents or any other agreement or instrument referred to therein shall be amended or otherwise modified in any respect, or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released, substituted or exchanged in whole or in part or otherwise dealt with;

(iv) any lien or security interest granted to, or in favor of, the Company as security for any of the Guaranteed Obligations shall fail to be perfected;

(v) the existence of any bankruptcy or insolvency proceedings with respect to the Subject Asset Obligor or any other guarantor of any of the Guaranteed Obligations;

(vi) any incapacity or disability, or any lack of or limitation on the status or power of, the Subject Asset Obligor or any other guarantor of any of the Guaranteed Obligations; or

(vii) any change in the Laws, rules or regulations of any jurisdiction, or any present or future action or order of any Governmental or judicial authority, amending, varying, reducing or otherwise affecting the validity or enforceability of the obligations of the Subject Asset Obligor under the Subject Asset Documents or of the obligations of any other guarantor in respect of any of the Guaranteed Obligations.

(c) Enron hereby expressly waives any requirement that the Company exhaust any right, power or remedy or proceed against the Subject Asset Obligor under the Subject Asset Documents or any other agreement or instrument referred to therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations, it being agreed that this Confirmation Letter is a guarantee of payment and not of collection.

(d) Except for the demand for payment set forth in Section 2(a), Enron hereby expressly waives notice of acceptance of this Confirmation Letter and also expressly waives diligence, presentment, demand of payment, protest and notice of dishonor.

361302_8.DOC

Exhibit A-2-2

(e)  Enron hereby agrees that, until the payment and satisfaction in full of all Guaranteed Obligations, Enron will not exercise any right or remedy (including, without limitation, the filing of any proof of claim in competition with the Company in any bankruptcy or insolvency proceeding with respect to the Subject Asset Obligor) against the Subject Asset Obligor or any other guarantor of any of the Guaranteed Obligations or any security therefore arising by reason of any performance by Enron of its obligations under this Section 2, including any right of subrogation, until all of the Guaranteed Obligations shall have been paid in full. The Company shall have no obligation, and Enron obligations hereunder shall not be affected by any failure by the Company, to file any proof of claim relating to the Guaranteed Obligations in any bankruptcy or insolvency proceedings with respect to the Subject Asset Obligor. If (i) Enron shall make payment to the Company of all or any part of the Guaranteed Obligations and (ii) all of the Guaranteed Obligations shall have been paid in full, the Company shall, at Enron's request, execute and deliver to Enron appropriate documents necessary to evidence the transfer by subrogation to Enron of an interest in the Guaranteed Obligations resulting from such payment by the Guarantor.

(f)  The obligations of Enron under this Section 2 will be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Subject Asset Obligor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such payment had not been made.

(g)  This Section 2 is a continuing guaranty and shall remain in full force and effect until the payment and satisfaction in full of all Guaranteed Obligations.

Section 3.  **Status of Obligations of Enron Hereunder.**  Enron hereby represents to the Company that:

(a)  It is duly organized or formed, validly existing and (if applicable) in good standing under the laws of the jurisdiction of its formation.

(b)  It has the power to execute and deliver this Confirmation Letter and to perform its obligations under this Confirmation Letter and has taken all necessary action to authorize such execution, delivery and performance.

(c)  Such execution, delivery and performance do not violate or conflict with any Law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any material ("*material*" for the purpose of this representation meaning creating a liability of $100,000,000 or more) contractual restriction binding on it or any of its assets.

(d)  All Governmental and other consents that are required to have been obtained by it with respect to the execution, delivery and performance of this Confirmation Letter have

been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e) Its obligations under this Confirmation Letter constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(f) Each amount that Enron is obligated to pay under this Confirmation Letter will be paid free and clear of, and without reduction by reason of, any United States withholding tax, deduction, set-off or counterclaim. If any such withholding tax, deduction, set-off or counterclaim is required to be made under applicable Law, then Enron shall (i) increase the amount payable under this Confirmation Letter so that after making all required deductions (including deductions with respect to additional sums payable under this Section 3(f)) the Company receives an amount equal to the sum it would have received had no such deduction been made, (ii) make such required deduction and (iii) pay the full amount deducted to the relevant governmental or other authority.

Section 4. **Status of Subject Asset.** In addition, Enron hereby represents to the Company that:

(a) The obligations of the Subject Asset Obligor under the Subject Asset Documents constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) Immediately following the acquisition by the Company of the Subject Asset, the Company will have good and marketable title to the Subject Asset, free and clear of all Encumbrances.

(c) All amounts payable by the Subject Asset Obligor under the Subject Asset Documents will be paid free and clear of, and without reduction by reason of, any United States withholding tax, deduction, set-off or counterclaim. If any such withholding tax, deduction, set-off or counterclaim is required to be made under applicable Law, then the Subject Asset Obligor shall (i) increase the amount payable under the Subject Asset Documents so that after making all required deductions (including deductions with respect to additional sums payable under this Section 4(c)) the Company receives an amount equal to the sum it would have received had no such deduction been made, (ii) make such required deduction and (iii) pay the full amount deducted to the relevant Governmental or other authority.

361302_8.DOC

Exhibit A-2-4

(d)   In the event of any inconsistency between the provisions of the Subject Asset Documents and the provisions of this Confirmation Letter, the provisions of this Confirmation Letter will prevail for the purposes hereof.

Section 5.  **Provision of Financial Information.**  If Enron is not at any time subject to the reporting requirements of Sections 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended (the "*Reporting Requirements*"), then, so long as the Subject Asset is outstanding, Enron will deliver to the Company periodic financial information with respect to Enron and its consolidated Subsidiaries of the type required under the Reporting Requirements.

Section 6.  **Transferability; Benefit of Confirmation Letter.**

(a)   This Confirmation Letter shall inure to the benefit of the Company and its permitted successors and permitted transferees of the Subject Asset, in each case in accordance with the LLC Agreement.  The Subject Asset is freely transferable without the consent of the Subject Asset Obligor or any other person or entity, except that (i) no such transfer may be effected that would require registration or qualification under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or any state securities laws, and (ii) the Subject Asset shall not be transferred to a Person that is not a "United States person" within the Code Section 7701(a)(30).

(b)   Except as provided in Section 6(a), neither this Confirmation Letter nor any interest or obligation in or under this Confirmation Letter may be transferred (whether by way of security or otherwise) by Enron or the Company without the prior written consent of the other.

Section 7.  **Amendment.**  No amendment, modification or waiver in respect of this Confirmation Letter will be effective unless in writing and executed by each of Enron and the Company.

Section 8.  **Indemnity and Expenses.**  Enron hereby indemnifies and holds harmless the Company from and against any losses, claims, damages or liabilities incurred by the Company that are related to or arise out of (a) any misrepresentation by Enron under this Confirmation Letter or (b) the assertion against the Company by any creditor of Enron or any of its affiliates (other than the Company) of any Claim that may be asserted against the Company by reason of control of the Company (whether due to substantive consolidation or otherwise) by Enron and/or such affiliates. In addition, Enron hereby agrees to reimburse the Company for all reasonable expenses, including reasonable legal fees, by reason of the enforcement and protection of its rights under this Confirmation Letter, including, but not limited to, costs of collection. Notwithstanding the foregoing or any other provision hereof to the contrary, Enron shall not be liable hereunder for any damages or amounts (whether as a Guaranteed Obligation or otherwise) constituting treble, punitive, exemplary, consequential or indirect damages or for loss of anticipated profits. If (a) an Indemnified Party has become liable to a third party (that is not another Indemnified Party) for losses constituting damages specified in the preceding sentence, and (b) such Indemnified Party would be entitled to indemnification under this Agreement but

for the limitation set forth in the preceding sentence, then such Indemnified Party shall nonetheless be entitled to indemnification for such losses incurred to such third party.

Section 9. **Governing Law.** This Confirmation Letter will be governed by and construed in accordance with the law of the State of New York.

**IN WITNESS WHEREOF** Enron has executed this Confirmation Letter with effect from the date specified on the first page hereof.

**ENRON CORP.**

By: _____
     Name:
     Title:

361302_8.DOC

Exhibit A-2-6