# EXHIBIT 13

WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Martin J. Bienenstock (MB 3001)
Brian S. Rosen (BR 0571)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                      :
In re                                 :    Chapter 11
                                      :
ENRON CORP., ET AL.,                  :    Case No. 01-16034 (AJG)
                                      :
                                      :    Jointly Administered
                         Debtors.     :
------------------------------------------------------------ x
```

**MOTION OF ENRON CORP., ET AL., FOR
AN ORDER, PURSUANT TO SECTIONS 105
AND 363 OF THE BANKRUPTCY CODE AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 2002, 3018, 6004, 9013
AND 9019, AUTHORIZING AND APPROVING (A) THE EXECUTION,
DELIVERY AND PERFORMANCE OF (1) SETTLEMENT AGREEMENT
WITH RESPECT TO CHOCTAW TRANSACTIONS AND ZEPHYRUS
TRANSACTIONS, (2)  LIQUIDATION AGREEMENT WITH RESPECT TO
CHEROKEE FINANCE V.O.F. i.l., AND (3) REDEMPTION AGREEMENT
WITH RESPECT TO ENRON FINANCE PARTNERS, LLC, AND (B) THE
<u>CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREBY</u>**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

        Enron Corp. ("ENE"), Enron North America Corp. ("ENA") and Enron

Power Marketing, Inc. ("EPMI"), as debtors and debtors in possession (collectively, the

"Debtor Movants"), as and for their motion (the "Motion")[1] for an order, pursuant to

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Settlement
Agreement (as defined below).

sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 2002, 3018, 6004, 9013 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), authorizing and approving: (a) the execution, delivery and

performance of the (1) Settlement Agreement with respect to the Choctaw Transactions

and the Zephyrus Transactions (each as defined below), (2) Cherokee Liquidation

Agreement (as defined below), and (3) EFP Redemption Agreement (as defined below);

and (b) the consummation of the transactions contemplated thereby, respectfully

represent:

## Jurisdiction

1.      This Court has subject matter jurisdiction to consider and

determine this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409.

## Background

2.      Commencing on December 2, 2001 (the "Petition Date"), and

periodically thereafter, ENE and certain of ENE's direct and indirect subsidiaries

(collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code.  The Debtors' chapter 11 cases (collectively, the "Enron Cases")

have been procedurally consolidated for administrative purposes.

3.      The Debtors continue to be authorized to operate their businesses

and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

4.      Pursuant to section 1102 of the Bankruptcy Code, on December 12, 2001 and March 27, 2002, the United States Trustee for the Southern District of New York appointed a statutory committee of unsecured creditors (the "Creditors' Committee") and the Employment-Related Issues Committee (the "Employee Committee"), respectively.  Each of the Creditors' Committee and the Employee Committee has been reconstituted from time to time.

5.      The Debtors have filed that certain Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated January 9, 2004 (the "Plan").  By order, dated January 9, 2004, the Bankruptcy Court approved the adequacy of the information contained in the disclosure statement accompanying the Plan and authorized the solicitation of acceptances and rejections with respect thereto.  The deadline for casting ballots with respect to the Plan was 5:00 p.m., New York City time, on March 24, 2004.  However, by order, dated April 5, 2004, such deadline was extended to May 24, 2004 (the "Ballot Date"), and the hearing to consider confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code was adjourned to commence on June 3, 2004.

**Formation of Apache**
**and the Choctaw Transactions**

6.      In 1999, pursuant to a series of transactions (collectively, the "Choctaw Transactions") and the documents entered into in connection therewith, a schedule of which is set forth on Exhibit "A" annexed to the Settlement Agreement (collectively, the "Choctaw Documents"), ENE and certain of its affiliates established the Apache financing structure.  As set forth in the below diagram, the Apache structure

consisted of the following entities: (a) ENE; (b) Ojibway, Inc. ("Ojibway"); (c) Sequoia

Financial Assets, LLC ("Sequoia"); (d) The Lucelia Foundation, Inc. ("Lucelia"); (e)

Seminole Capital LLC ("Seminole"); (f) Cheyenne Finance S.a.r.l. ("Cheyenne"); (g)

Cherokee Finance V.O.F. i.l. ("Cherokee"); (h) Choctaw Investors B.V. ("Choctaw"); (i)

Rabo Merchant Bank N.V. ("Rabo"); (j) certain lenders (collectively, the "Choctaw

Lenders") party to the Credit Agreement (as defined below), including JPMorgan Chase

Bank (f/k/a The Chase Manhattan Bank, successor by merger to Chase Bank of Texas,

N.A.) ("JPMC"), as a Choctaw Lender and as administrative and collateral agent for the

Choctaw Lenders; (k) Enron Capital Ventures, LLC ("ECV"); and (l) EBS Ventures,

LLC ("EBS").

       7.     Sequoia was formed as a "Financial Asset Securitization

Investment Trust," in accordance with section 860L of the Internal Revenue Code of

1986, as amended, to securitize thirty-day receivables owed to ENE, ENA and EPMI, and

to issue securities backed by those receivables, cash and short-term commercial paper

issued by ENA and ENE.  ENE purchased a Fifty Million Dollar ($50,000,000.00) Class

A subordinated interest in Sequoia, and Ojibway, an unrelated party, purchased a Two

Million Dollar ($2,000,000.00) Class O interest in Sequoia.

       8.     At or about such time, ENE formed and capitalized Seminole by

contributing approximately Seven Hundred Fifty Million Dollars ($750,000,000.00)

thereto in exchange for a ninety-nine and eight-tenths percent (99.8%) limited liability

company membership interest in Seminole.[2]  Thereafter, Cheyenne was formed and

---

[2] Lucelia owns the remaining two-tenths percent (0.2%) limited liability company interest in Seminole.

capitalized by Seminole contributing Seven Hundred Fifty Million Dollars ($750,000,000.00) thereto in exchange for all of the ownership interests of Cheyenne.

9.      On May 28, 1999, Cherokee, an entity designed to make loans to Sequoia, was formed.  At that time, Choctaw, the Choctaw Lenders and Chase Bank of Texas, N.A. entered into that certain Credit Agreement, dated as of May 28, 1999 (the "Credit Agreement"), pursuant to which the Choctaw Lenders made certain loans to Choctaw.[3]  Choctaw used such proceeds to purchase all of the preferred equity interests of Cherokee (the "Cherokee Preferred Interests"), and used such Cherokee Preferred Interests to secure the loan arising from such Credit Agreement.  In addition, Cheyenne contributed approximately Seven Hundred Fifty Million Dollars ($750,000,000.00) to Cherokee in exchange for all of the common equity interests of Cherokee.  As a result of the aforementioned transactions, Cherokee was capitalized with approximately One Billion Two Hundred Fifty Million Dollars ($1,250,000,000.00).[4]

10.     Pursuant to that certain Amended and Restated Note Purchase Agreement (the "Cherokee Note Purchase Agreement"), dated as of December 22, 2000, by and between Cherokee and Sequoia, Cherokee purchased from Sequoia, on the first business day of each month, senior secured notes issued by Sequoia to Cherokee (the "Sequoia/Cherokee Notes").  Sequoia used the proceeds from its sale of the Sequoia/Cherokee Notes to purchase from ENE and certain of its affiliates short-term, ordinary course, trade receivables (the "Enron Receivables") pursuant to that certain Sale

---

[3] Rabo also contributed approximately Fifteen Million Dollars ($15,000,000.00) to Choctaw in exchange for approximately three percent (3%) of the equity interests of Choctaw.

[4] Cherokee also owns ECV LLC and EBS LLC.

and Servicing Agreement, dated as of May 28, 1999, as amended and restated by that

certain Amended and Restated Sale and Servicing Agreement, dated as of December 22,

2000, by and among ENE, as servicer, certain ENE affiliates, as sellers of Enron

Receivables, and Sequoia (the "Servicing Agreement").  As servicer, ENE would collect

the Enron Receivables, and Sequoia would apply the proceeds thereof to the amounts due

from Sequoia to Cherokee pursuant to the Sequoia/Cherokee Notes.  Cherokee would

then contemporaneously purchase interim notes from Sequoia.  Sequoia used the

proceeds of the interim notes to purchase from ENE certain indebtedness issued by ENA

to ENE and evidenced by the Intercompany Note, dated May 28, 1999 (the "ENA

Paper").  ENE guaranteed the payment of the ENA Paper pursuant to the Servicing

Agreement (the "ENE/Sequoia Guaranty").  The ENA Paper matured, and was payable in

cash, on the last day of each month.  Sequoia used such cash to redeem the outstanding

Sequoia/Cherokee Notes.  On the first business day of the following month, Cherokee

would purchase new Sequoia/Cherokee Notes from Sequoia to finance Sequoia's

acquisition of new Enron Receivables and the next monthly cycle would begin anew.

      11.     In order to secure Sequoia's obligations to Cherokee under the

Sequoia/Cherokee Notes, Sequoia granted to JPMC, as collateral agent for the benefit of

Cherokee, a lien upon, and security interest in, among other things, certain receivables,

commercial paper and other assets, including certain property held by or on behalf of

Sequoia.

      12.     On or about November 1, 2001: (a) ENA executed and delivered a

promissory note to Cherokee (the "ENA/Cherokee Note") in the original principal

amount of Eight Hundred Twenty Million Dollars ($820,000,000.00); and (b) by

confirmation letter, ENE guaranteed to Cherokee the payment and performance of ENA pursuant to the ENA/Cherokee Note (the "ENE/Cherokee Guaranty").

13.     On the Petition Date, and in connection with the Choctaw Transactions: (a) ENE maintained a receivable in the amount of One Billion Three Hundred Ten Million Dollars ($1,310,000,000.00) from Sequoia (the "Sequoia/ENE Receivable"); (b) Sequoia held ENA Paper having an outstanding principal balance of Six Hundred Seventy-Six Million Dollars ($676,000,000.00); (c) Sequoia held, and was the beneficiary of, the ENE/Sequoia Guaranty; (d) Sequoia maintained a receivable in the amount of One Billion Three Hundred Ten Million Dollars ($1,310,000,000.00) from ENA (the "ENA/Sequoia Receivable"); (e) Cherokee held Sequoia/Cherokee Notes in the original principal amount of approximately Six Hundred Eleven Million Dollars ($611,000,000.00); (f) Cherokee held the ENA/Cherokee Note; and (g) Cherokee held, and was the beneficiary of, the ENE/Cherokee Guaranty.

14.     The following chart illustrates the corporate and capital structures associated with the Choctaw Transactions, as well as assets held, as of the Petition Date.

**Project Apache**
**Structure as of December 2, 2001**



**Formation of Tammy
and the Zephyrus Transactions**

15.    In 2000, pursuant to a series of transactions (collectively, the "Zephyrus Transactions") and the documents entered into in connection therewith, a schedule of which is set forth on Exhibit "B" annexed to the Settlement Agreement (collectively, the "Zephyrus Documents"), ENE and certain of its affiliates established the Tammy financing structure.  As set forth in the below diagram, the Tammy structure consisted of the following entities: (a) ENE; (b) Enron Finance Management, LLC ("EFM"); (c) Smith Street Land Company ("SSLC"); (d) Enron Global Exploration & Production, Inc. ("EGEPI"); (e) Boreas Holdings, Corp. ("Boreas"); (f) Enron Caribbean Basin LLC ("ECB"); (g) Enron Capital Investments Corp. ("ECIC"); (h) Zephyrus Investments, LLC ("Zephyrus"); (i) Enron Finance Partners, LLC ("EFP"); (j) Enron Intermediate Holdings, LLC ("EIH"); (k) Enron Asset Holdings, LLC ("EAH"); (l) Enron Oil & Gas India, Ltd. ("EOGIL"); (m) Enron LNG Power (Atlantic), Ltd. ("Enron LNG"); (n) certain subsidiaries of Enron LNG; (o) certain lenders (collectively, the "Zephyrus Lenders") party to the Funding Agreement (as defined below), including JPMC, as a Zephyrus Lender and as administrative agent and collateral agent for the Zephyrus Lenders; and (p) ECM III.  EFM, SSLC, EGEPI, Boreas, ECB, ECIC and their subsidiaries are all indirectly or directly owned by ENE.

16.    EFP has three classes of membership interests, i.e. Class A, Class B and Class C.  EFM holds all of the Class A membership interests of EFP.  SSLC, EGEPI, Boreas, ECB and ECIC (collectively, the "Class B Members") hold all of the

Class B membership interests of EFP.  Zephyrus holds all of the Class C membership interests of EFP (the "EFP Preferred Interests").

17.    In 2000, Zephyrus was formed and capitalized pursuant to that certain Funding Agreement, dated as of November 28, 2000, by and among Zephyrus, the Zephyrus Lenders, certain financial institutions as purchasers of equity interests in Zephyrus (the "Certificate Purchasers"), JPMC, Bank of America, N.A. ("BofA"), BNP Paribas ("BNP") and Fleet National Bank, as co-agents, and Chase Securities, Inc. (the "Funding Agreement"), by which the Zephyrus Lenders loaned funds to Zephyrus and the Certificate Purchasers purchased membership interests in Zephyrus.  Thereafter, Zephyrus used such funds to purchase the EFP Preferred Interests.

18.    Except for the proceeds of the EFP Preferred Interests and a One Hundred Twenty-Five Million Dollar ($125,000,000.00) demand note issued by ENE (the "ENE/EFP Note"), EFP contributed all of its assets to EIH in exchange for one hundred percent (100%) of the membership interests of EIH.  EIH, in turn, contributed these assets, except for a Two Hundred Million Dollar ($200,000,000.00) demand note issued by ENE (the "ENE/EIH Note"), to EAH in exchange for all of the Class B membership interests of EAH.  As a result of such contributions: (a) EFP holds the ENE/EFP Note; (b) EIH holds the ENE/EIH Note; and (c) EAH holds all of the remaining contributed assets.[5]

---

[5] As of November 20, 2001, EAH's assets consisted of: (a) Four Hundred Thousand Dollars ($400,000.00) in cash; (b) one hundred percent (100%) of the stock of EOGIL; (c) a Thirty-Two Million Five Hundred Thousand Dollar ($32,500,000.00) note receivable from EGEPI China Company, a Mauritius company; (d) an ENE note receivable in the amount of Five Hundred Forty-Two Million Dollars ($542,000,000.00), representing proceeds from the sale of stock of Enron Oil & Gas Company; (e) a Twenty Million Dollar ($20,000,000.00) note receivable issued by EFM; (f) an option to purchase all of the common stock of Enron Renewable Energy Corp., a Debtor, for One Dollar ($1.00); (g) one hundred percent (100%) of the

19.    Similar to the transactions involving Cherokee and Sequoia, EFP purchased from Sequoia on the first business day of each month, senior secured notes issued by Sequoia (the "Sequoia/EFP Notes") pursuant to that certain Note Purchase Agreement, dated as of December 22, 2000 (collectively with the Cherokee Note Purchase Agreement, the "Note Purchase Agreements"), by and between Sequoia and EFP. Sequoia combined the proceeds from the sale of the Sequoia/EFP Notes with the proceeds of the Sequoia/Cherokee Notes to purchase Enron Receivables pursuant to the Servicing Agreement. As the proceeds of the Enron Receivables were collected and, in part, applied to repay the Sequoia/EFP Notes, EFP would contemporaneously purchase interim notes from Sequoia, the proceeds of which were combined by Sequoia with proceeds from the sale of interim notes to Cherokee and used to purchase ENA Paper. The interim notes sold to EFP were repaid from the cash paid at maturity of the ENA Paper at the end of each month and, similar to Cherokee, EFP would purchase new Sequoia/EFP Notes on the first business day of the following month to begin the monthly investment cycle anew. In order to secure Sequoia's obligations to EFP under the Sequoia/EFP Notes, Sequoia granted to JPMC, as collateral agent for the benefit of EFP, a lien upon and security interest in, among other things, the Enron Receivables, the ENA Paper and other assets, including certain property held by or on behalf of Sequoia.

20.    On or about November 1, 2001: (a) ENA executed and delivered a promissory note to EFP (the "ENA/EFP Note") in the original principal amount of Five Hundred Eight Million Dollars ($508,000,000.00). JPMC and the Zephyrus Lenders

---

stock of Enron LNG; and (h) a derivative interest in a receivable representing proceeds from the sale of East Coast Power LLC.

assert, and ENE disputes, that ENE guaranteed to EFP the payment and performance of ENA pursuant to the ENA/EFP Note (the "Disputed ENE/EFP Guaranty").

21.     On the Petition Date, and in connection with the Zephyrus Transactions: (a) EFP held Sequoia/EFP Notes in the amount of Six Million Dollars ($6,000,000.00); (b) EFP held the ENA/EFP Note; (c) EFP held the ENE/EFP Note; and (d) JPMC asserts, and ENE disputes, that EFP held, and was the beneficiary of, the Disputed ENE/EFP Guaranty.

22.     The following chart illustrates the corporate and capital structures associated with the Zephyrus Transactions, as well as assets held, as of the Petition Date.

**Project Tammy**
**Structure as of December 2, 2001**



**Post-Petition Actions and Litigation With Respect to**
**the Choctaw and Zephyrus Transactions**

23.    On or about November 29, 2001, as a result of a downgrade in

ENE's credit rating, JPMC, as agent for the Choctaw Lenders and Zephyrus Lenders,

issued default notices to ENE and certain entities affiliated to Choctaw and Zephyrus (the

"Downgrade Notices").  The Downgrade Notices triggered certain restrictive provisions

of the Credit Agreement, the Funding Agreement, the Note Purchase Agreements and the

Servicing Agreement.  After the Petition Date, in connection with such transactions,

JPMC, as collateral agent and administrative agent, alleged and asserted certain rights to

enforce and realize upon certain collateral relating to the Choctaw Transactions and the

Zephyrus Transactions, in accordance with the terms of the Choctaw Documents and the

Zephyrus Documents.

24.    On December 11, 2001, JPMC filed a complaint commencing an

action against certain of the Debtors, styled <u>JPMorgan Chase Bank, as Administrative</u>

<u>Agent</u> v. <u>Enron Corp., Enron North America Corp. and Enron Power Marketing, Inc.</u>,

Adversary Proceeding No. 01-3637 (AJG) (the "JPMC Action"), in the Bankruptcy Court

seeking, among other relief, a turnover of property, an accounting and certain injunctive

relief with respect to the Choctaw Transactions and the Zephyrus Transactions.  The

aggregate value of the Apache and Tammy-related assets affected by the JPMC Action is

approximately Two Billion One Hundred Million Dollars ($2,100,000,000.00).

25.    JPMC (as agent for itself and on behalf of the Choctaw Lenders

and the Zephyrus Lenders), certain of the Choctaw Parties, certain of the Zephyrus

Parties, Cherokee and EFP filed, or cause to be filed, the following claims (collectively,

the "Claims") in connection with the Choctaw Transactions and the Zephyrus

Transactions:

| Claim | Claimant | Debtor | Amount |
|-------|----------|--------|--------|
| 11125 | JPMC, as Collateral Agent on behalf of Sequoia | ENA | $1,986,020,410.00 plus |
| 11126 | EFP | ENE | $1,339,140,987.00 plus |
| 11127 | EFP | ENA | $508,000,000.00 plus |
| 11128 | EFP | Smith Street Land Company | Unliquidated |
| 11129 | JPMC, as Collateral Agent on behalf of Zephyrus | ENE | Unliquidated |
| 11130 | JPMC, as Collateral Agent on behalf of Zephyrus | Smith Street Land Company | Unliquidated |
| 11131 | JPMC, as Administrative Agent | ENE | $481,725,000.00 plus |
| 11132 | Cherokee | ENE | $1,480,726,659.00 plus |
| 11133 | Cherokee | ENA | $820,000,000.00 plus |
| 11134 | JPMC, as Collateral Agent on behalf of Choctaw | ENE | Unliquidated |
| 11135 | JPMC, as Administrative Agent | ENE | $485,000,000.00 plus |

| 11156 | JPMC, as Collateral Agent on behalf of Sequoia | ENE | $1,988,698,523.00 plus |
|---|---|---|---|
| 13295 | ABN AMRO | ENE and ENA | Unliquidated |
| 13849 | BNP | ENA | $45,348,687.50 |
| 13856 | BNP | ENE | $45,348,687.50 plus |
| 14089 | ABN AMRO | ENE and ENA | Unliquidated |
| 18517 | BNP | ENA | $50,599,984.44 plus |
| 18518 | BNP | ENE | $50, 599,984.44 plus |

26.     On October 29, 2002, ENE filed a complaint commencing an

action against BofA, styled Enron Corp. v. Bank of America, N.A., Adversary

Proceeding No. 02-3436 (AJG) (the "BofA Action"), in the Bankruptcy Court seeking,

among other relief, the turnover of ENE property, allegedly improperly seized by BofA,

valued at approximately One Hundred Twenty-Three Million One Hundred Eighty-Seven

Thousand Six Hundred Seventy-Four Dollars and Twelve Cents ($123,187,674.12), together with any interest accrued from and after the date of seizure.

27.     By motion, dated May 9, 2003 (the "Intervention Motion"), JPMC sought to intervene as a plaintiff in the BofA Action on the basis that, among other things, certain of the proceeds seized by BofA were proceeds of Enron Receivables associated with the Choctaw Transactions and the Zephyrus Transactions.

28.     Pursuant to that certain Stipulation and Order Resolving Motion of JPMorgan Chase Bank to Intervene in Adversary Proceeding, dated August 7, 2003 (the "BofA Action Stipulation"): (a) the Intervention Motion was withdrawn without prejudice; and (b) ENE agreed that the first Fifteen Million Dollars ($15,000,000.00) recovered by ENE in connection with the BofA Action (or a compromise and settlement thereof) would be retained by ENE and disbursed (i) upon entry of a final judgment or final order in the JPMC Action, or (ii) if the JPMC Action is dismissed without the entry of such final order, upon the agreement of the Debtors and the Creditors' Committee or as otherwise ordered by the Bankruptcy Court.

29.     On December 1, 2003, ENE filed a complaint commencing an action, styled Enron Corp. v. Cherokee Finance V.O.F., et al., Adversary Proceeding No. 03-93602 (AJG) (the "ENE Guaranty Action"), in the Bankruptcy Court, seeking, among other relief, the avoidance of certain guarantees of ENE (including the ENE/Cherokee Guaranty) in accordance with section 548(a) of the Bankruptcy Code.

30.     On January 9, 2004: (a) the Bankruptcy Court entered the Order, Pursuant to Sections 105(a), 502, 1125 and 1126 of the Bankruptcy Code and Rules 3003, 3017 and 3018 of the Federal Rules of Bankruptcy Procedure Establishing Voting

Procedures in Connection With the Plan Process and Temporary Allowance of Claims Procedures Related Thereto (as modified from time to time, the "Voting Procedures Order"); and (b) the Debtors filed the Omnibus Objection to Proofs of Claim (the "Omnibus Objection"), which *inter alia*, objected to Claims No. 11125, 11126, 11127, 11128, 11129, 11130, 11131, 11132, 11133, 11134, 11135 and 11156 filed by JPMC, as agent for itself and the Choctaw Lenders and the Zephyrus Lenders, that, together with Claims No. 13295, 13849, 13856, 14089, 18517 and 18518, are the subject of the Settlement Agreement, the Cherokee Liquidation Agreement and the EFP Redemption Agreement (collectively, the "Proposed Agreements"). In accordance with the terms of the Voting Procedures Order, absent further order of the Bankruptcy Court, the Claims are not entitled to vote with respect to the Plan. Accordingly, JPMC, as agent for itself and the Choctaw Lenders and the Zephyrus Lenders, filed a motion for temporary allowance of certain of the Claims, which will be heard by the Bankruptcy Court on a date to be determined.

**The Settlement Agreement**

31.     In connection with the foregoing, certain parties entered into extensive, arm's length and good faith negotiations and discussions to resolve such structures, lawsuits and Claims. As a result of such negotiations, on or about May 10, 2004, such parties executed that certain Settlement Agreement (the "Settlement Agreement"), by and among ENE, ENA, EPMI, Sequoia, Cheyenne,[6] Cherokee, EFP, JPMC (as: (a) Administrative Agent pursuant to the (i) Credit Agreement, and (ii) the

---

[6] ENE, ENA, EPMI, Sequoia and Cheyenne shall be referred to collectively herein as the "Enron Parties."

Funding Agreement; (b) Collateral Agent pursuant to that certain Amended and Restated

Security Agreement, dated as of December 22, 2000, by and among Sequoia, Cherokee,

EFP and JPMC (the "Security Agreement"); and (c) attorney-in-fact for Sequoia pursuant

to the Security Agreement) and certain of the Choctaw Lenders and the Zephyrus

Lenders. A copy of the Settlement Agreement is annexed hereto as Exhibit "A."

32.    The salient terms of the Settlement Agreement are as follows:[7]

- <u>Allowance of Claims</u>.  On the Effective Date: (a) Claim Nos. 11125, 11126, 11127, 11132 and 11133 shall be allowed as general unsecured claims against the respective Debtors in the following amounts (i) Claim No. 11125, as a Class 5 Claim against ENA, in the amount of One Billion Nine Hundred Eighty-Six Million Twenty Thousand Four Hundred Ten Dollars ($1,986,020,410.00), (ii) Claim No. 11126 in the amount of Four Hundred Fifteen Million Five Hundred Thousand Dollars ($415,500,000.00), bifurcated into a Class 4 Claim against ENE under the Plan in the amount of One Hundred Thirty-Five Million Dollars ($135,000,000.00) and an Allowed ENE Guaranty Claim, Class 185 under the Plan, in the amount of Two Hundred Eighty Million Five Hundred Thousand Dollars ($280,500,000.00), (iii) Claim No. 11127, as a Class 5 Claim against ENA, in the amount of Five Hundred Ten Million Dollars ($510,000,000.00), (iv) Claim No. 11132, as a Class 185 Allowed ENE Guaranty Claim under the Plan, in the amount of Seven Hundred Ninety-Six Million Five Hundred Thousand Dollars ($796,500,000.00), and (v) Claim No. 11133, as a Class 5 Claim against ENA, in the amount of Eight Hundred Twenty-Two Million Dollars ($822,000,000.00) (each an "Allowed Claim" and collectively, the "Allowed Claims"); (b) Claim Nos. 11128, 11129, 11130, 11131, 11134, 11135, 11156, 13295 (to the extent of the Choctaw Transactions and the Zephyrus Transactions), 13849, 13856, 14089 (to the extent of the Choctaw Transactions and the Zephyrus Transactions), 18517 and 18518, together with any other proofs of claim filed by any of the Choctaw Lenders or the Zephyrus Lenders with respect to the Choctaw Transactions and the Zephyrus Transactions, respectively, shall be disallowed and expunged; and (c) the Debtors shall take such action as is appropriate, and each of JPMC, the Choctaw Parties and the Zephyrus Parties consent to cause the allowance and disallowance thereof to be reflected on the claims docket of the Enron Cases.

---

[7] The summary of the terms of the Settlement Agreement set forth herein is qualified by the entire text of the Settlement Agreement, which shall govern the understanding between the parties thereto.

- <u>Assignment of Claims</u>.  On the Effective Date, and except to the extent provided in Sections 3.6 and 4.4 of the Settlement Agreement, in full and complete satisfaction of any other claims, causes of action, damages, obligations, rights and interests which may be outstanding pursuant to the Choctaw Transactions, the Choctaw Documents, the Zephyrus Transactions and the Zephyrus Documents, the Allowed Claims shall be assigned as follows:

    (a) Pursuant to the Choctaw Transactions and the Choctaw Documents and subject to the limitations set forth in the provisions of Section 3.4 of the Settlement Agreement and the Cherokee Liquidation Agreement, in full and complete satisfaction of any and all claims that Cherokee, JPMC, as agent, and the Choctaw Lenders may have against Sequoia and the Enron Parties (except with respect to making distributions on account of the Allowed Claims pursuant to the Plan) in connection with the Choctaw Transactions and the Choctaw Documents, Allowed Claim No. 11125, solely to the extent of One Billion Nine Hundred Sixty-Eight Million Twenty Thousand Four Hundred Ten Dollars ($1,968,020,410.00), shall be assigned by Sequoia to Cherokee and a portion thereof, together with Allowed Claim No. 11132 and Allowed Claim No. 11133, shall be assigned by Cherokee to JPMC as agent for the Choctaw Lenders.

    (b) Pursuant to the Zephyrus Transactions and the Zephyrus Documents and subject to the limitations set forth in the provisions of Section 3.5 of the Settlement Agreement and the EFP Redemption Agreement, in full and complete satisfaction of any and all claims that EFP, JPMC, as agent, and the Zephyrus Lenders may have against Sequoia and the Enron Parties (except with respect to making distributions on account of the Allowed Claims pursuant to the Plan) in connection with the Zephyrus Transactions and the Zephyrus Documents, Allowed Claim No. 11125, solely to the extent of Eighteen Million Dollars ($18,000,000.00), shall be assigned to EFP, and such claim, together with Allowed Claim No. 11126 and Allowed Claim No. 11127 shall be assigned by EFP to JPMC as agent for the Zephyrus Lenders.

- <u>Distribution of Plan Recoveries</u>.  Pursuant to the terms of the Cherokee Liquidation Agreement and the EFP Redemption Agreement: (a) each holder of Choctaw Indebtedness or Zephyrus Funding shall be entitled to receive its *pro rata* share of distributions pursuant to the Plan on account of the Allowed Claims distributed pursuant to the Cherokee Liquidation Agreement or the EFP Redemption Agreement, as the case may be,

including without limitation, the Assigned Claims, except to the extent that such holder holds Recovery Action Indebtedness,[8] in which case, distributions on account of Allowed Claims, including without limitation, the Assigned Claims, corresponding to such Recovery Action Indebtedness which otherwise would be made in accordance with the terms and the provisions of the Plan on account of the Allowed Claims, including, without limitation, the Assigned Claims, shall be placed into the Disputed Claims Reserve in accordance with the terms and conditions of Section 21.3 of the Plan; and (b) the holder of such Recovery Action Indebtedness shall receive no distributions on account of the Allowed Claims, including, without limitation, the Assigned Claims, corresponding to such Recovery Action Indebtedness until the earliest to occur of (i) entry of a final order or final judgment in the Recovery Action[9] dismissing the claims and causes of action asserted against such Recovery Action Defendant, in which case, any distributions so reserved shall be released to JPMC, as agent for the holder of such Recovery Action Indebtedness, (ii) entry of a final order or final judgment granting the relief requested in the Recovery Action, in which case, any distributions so reserved shall be released to ENE or, in the event that the Litigation Trust has been created and Litigation Trust Claims are assigned thereto, to the Litigation Trust, as the case may be, and (iii) entry of a final order of the Bankruptcy Court compromising and settling the claims and causes of action asserted against such Recovery Action Defendant in the Recovery Action, in which case, any distributions so reserved shall be released to the party entitled thereto in connection with such compromise and settlement.

- Dismissal of Litigation. On the Effective Date, but in no event later than ten (10) business days thereafter, each of the JPMC Action and the ENE Guaranty Action shall be dismissed with prejudice and the parties thereto shall be released from any obligation to produce materials in accordance with any outstanding discovery requests therein and any such obligation to produce materials shall be stayed from the date of the Settlement Agreement through the Effective Date.

---

[8] "Recovery Action Indebtedness" means any Choctaw Indebtedness or Zephyrus Funding that was held, as of the Petition Date, by a "Recovery Action Defendant," which means: (a) with respect to any Choctaw Party or Zephyrus Party that is not named as a defendant in the Recovery Action, Citibank, N.A., JPMorgan Chase Bank, Barclays Bank PLC, Deutsche Bank AG, Canadian Imperial Bank of Commerce, Merrill Lynch & Co., Inc., Credit Suisse First Boston, Inc., The Toronto-Dominion Bank, The Royal Bank of Scotland or Royal Bank of Canada and each of their respective subsidiaries and affiliates named as a defendant in the Recovery Action; and (b) with respect to any Choctaw Party or Zephyrus Party that is named as a defendant in the Recovery Action, any entity named as a defendant in the Recovery Action.

[9] "Recovery Action" means that certain adversary proceeding styled Enron Corp. and Enron North America Corp. v. Citigroup Inc., et al., Adversary Proceeding No. 03-9266 (AJG), pending in the Bankruptcy Court.

- <u>Liquidation of Cherokee</u>.  Contemporaneously with the Settlement Agreement, Cherokee, Cheyenne and JPMC, as holder of the claim in respect of the Cherokee Preferred Interests in its capacity as agent for the Choctaw Lenders, shall enter into the Cherokee Liquidation Agreement, the salient terms of which are set forth below.

- <u>Redemption of EFP Preferred Interests by EFP</u>.  Contemporaneously with the Settlement Agreement, the members of EFP and JPMC, as a Zephyrus Lender and as agent for the Zephyrus Lenders, shall enter into the EFP Redemption Agreement, the salient terms of which are set forth below.

- <u>Release of Cherokee and EFP</u>.  On the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the Proposed Agreements, (a) the Enron Parties, for and on behalf of themselves and each of their officers, employees and agents (collectively, the "Enron Releasors"); and (b) JPMC, each of the Choctaw Parties and the Zephyrus Parties (collectively, the "Choctaw/Zephyrus Releasors") and their respective successors and assigns and each of their affiliates, officers, employees and agents, shall irrevocably and unconditionally forever release, acquit and forever discharge Cherokee, EFP, Sequoia, Cheyenne, EBS, ECV, Enron Netherlands Holdings B.V., Seminole, EFM, SSLC, EGEPI, Boreas, ECB, ECIC, EIH and EAH and each of their respective past and present officers, directors, and employees (collectively, the "Cherokee/EFP Releasees"), from any and all claims, demands, liabilities and causes of action of any and every kind, character or nature whatsoever, in law or in equity, whether asserted or unasserted, which the Enron Releasors, the Choctaw/Zephyrus Releasors, or any of them, have or may have or claim to have, now or in the future, against any Cherokee/EFP Releasee to the extent arising under, relating to, or connected with the Choctaw Transactions, the Choctaw Documents, the Zephyrus Transactions, the Zephyrus Documents or any act of commission or omission under or in respect of the Choctaw Transactions, the Choctaw Documents, the Zephyrus Transactions or the Zephyrus Documents.  Notwithstanding anything contained in the Settlement Agreement or elsewhere to the contrary, the foregoing is not intended to nor shall it have the effect of: (u) releasing any claim or cause of action of the Enron Releasors or the Choctaw/Zephyrus Releasors under or in respect of the Allowed Claims or precluding any of the Cherokee/EFP Releasees from offering into evidence the existence of such release, the Settlement Agreement, the Cherokee Liquidation Agreement, the EFP Redemption Agreement or the Approval Order in connection with any action to enforce the same; (v) releasing the Cherokee/EFP Releasees from the performance of their

obligations in accordance with the Settlement Agreement and the terms of the Approval Order; (w) releasing the Cherokee/EFP Releasees from the performance of their obligations in accordance with the Cherokee Liquidation Agreement or the EFP Redemption Agreement; (x) releasing any claim or cause of action of the Choctaw/Zephyrus Releasors or the Settlement Agreement Enron Releasors arising under the Settlement Agreement, the Cherokee Liquidation Agreement, the EFP Redemption Agreement or under the Approval Order; (y) releasing any claim or cause of action in any action, suit or proceeding permitted pursuant to the provisions of Section 4.4 of the Settlement Agreement; or (z) releasing any claim or cause of action of any Choctaw/Zephyrus Releasor against any other Choctaw/Zephyrus Releasor.

- <u>Resignation of Management Appointees</u>.  On the Effective Date: (a) each of the persons appointed by JPMC, on behalf of itself, the Choctaw Lenders and the Zephyrus Lenders, shall, without the need for further action or order of the Bankruptcy Court, be deemed to have resigned from the board of Cherokee and EFP, respectively; and (b) JPMC shall provide a schedule of all actions taken by Cherokee and EFP while such persons appointed by JPMC, on behalf of itself, the Choctaw Lenders and the Zephyrus Lenders, served as directors of Cherokee or EFP, as the case may be.

- <u>Release of Collateral</u>.  On the Effective Date, but in no event later than ten (10) business days thereafter, JPMC shall take any additional action as requested by the Enron Parties that is necessary to release any liens upon and security interests in the assets of Sequoia remaining after giving effect to the assignment of the Allowed Claims, including without limitation, the execution and delivery of UCC-3 financing statements in accordance with Section 5.11 of the Security Agreement.

- <u>BofA Litigation</u>.  On the Effective Date, the Debtors shall have been deemed to have satisfied all obligations with respect to the BofA Action Stipulation, including, without limitation, those set forth in decretal paragraph 2 thereof, and JPMC, all of the Choctaw Lenders and all of the Zephyrus Lenders shall, without the need for further action or order of the Bankruptcy Court, be deemed to have waived, released and discharged any claim, lien, security interest or other interest, with respect to the Choctaw Transactions and/or the Zephyrus Transactions, in the monies seized by BofA and that are the subject of the BofA Action.

- <u>Recovery Action Indebtedness</u>.  The parties to the Settlement Agreement agree that: (a) a Recovery Action Defendant's act of acquiring Choctaw Indebtedness or Zephyrus Funding, as the case may be, during the period following the Petition Date shall not form the basis of any (i) claims that

might be premised, in part, upon the knowledge of, duty of, or course of conduct by counterparties in connection with transactions with or among the Debtors, the Enron Parties, ENE officers, and/or related entities arising from or relating to the period prior to the Petition Date (the "Course of Conduct Claims") or (ii) any claim by any party-in-interest seeking to subordinate, disallow or seek the waiver of any claim of such Recovery Action Defendant relating to such Choctaw Indebtedness or Zephyrus Funding, if such Recovery Action Defendant did not hold Recovery Action Indebtedness and/or did not have or hold any direct or indirect rights, obligations, interests or claims of any kind or nature whatsoever in any of the Choctaw Transactions or the Zephyrus Transactions or under the Choctaw Documents or Zephyrus Documents prior to or as of the Petition Date; and (b) Course of Conduct Claims shall not be used to withhold or challenge any distributions to be made to any Choctaw Party or Zephyrus Party on account of Allowed Claims, pursuant to the Settlement Agreement, the Cherokee Liquidation Agreement or the EFP Redemption Agreement, except to the extent that the interest of such Choctaw Party or Zephyrus Party, as the case may be, in such Allowed Claim constitutes Recovery Action Indebtedness.

- Covenants of Choctaw/Zephyrus Parties. Each of JPMC, the Choctaw Parties and the Zephyrus Parties agrees and covenants as follows:

  (a) In connection with the solicitation of ballots with respect to the Plan, JPMC (i) as holder of the claim in respect of the Cherokee Preferred Interests in its capacity as agent for the Choctaw Lenders, and (ii) as agent for the Zephyrus Lenders, in their respective capacities as asserted holders of the Cherokee Preferred Interests and the EFP Preferred Interests, shall, upon entry of a scheduling order with respect to this Motion, direct Cherokee and EFP, as the case may be, to vote each of the Allowed Claim Nos. 11126, 11127, 11132, 11125 and the portion of 11125 allocable to the Choctaw Lenders and the Zephyrus Lenders in accordance with the provisions of the Cherokee Liquidation Agreement and the EFP Redemption Agreement in favor of the Plan by delivering its duly executed and completed ballot in favor of the Plan and will not change or withdraw (or cause to be changed or withdrawn) such vote(s);[10]

---

[10] JPMC is not voting any portion of the Allowed Claims that ultimately inures to the benefit of an affiliate of the Debtors. Although the Debtor Movants believe that such Allowed Claims, in their entirety, could be voted by JPMC on behalf of Cherokee or EFP, as the case may be, the Debtor Movants wish to avoid any arguments that the Claims asserted by such entities were controlled by the Debtors, notwithstanding JPMC's superior rights with respect to the governance thereof.

(b) JPMC and each of the Choctaw Parties and Zephyrus Parties, solely in their capacity as a Choctaw Lender or a Zephyrus Lender, shall not, and shall not cause Cherokee or EFP to, at any time prior to the termination of the Settlement Agreement vote (or cause to be voted), in favor of, or otherwise propose, file, or solicit, directly or indirectly, any workout, restructuring, plan of reorganization or plan of liquidation concerning the Debtors other than the Plan;

(c) JPMC and each of the Choctaw Parties and Zephyrus Parties will not sell, transfer, pledge, hypothecate or assign any of the relevant Choctaw Indebtedness or Zephyrus Funding or any voting or participation or other interest therein during the term of such agreement except to a purchaser or other entity who agrees prior to such transfer to be bound by all of the terms of the Settlement Agreement with respect to the relevant Choctaw Indebtedness or Zephyrus Funding being transferred to such purchaser, which agreement shall be confirmed in writing (which writing may include a trade confirmation issued by a broker or dealer, acting as principal or as agent for the purchaser, stating that such agreement is a term of such transfer), in which event the Debtors shall be deemed to have acknowledged that their respective obligations to the Choctaw Parties and the Zephyrus Parties under the Settlement Agreement shall be deemed to constitute obligations in favor of such purchaser or other entity, and the Debtors shall confirm promptly that acknowledgement in writing if requested;

(d) Solely in their capacity as a Choctaw Lender or a Zephyrus Lender, each of the Choctaw Parties and the Zephyrus Parties will not (i) object to, delay, impede or take any action to interfere, directly or indirectly, with the acceptance or implementation of the Plan, or (ii) solicit in any fashion any person or entity to do any of the foregoing;

(e) None of the Choctaw Parties and the Zephyrus Parties shall file any additional claims or proofs of claim with the Bankruptcy Court against any of the Debtors with respect to, arising from or relating to the Choctaw Transactions or the Zephyrus Transactions, including without limitation, against any of the Debtors' affiliates that may subsequently commence, or have commenced against it, a case under the Bankruptcy Code; and

(f) On the Effective Date, JPMC and each of the Choctaw Parties and the Zephyrus Parties or their successors in interest in accordance with the provisions of Section 4.1(c) of the Settlement Agreement, as the case may be, shall provide the Enron Parties with a

certificate to the effect that each of the representations and warranties set forth in Sections 2.1 and 2.2 of the Settlement Agreement are true and correct as of the Effective Date.

- <u>Further Acquisition of Indebtedness</u>.  The foregoing shall not preclude the Choctaw Parties or the Zephyrus Parties from acquiring additional Choctaw Indebtedness or Zephyrus Funding; <u>provided</u>, <u>however</u>, that any such additional Choctaw Indebtedness or Zephyrus Funding so acquired shall automatically be deemed to be subject to all of the terms of the Settlement Agreement.  The Settlement Agreement shall in no way be construed to preclude the Choctaw Parties or the Zephyrus Parties from acquiring any other securities or claims against the Debtors.

- <u>Covenants of the Enron Parties</u>.  Each of the Enron Parties covenants and agrees, subject to its fiduciary duties, that: (a) the Debtors shall file this Motion, as soon as practicable, but in no event later than the tenth (10th) business day following the date of the Settlement Agreement, seeking approval of the Settlement Agreement and to have a hearing to consider such Motion in accordance with applicable orders entered in the Enron Cases; (b) on the Effective Date, each of the Enron Parties shall take such action as is necessary to cause the voting of the Assigned Claims in accordance with the terms of the Settlement Agreement, including without limitation, the preparation, execution and delivery of an appropriate voting stipulation and service of the Plan and Disclosure Statement upon JPMC, the Choctaw Lenders and the Zephyrus Lenders; and (c) unless otherwise required by applicable law, including without limitation, an order of the Bankruptcy Court or such other court of competent jurisdiction, each of the Enron Parties shall keep confidential the Indebtedness Schedules and the independent and separate written confirmations provided in accordance with the provisions of Section 2.1 of the Settlement Agreement.

- <u>Covenant Not to Sue</u>.  To the fullest extent permitted by law, each of: (a) the Choctaw Parties and the Zephyrus Parties (collectively, the "Choctaw/Zephyrus Grantors"); and (b) Cherokee and EFP (collectively, the "Cherokee/EFP Grantors") agrees that it shall not initiate, commence or continue or cause to be initiated, commenced or continued (or encourage or aid in the initiation of) any arbitration, action, suit, litigation or other proceeding against any of the Enron Parties, and each of their respective officers and directors, partners, principals, subsidiaries, affiliates, parent companies and employees, including without limitation, the Debtors, Sequoia, Cheyenne, EBS, ECV, Enron Netherlands Holdings B.V., Seminole, EFM, SSLC, EGEPI, Boreas, ECB, ECIC, EIH and EAH (collectively, the "Covenant Beneficiaries") before any court, administrative agency or other tribunal with respect to any claim, demand,

liability and cause of action of any and every kind, character or nature whatsoever, in law or in equity, which the Choctaw/Zephyrus Grantors, the Cherokee/EFP Grantors, or any of them, have or may have or claim to have, now or in the future, against any Covenant Beneficiary to the extent arising under, relating to, or connected with the Choctaw Transactions, the Choctaw Documents, the Zephyrus Transactions or the Zephyrus Documents, including without limitation, the filing of a claim or proof of claim with the Bankruptcy Court in connection with the Enron Cases; provided, however, that nothing contained in Section 4.4 of the Settlement Agreement is intended to preclude (y) the Choctaw/Zephyrus Grantors or the Cherokee/EFP Grantors from (i) initiating, commencing or continuing any action, suit or other proceeding to enforce the provisions of the Settlement Agreement, the Cherokee Liquidation Agreement, the EFP Redemption Agreement or the Approval Order and the performance of obligations thereunder, (ii) initiating, commencing or continuing any action, suit or other proceeding against principals, officers, directors or employees of the Covenant Beneficiaries in the event that one or more of the Covenant Beneficiaries or any other third party or entity commences or has commenced an action, suit or other proceeding against the Choctaw/Zephyrus Grantors or the Cherokee/EFP Grantors, as the case may be, which involves, is predicated upon, relates to, respecting, or refers to, in whole or in part, the Choctaw Transactions, the Choctaw Documents, the Zephyrus Transactions or the Zephyrus Documents; provided, however, that, in the event that (A) any of the Choctaw/Zephyrus Grantors or the Cherokee/EFP Grantors initiates, commences or continues an action, suit or other proceeding against a principal, officer, director or employee of the Covenant Beneficiaries, (B) any such action, suit or other proceeding gives rise to or results in a judgment or final order requiring the payment of monies to the plaintiff therein (the "Judgment Amount") and (C) with respect to the claims and causes of action giving rise to the Judgment Amount, the defendant in such action, suit or other proceeding has a claim for contribution, indemnification or reimbursement or has incurred costs and expenses which give rise to an enforceable claim against any of the Debtors or the Enron Parties and a final judgment or final order requiring the payment thereof by any of the Debtors or the Enron Parties is entered by a court of competent jurisdiction (the aggregate amount of all such rights, claims, costs and expenses that the Debtors or the Enron Parties are required to pay pursuant to such final judgment or order being referred to as the "Indemnified/Contribution Amount"), then (1) (I) the Choctaw/Zephyrus Grantors and the Cherokee/EFP Grantors shall reduce the Judgment Amount to the extent of the Indemnified/Contribution Amount or (II) if reduction of the Judgment Amount will not reduce the Indemnified/Contribution Amount to zero, then, to the extent that the Debtors or the Enron Parties make payments in respect of the

Indemnified/Contribution Amount and the Choctaw/Zephyrus Grantors or the Cherokee/EFP Grantors receive payment of the Judgment Amount inclusive of an amount equal to the payment of the Indemnified/Contribution Amount, the applicable Choctaw/Zephyrus Grantor or Cherokee/EFP Grantor, as the case may be, receiving such payment shall pay the amount thereof attributable to the Indemnified/Contribution Amount to the applicable Debtor or Enron Party, (2) none of the Choctaw/Zephyrus Grantors or the Cherokee/EFP Grantors shall be entitled to assert a claim against any of the Debtors or the Enron Parties with respect to the Indemnified/Contribution Amount and (3) none of the Debtors or the Enron Parties shall have any liability with respect to the Indemnified/Contribution Amount, or (iii) asserting and establishing any defense or apportionment in connection with a litigation against them or any of them, including without limitation, in connection with the Recovery Action and other presently pending actions; or (z) the Cherokee/EFP Grantors from commencing any action, suit or other proceeding against Enron Netherlands Holdings B.V. arising from or relating to any and all outstanding promissory notes and accounts payable of Enron Netherlands Holdings B.V. issued or currently for the benefit of either of the Cherokee/EFP Grantors.  The Covenant Not to Sue shall be a complete defense to any arbitration, suit, action, litigation or other proceeding brought in violation of such Covenant Not to Sue.

- Effectiveness of the Settlement Agreement.  Except with respect to the covenant of the Enron Parties to file this Motion seeking approval of the Settlement Agreement, the terms and conditions of the Settlement Agreement are expressly subject to the approval of the Bankruptcy Court and entry of the Approval Order.

- Termination of Agreement.  The obligations of JPMC, the Choctaw Parties and the Zephyrus Parties under the Settlement Agreement shall terminate upon the occurrence of any Agreement Termination Event,[11] unless the occurrence of such Agreement Termination Event is waived in writing by the relevant party.  If any Agreement Termination Event occurs (and has not been waived) at a time when court permission shall be required to change or withdraw (or cause to be changed or withdrawn) the vote(s) in favor of the Plan on account of the Assigned Claims, the Debtors and the other parties to the Settlement Agreement shall not,

---

[11] "Agreement Termination Event" is defined as any of the following: (a) the Debtors publicly announce their intention not to pursue confirmation of the Plan; (b) the Debtors file a plan, or solicit votes on a chapter 11 plan which contains terms that are not materially consistent with the terms set forth in the Plan; (c) the Debtors' chapter 11 bankruptcy cases are converted to cases under chapter 7 of the Bankruptcy Code; or (d) the Debtors breach or repudiate their obligations pursuant to Section 4.3(a) of the Settlement Agreement to pursue approval of the compromise and settlement contemplated thereby.

subject to its fiduciary duties, if any, in connection therewith, oppose any attempt by such party to change or withdraw (or cause to be changed or withdrawn) such vote(s) at such time.

**The Cherokee Liquidation Agreement**

33.    In connection with the foregoing, certain parties entered into extensive, arm's length and good faith negotiations and discussions with respect to the liquidation of Cherokee.  As a result of such negotiations, on or about May 10, 2004, such parties executed that certain Cherokee Finance V.O.F. i.l. Liquidation Agreement (the "Cherokee Liquidation Agreement"), by and among JPMC, Cheyenne and Cherokee, a copy of which is annexed hereto as Exhibit "B."

34.    The salient terms of the Cherokee Liquidation Agreement are as follows: [12]

- <u>Termination and Wind Up of Cherokee</u>.  Cheyenne and JPMC (the "Cherokee Liquidation Agreement Parties") acknowledge that Cherokee was dissolved as of February 21, 2003 pursuant to the terms of its partnership agreement (the "Cherokee Partnership Agreement") and is in the process of liquidating and winding up in accordance with the terms of the Cherokee Liquidation Agreement.  In addition, the Cherokee Liquidation Agreement Parties agree that, at all times during Cherokee's liquidation and winding up, they shall represent Cherokee jointly (except with respect to voting the Allowed Claims pursuant to the Settlement Agreement, in which event Cherokee's board of directors shall represent Cherokee), and no liquidating agent shall be appointed.

- <u>Assignment by Cherokee of Certain Assets to JPMC, as Collateral Agent for the Choctaw Lenders, in Full and Final Discharge of Claims</u>.  Cherokee assigns to JPMC, as Collateral Agent for the Choctaw Lenders and JPMC, as Collateral Agent for the Choctaw Lenders accepts, as of the Effective Date, the following claims and all rights with respect thereto pursuant to the Plan (collectively, the "Assigned Claims"): (a) Allowed

---

[12] The summary of the terms of the Cherokee Liquidation Agreement set forth herein is qualified by the entire text of the Cherokee Liquidation Agreement, which shall govern the understanding between the parties thereto.

Claim No. 11132; (b) Allowed Claim No. 11133; and (c) Allowed Claim No. 11125, solely to the extent of Nine Hundred Fifty Million Dollars ($950,000,000.00) (collectively, the "Assigned Claims"), in full and final settlement of the Choctaw Claim (as defined in the Cherokee Liquidation Agreement).  In full and complete satisfaction of any and all claims arising from or relating to the Choctaw Claim, the Preferred Units, the GPA or the Choctaw Indebtedness (each as defined in the Cherokee Liquidation Agreement), each holder of Choctaw Indebtedness shall be entitled to receive from JPMC, as Collateral Agent for the Choctaw Lenders to the extent received by JPMC, as Collateral Agent for the Choctaw Lenders under the Plan, such holder's *pro rata* share of distributions pursuant to the Plan on account of the Assigned Claims; provided, however, that as a condition to receiving any such distribution, each holder of Choctaw Indebtedness shall be required to deliver to JPMC, with a copy to Cherokee (and upon the liquidation of Cherokee, to ENE), a certification affirming that it does not hold Recovery Action Indebtedness; and, provided, further, that to the extent that any such holder holds Recovery Action Indebtedness: (y) such holder's *pro rata* share of the distributions on account of the Assigned Claims corresponding to such Recovery Action Indebtedness which otherwise would be made to such Choctaw Lender in accordance with the Cherokee Liquidation Agreement shall be placed into the Disputed Claims Reserve in accordance with the terms and conditions of Section 21.3 of the Plan; and (z) the holder of such Recovery Action Indebtedness shall receive no distributions on account of the Assigned Claims corresponding to such Recovery Action Indebtedness until the earliest to occur of (i) entry of a final order or final judgment in the Recovery Action dismissing the claims and causes of action asserted against such Recovery Action Defendant, in which case, any distributions so reserved shall be released to JPMC, as Collateral Agent for the Choctaw Lenders, for distribution to the holder of such Recovery Action Indebtedness, (ii) entry of a final order or final judgment granting the relief requested in the Recovery Action, in which case, any distributions so reserved shall be released to ENE or, in the event that the Litigation Trust has been created and Litigation Trust Claims are assigned thereto, to the Litigation Trust, as the case may be, and (iii) entry of a final order of the Bankruptcy Court compromising and settling the claims and causes of action asserted against such Recovery Action Defendant in the Recovery Action, in which case, any distributions so reserved shall be released to the party entitled thereto in connection with such compromise and settlement.

Any distributions received by JPMC as Collateral Agent for a Choctaw Lender on account of Assigned Claims shall not be considered to correspond to Recovery Action Indebtedness to the extent that the Choctaw Lender on behalf of which such distribution is received does not hold Recovery Action Indebtedness, notwithstanding that JPMC is named

as a Recovery Action Defendant.  Cheyenne and Cherokee acknowledge that, after the Effective Date but prior to the date that distribution on account of Assigned Claims are paid under the Plan, JPMC, as Collateral Agent for the Choctaw Lenders, may distribute to each Choctaw Lender its *pro rata* share of the Assigned Claims.  The distribution of the Assigned Claims shall not: (a) affect the limitation set forth in Clause 2.1 of the Cherokee Liquidation Agreement with respect to distribution corresponding to Recovery Action Indebtedness; or (b) limit the rights of the Enron Releasors or any other party in interest, in accordance with section 502(d) of the Bankruptcy Code, to the extent that the holder of Choctaw Indebtedness holds Recovery Action Indebtedness.

- <u>Further Assurances</u>.  Each of the Cherokee Liquidation Agreement Parties agrees to cause to be executed and delivered all such instruments, and to take all such action as the other Cherokee Liquidation Agreement Parties reasonably request in order to effectuate the intent and purposes of the Cherokee Liquidation Agreement.

- <u>Release by Choctaw Releasors</u>.  Subject to Cherokee assigning to JPMC, as Collateral Agent for the Choctaw Lenders, the Assigned Claims, on the Effective Date and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the Settlement Agreement, JPMC, its successors and assigns and each of their affiliates, officers, employees and agents (collectively, the "Choctaw Releasors"), hereby irrevocably and unconditionally forever release, acquit and forever discharge Cherokee, Sequoia, Cheyenne, EBS, ECV, Enron Netherlands Holdings B.V., Seminole, EFM, SSLC, ECIC, EGEPI, ECB, Boreas, EIH and EAH and each of their respective past and present officers, directors and employees (collectively, the "Choctaw Releasees") from any and all claims, demands, liabilities and causes of action of any and every kind, character or nature whatsoever, in law or in equity, whether asserted or unasserted, which the Choctaw Releasors have or may have or claim to have, now or in the future, against any Choctaw Releasee to the extent arising under, relating to, or connected with the Choctaw Transactions and the Choctaw Documents, or any act of commission or omission in respect of the Choctaw Transactions or the Choctaw Documents.  Notwithstanding anything contained in the Settlement Agreement or elsewhere to the contrary, the foregoing is not intended to nor shall it have the effect of: (u) releasing the Allowed Claims or any claim or cause of action of the Choctaw Releasors under or in respect of the Allowed Claims or precluding any of the Choctaw Releasees from offering into evidence the existence of such release, the Cherokee Liquidation Agreement, the Settlement Agreement, the EFP Redemption Agreement or the Approval Order in connection with any action to enforce the same; (v) releasing any

Choctaw Releasee from the performance of its obligations in accordance with the Cherokee Liquidation Agreement and the terms of the Approval Order; (w) releasing any claim or cause of action of the Choctaw Releasors arising under the Cherokee Liquidation Agreement, the Settlement Agreement, the EFP Redemption Agreement or under the Approval Order; (x) releasing any claim or cause of action in any action, suit or proceeding permitted pursuant to the provisions of Clause 9.8 of the Cherokee Liquidation Agreement; (y) releasing any claim or cause of action of Cherokee against Enron Netherlands Holdings B.V. arising from or relating to any and all outstanding promissory notes and accounts payable of Enron Netherlands Holdings B.V. issued or currently for the benefit of Cherokee; or (z) releasing any claim of any Choctaw Releasor against and other Choctaw Releasor.

- <u>Assignment by Cherokee of Certain Assets to Cheyenne in Full and Final Discharge of Claims</u>.  Cherokee assigns to Cheyenne, as of the Effective Date, all assets (now or hereafter existing) of Cherokee other than the Assigned Claims (collectively, the "Cheyenne Assets").  Cheyenne assumes and agrees to pay, perform and discharge, as of the Effective Date, all liabilities of Cherokee other than: (a) JPMC's share (as Collateral Agent on behalf of the Choctaw Lenders) of those liabilities expressly identified in Clause 6 of the Cherokee Liquidation Agreement; and (b) liabilities that arise from claims made by or through Choctaw, JPMC or the Choctaw Lenders.

  Each of the Cherokee Liquidation Agreement Parties agrees to cause to be executed and delivered all such instruments, and to take all such action as the other Cherokee Liquidation Agreement Parties reasonably request in order to effectuate the intent and purposes of the Cherokee Liquidation Agreement.

- <u>Release by Cheyenne Releasors</u>.  Subject to Cherokee assigning to Cheyenne the Cheyenne Assets, on the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the Settlement Agreement, Cheyenne and its successors and assigns and each of their directors, officers, employees and agents (collectively, the "Cheyenne Releasors"), irrevocably and unconditionally forever release, acquit and forever discharge Cherokee and each of its past and present officers, directors, affiliates and employees (collectively, the "Cheyenne Releasees") from any and all claims, demands, liabilities and causes of action of any and every kind, character or nature whatsoever, in law or in equity, whether asserted or unasserted, which the Cheyenne Releasors have or may have or claim to have, now or in the future, against any Cherokee Releasee to the extent

arising under, relating to, or connected with Cherokee's organizational documents. Notwithstanding anything contained herein or elsewhere to the contrary, the foregoing is not intended to nor shall it have the effect of: (v) releasing any claim or cause of action of the Cheyenne Releasors arising under the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order or precluding any of the Cherokee Releasees from offering into evidence the existence of this release, the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order in connection with any action to enforce the same; (w) releasing any Cherokee Releasee from the performance of its obligations in accordance with the Cherokee Liquidation Agreement, the Settlement Agreement and the terms of the Approval Order; (x) releasing any claim or cause of action of the Cheyenne Releasors arising under the Cherokee Liquidation Agreement, the Settlement Agreement or under the Approval Order; (y) releasing any claim or cause of action otherwise preserved pursuant to the provisions of Clause 9.8 of the Cherokee Liquidation Agreement; or (z) releasing any claim or cause of action of Cherokee against Enron Netherlands Holdings B.V. arising from or relating to any and all outstanding promissory notes and accounts payable of Enron Netherlands Holdings B.V. issued or currently for the benefit of Cherokee.

- <u>Filings</u>. As soon as possible after the execution of the Cherokee Liquidation Agreement, the parties thereto shall cooperate in filing: (a) the necessary statement regarding the termination of Cherokee with the trade register of the Amsterdam Chamber of Commerce; and (b) the relevant tax returns and filings regarding Cherokee with the Netherlands and the United States tax authorities.

- <u>Termination of Certain Ancillary Agreements</u>. Pursuant to the Cherokee Liquidation Agreement, the parties thereto agree to: (a) terminate the Domiciliation Agreement with Rabobank Management B.V. and split equally the fees due thereunder on the termination date; and (b) terminate the Administration Agreement with Chase Manhattan Bank (Ireland) Plc. and split equally the fees due thereunder on the termination date.

- <u>Payment of Fees</u>. Each of the parties to the Cherokee Liquidation Agreement will bear its own costs, expenses and attorneys' fees arising out of or related to the preparation, execution and delivery of the Cherokee Liquidation Agreement. No party thereto makes any representations or warranties concerning the tax consequences of the Liquidation Agreement or the payments to be made thereunder. If any party to the Cherokee Liquidation Agreement brings an action against any other party thereto based upon a breach by such other party of its obligations thereunder, the prevailing party shall be entitled to all reasonable expenses incurred, including reasonable attorneys' fees and expenses. Notwithstanding

anything in the Cherokee Liquidation Agreement to the contrary, upon the occurrence of the Effective Date and the submission to Cheyenne of detailed records documenting the reasonable and actual out-of-pocket fees and expenses of JPMC, as Collateral Agent for the Choctaw Lenders, and its attorneys arising out of the negotiation and execution of the Cherokee Liquidation Agreement and the Settlement Agreement, and the consummation of the transactions thereby contemplated, Cherokee agrees to pay such properly documented, reasonable and actual out-of-pocket fees and expenses, in an amount, including the fees and expenses payable by JPMC, as Collateral Agent, pursuant to Section 6 of the Cherokee Liquidation Agreement, not to exceed Five Hundred Thousand Dollars ($500,000.00) in the aggregate; provided, that any dispute with respect to such fees and expenses shall be resolved by the Bankruptcy Court.

- <u>Covenant Not to Sue</u>.  To the fullest extent permitted by law, each of: (a) the Choctaw Lenders; and (b) Cherokee (collectively, the "Choctaw/Cherokee Grantors") agrees that it shall not initiate, commence or continue, or cause to be initiated, commenced or continued (or encourage or aid in the initiation of) any arbitration, action, suit, litigation or other proceeding against any of the Covenant Beneficiaries before any court, administrative agency or other tribunal with respect to any claim, demand, liability and cause of action of any and every kind, character or nature whatsoever, in law or in equity, which the Choctaw/Cherokee Grantors have or may have or claim to have, now or in the future, against any Covenant Beneficiary to the extent arising under, relating to, or connected with the Choctaw Transactions or the Choctaw Documents, including without limitation, the filing of a claim or proof of claim with the Bankruptcy Court in connection with the Enron Cases; provided, however, that, nothing contained in Clause 9.8 of the Cherokee Liquidation Agreement is intended to preclude: (y) the Choctaw/Cherokee Grantors from (i) initiating, commencing or continuing any action, suit or other proceeding to enforce the provisions of the EFP Redemption Agreement, the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order and the performance of obligations thereunder, (ii) initiating, commencing or continuing any action, suit or other proceeding against principals, officers, directors or employees of the Covenant Beneficiaries in the event that one or more of the Covenant Beneficiaries or any other third party or entity commences or has commenced an action, suit or other proceeding against the Choctaw/Cherokee Grantors which involves, is predicated upon, relates to, respecting, or refers to, in whole or in part, the Choctaw Transactions or the Choctaw Documents; provided, however, that, in the event that (A) any of the Choctaw/Cherokee Grantors initiate, commence or continue an action, suit or other proceeding against a principal, officer, director or employee of the Covenant Beneficiaries, (B) any such action, suit or other

proceeding gives rise to or results in a judgment or final order requiring the payment of a Judgment Amount, and (C) with respect to the claims and causes of action giving rise to the Judgment Amount, the defendant in such action, suit or other proceeding has a claim for contribution, indemnification or reimbursement, or has incurred costs and expenses which gives rise to an enforceable claim against any of the Debtors or the Enron Parties and a final judgment or final order requiring the payment of such Indemnified/Contribution Amount by any of the Debtors or the Enron Parties is entered by a court of competent jurisdiction, then (1) (I) the Choctaw/Cherokee Grantors shall reduce the Judgment Amount to the extent of the Indemnified/Contribution Amount or (II) if reduction of the Judgment Amount will not reduce the Indemnified/Contribution Amount to zero, then, to the extent that the Debtors or the Enron Parties make payments in respect of the Indemnified/Contribution Amount and the Choctaw/Cherokee Grantors receive payment of the Judgment Amount inclusive of an amount equal to the Indemnified/Contribution Amount, the applicable Choctaw/Cherokee Grantor receiving such payment shall pay the amount thereof attributable to the Indemnified/Contribution Amount to the applicable Debtor or Enron Party, (2) none of the Choctaw/Cherokee Grantors shall be entitled to assert a claim against any of the Debtors or the Enron Parties with respect to the Indemnified/Contribution Amount, and (3) none of the Debtors or the Enron Parties shall have any liability with respect to the Indemnified/Contribution Amount, or (iii) asserting and establishing any defense or apportionment in connection with a litigation against them or any of them, including without limitation, in connection with the Recovery Action and other presently pending actions; or (z) the Choctaw/Cherokee Grantors from commencing any action, suit or other proceeding against Enron Netherlands Holdings B.V. arising from or relating to any and all outstanding promissory notes and accounts payable of Enron Netherlands Holdings B.V. issued or currently for the benefit of the Choctaw/Cherokee Grantors. The Covenant Not to Sue shall be a complete defense to any arbitration, suit, action, litigation or other proceeding brought in violation of such Covenant Not to Sue.

- <u>Recovery Action Indebtedness</u>. The parties to the Cherokee Liquidation Agreement agree that: (a) a Recovery Action Defendant's act of acquiring Choctaw Indebtedness during the period following the Petition Date shall not form the basis of any (i) claim that might be premised, in part, upon a Course of Conduct Claim or (ii) claim by any party-in-interest seeking to subordinate, disallow or seek the waiver of any claim of such Recovery Action Defendant relating to such Choctaw Indebtedness, if such Recovery Action Defendant did not hold Recovery Action Indebtedness and/or did not have or hold any direct or indirect rights, obligations, interests or claims of any kind or nature whatsoever in any of the Choctaw Transactions or under the Choctaw Documents prior to, or as of, the

Petition Date; and (b) Course of Conduct Claims shall not be used to withhold or challenge any distributions to be made to any Choctaw Party on account of Allowed Claims, pursuant to the Cherokee Liquidation Agreement, the Settlement Agreement or the EFP Redemption Agreement, except to the extent that the interest of such Choctaw Party in such Allowed Claim constitutes Recovery Action Indebtedness.

**The EFP Redemption Agreement**

35.    In connection with the foregoing, certain parties entered into extensive, arm's length and good faith negotiations and discussions with respect to the redemption of the membership interests of EFP currently held by Zephyrus (or JPMC, as Collateral Agent for the Zephyrus Lenders).  As a result of such negotiations, on or about May 10, 2004, such parties executed that certain Redemption Agreement, by and among EFP, ENE, EFM, SSLC, ECIC, EGEPI, ECB, Boreas, Zephyrus and JPMC (the "EFP Redemption Agreement"), a copy of which is annexed hereto as Exhibit "C."

36.    The salient terms of the EFP Redemption Agreement are as follows: [13]

- Redemption.  Subject to the terms and conditions set forth in the EFP Redemption Agreement, on the Redemption Date (as defined therein), Zephyrus, or if the transfer of the EFP Preferred Interests to JPMC, as Collateral Agent for the Zephyrus Lenders (the "Zephyrus Transfer") shall have been completed, JPMC, as Collateral Agent for the Zephyrus Lenders, shall sell, assign, transfer and convey to EFP, and EFP shall purchase, acquire and redeem from Zephyrus or, if the Zephyrus Transfer has been completed, JPMC, as Collateral Agent for the Zephyrus Lenders, all right, title and interest of Zephyrus and JPMC, as Collateral Agent for the Zephyrus Lenders, in and to the EFP Preferred Interests, and in consideration thereof, EFP shall simultaneously assign to JPMC, as Collateral Agent for the Zephyrus Lenders, the following claims and rights with respect thereto pursuant to the Plan (collectively, the "EFP Redemption Amount"): (a) Claim No. 11125, solely to the extent of

---

[13] The summary of the terms of the EFP Redemption Agreement set forth herein is qualified by the entire text of the EFP Redemption Agreement, which shall govern the understanding between the parties thereto.

Eighteen Million Dollars ($18,000,000.00); (b) Claim No. 11126 in the amount of Four Hundred Fifteen Million Five Hundred Thousand Dollars ($415,500,000.00), bifurcated into a Class 4 Claim against ENE under the Plan in the amount of One Hundred Thirty-Five Million Dollars ($135,000,000.00) and an Allowed ENE Guaranty Claim, Class 185 under the Plan, in the amount of Two Hundred Eighty Million Five Hundred Thousand Dollars ($280,500,000.00); and (c) Claim No. 11127, as a Class 5 Claim against ENA in the amount of Five Hundred Ten Million Dollars ($510,000,000.00) (collectively, the "EFP Allowed Claims").  In full and complete satisfaction of any and all claims arising from or relating to the EFP Preferred Interests, the EFP LLC Agreement (as defined below) or the Zephyrus Funding, each of the Zephyrus Lenders shall be entitled to receive from JPMC, as Collateral Agent for the Zephyrus Lenders, to the extent received by JPMC, as Collateral Agent for the Zephyrus Lenders, under the Plan, such Zephyrus Lender's *pro rata* share of distributions pursuant to the Plan on account of such EFP Allowed Claims; <u>provided</u>, that as a condition to receiving any such distribution, each Zephyrus Lender shall be required to deliver to JPMC, with a copy to EFP (and upon dissolution of EFP, to ENE), a certification affirming that it does not hold Recovery Action Indebtedness; <u>provided</u>, <u>further</u>, that to the extent that any such Zephyrus Lender holds Recovery Action Indebtedness: (y) such Zephyrus Lender's *pro rata* share of distributions on account of EFP Allowed Claims corresponding to such Recovery Action Indebtedness which otherwise would be made to such Zephyrus Lender in accordance with Section 1.1 of the EFP Redemption Agreement shall be placed into the Disputed Claims Reserve in accordance with the terms and conditions of Section 21.3 of the Plan; and (z) the holder of such Recovery Action Indebtedness shall receive no distributions on account of the EFP Allowed Claims corresponding to such Recovery Action Indebtedness until the earliest to occur of (i) entry of a final order or final judgment in the Recovery Action dismissing the claims and causes of action asserted against such Recovery Action Defendant, in which case, any distributions so reserved shall be released to JPMC, as Collateral Agent for the Zephyrus Lenders, for distribution to the holder of such Recovery Action Indebtedness, (ii) entry of a final order or final judgment granting the relief requested in the Recovery Action, in which case, any distributions so reserved shall be released to ENE or, in the event that the Litigation Trust has been created and Litigation Trust Claims are assigned thereto, to the Litigation Trust, as the case may be, and (iii) entry of a final order of the Bankruptcy Court compromising and settling the claims and causes of action asserted against such Recovery Action Defendant in the Recovery Action, in which case, any distributions so reserved shall be released to the party entitled thereto in connection with such compromise and settlement. Any distributions received by JPMC as Collateral Agent for a Zephyrus Lender on account of EFP Allowed Claims shall not be considered to

correspond to Recovery Action Indebtedness to the extent that the Zephyrus Lender on behalf of which such distribution is received does not hold Recovery Action Indebtedness, notwithstanding that JPMC is named as a Recovery Action Defendant.  EFP and the Enron Parties acknowledge that, after the Redemption Date but prior to the date that distributions on account of EFP Allowed Claims are made under the Plan, JPMC, as Collateral Agent for the Zephyrus Lenders, may distribute to each Zephyrus Lender its *pro rata* share of the EFP Allowed Claims.  The distribution of the EFP Allowed Claims shall not: (aa) affect the limitations set forth above with respect to distributions corresponding to Recovery Action Indebtedness; or (bb) limit the rights of the Enron Releasors (as defined in the Settlement Agreement) or any other party-in-interest in accordance with section 502(d) of the Bankruptcy Code to the extent that the holder of the Zephyrus Funding holds Recovery Action Indebtedness.

- Cancellation of the EFP Preferred Interests.  Immediately upon payment of the EFP Redemption Amount and without the need for the execution and delivery of additional documentation, the EFP Preferred Interests shall be deemed cancelled and all rights and obligations with respect thereto, and arising in connection therewith, shall terminate, including, but not limited to, such rights and obligations arising pursuant to the Third Amended and Restated Limited Liability Company Agreement of Enron Finance Partners, LLC, dated as of January 2, 2001 (the "EFP LLC Agreement").

- Consent and Waiver With Respect to Certain Terms of the EFP LLC Agreement.  The parties to the EFP Redemption Agreement expressly consent to the redemption set forth therein and expressly waive certain procedural requirements set forth in the EFP LLC Agreement in connection with the effectuation thereof.

- Resignation of Directors/Managers.  On the Redemption Date, immediately upon payment of the EFP Redemption Amount: (a) any and all directors/managers of EFP appointed by JPMC, as Collateral Agent for the Zephyrus Lenders, or Zephyrus shall be deemed to have resigned such position, without the need for the execution and delivery of additional documentation; and (b) JPMC, as Collateral Agent for the Zephyrus Lenders, Zephyrus and the Zephyrus Lenders shall be deemed to have waived, released and discharged any claim, right or interest to assume control of the management of EFP in accordance with the terms and provisions of the EFP LLC Agreement, without the need for the execution and delivery of additional documentation.

- <u>Filing of Motion Seeking Approval of, and Authority to Enter Into, the EFP Redemption Agreement</u>.  The Debtors shall file this Motion as soon as practicable, but in no event later than the tenth (10th) business day following the date of the EFP Redemption Agreement, in the Bankruptcy Court seeking an order granting approval of, and the authority to enter into, the EFP Redemption Agreement, and to have a hearing to consider such motion in accordance with applicable orders entered in the Enron Cases.

- <u>Releases</u>.  On the Redemption Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, Zephyrus, JPMC, and their respective successors and assigns and each of their affiliates, officers, employees and agents (collectively, the <u>"Zephyrus/JPMC Releasors"</u>), shall irrevocably and unconditionally forever release, acquit and forever discharge EFP, Sequoia, Cheyenne, EBS, ECV, Enron Netherlands Holdings B.V., Seminole, EFM, SSLC, EGEPI, Boreas, ECB, ECIC, EIH, and EAH, and each of their respective past and present officers, directors and employees (collectively, the "Zephyrus/JPMC Releasees") from any and all claims, demands, liabilities and causes of action of any and every kind, character or nature whatsoever, in law or in equity, whether asserted or unasserted, which the Zephyrus/JPMC Releasors, or any of them, have or may have or claim to have, now or in the future, against any of the Zephyrus/JPMC Releasees to the extent arising under, relating to, or in connection with the Zephyrus Transactions, the Zephyrus Documents, or any act of commission or omission in respect of the Zephyrus Transactions or the Zephyrus Documents.  Notwithstanding anything contained in the EFP Redemption Agreement or elsewhere to the contrary, the foregoing is not intended to nor shall it have the effect of: (a) releasing the Allowed Claims or any claim or cause of action of the Zephyrus/JPMC Releasors under or in respect of the Allowed Claims or precluding any of the Parties from offering into evidence the existence of this release, the EFP Redemption Agreement, the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order in connection with any action to enforce the same; (b) releasing the Zephyrus/JPMC Releasees from the performance of their obligations in accordance with the EFP Redemption Agreement, the Settlement Agreement, the Cherokee Liquidation Agreement and the terms of the Approval Order; (c) releasing any claim or cause of action of the Zephyrus/JPMC Releasors arising under the EFP Redemption Agreement, the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order; (d) releasing any claim or cause of action otherwise preserved pursuant to the provisions of Section 14.4 of the EFP Redemption Agreement; or (e) releasing any claim or cause of action of any Zephyrus/JPMC Releasor against any other Zephyrus/JPMC Releasor.

- <u>Covenant Not to Sue</u>.  To the fullest extent permitted by law, each of: (a) the Zephyrus Lenders; and (b) EFP (collectively, the "Zephyrus/EFP Grantors") agrees that it shall not initiate, commence or continue, or cause to be initiated, commenced or continued (or encourage or aid in the initiation of) any arbitration, action, suit, litigation or other proceeding against any of the Covenant Beneficiaries before any court, administrative agency or other tribunal with respect to any claim, demand, liability and cause of action of any and every kind, character or nature whatsoever, in law or in equity, which the Zephyrus/EFP Grantors have or may have or claim to have, now or in the future, against any Covenant Beneficiary to the extent arising under, relating to, or connected with the Zephyrus Transactions or the Zephyrus Documents, including without limitation, the filing of a claim or proof of claim with the Bankruptcy Court in connection with the Enron Cases; <u>provided</u>, <u>however</u>, that nothing contained in Section 14.4 of the EFP Redemption Agreement is intended to preclude: (y) the Zephyrus/EFP Grantors from (i) initiating, commencing or continuing any action, suit or other proceeding to enforce the provisions of the EFP Redemption Agreement, the Settlement Agreement, the Cherokee Liquidation Agreement or the Approval Order and the performance of obligations thereunder, (ii) initiating, commencing or continuing any action, suit or other proceeding against principals, officers, directors or employees of the Covenant Beneficiaries in the event that one or more of the Covenant Beneficiaries or any other third party or entity commences or has commenced an action, suit or other proceeding against the Zephyrus/EFP Grantors which involves, is predicated upon, relates to, respecting, or refers to, in whole or in part, the Zephyrus Transactions or the Zephyrus Documents; <u>provided</u>, <u>however</u>, that, in the event that (A) any of the Zephyrus/EFP Grantors initiate, commence or continue an action, suit or other proceeding against a principal, officer, director or employee of the Covenant Beneficiaries, (B) any such action, suit or other proceeding gives rise to or results in a judgment or final order requiring the payment of a Judgment Amount, and (C) with respect to the claims and causes of action giving rise to the Judgment Amount, the defendant in such action, suit or other proceeding has a claim for contribution, indemnification or reimbursement, or has incurred costs and expenses which gives rise to an enforceable claim against any of the Debtors or the Enron Parties and a final judgment or final order requiring the payment of such Indemnified/Contribution Amount by any of the Debtors or the Enron Parties is entered by a court of competent jurisdiction, then (1) (I) the Zephyrus/EFP Grantors shall reduce the Judgment Amount to the extent of the Indemnified/Contribution Amount, or (II) if reduction of the Judgment Amount will not reduce the Indemnified/Contribution Amount to zero, then, to the extent that the Debtors or the Enron Parties make payments in respect of the

Indemnified/Contribution Amount and the Zephyrus/EFP Grantors receive payment of the Judgment Amount inclusive of an amount equal to the payment of the Indemnified/Contribution Amount, the applicable Zephyrus/EFP Grantor receiving such payment shall pay the amount thereof attributable to the Indemnified/Contribution Amount to the applicable Debtor or Enron Party, (2) none of the Zephyrus/EFP Grantors shall be entitled to assert a claim against any of the Debtors or the Enron Parties with respect to the Indemnified/Contribution Amount, and (3) none of the Debtors or the Enron Parties shall have any liability with respect to the Indemnified/Contribution Amount, or (iii) asserting and establishing any defense or apportionment in connection with a litigation against them or any of them, including without limitation, in connection with the Recovery Action and other presently pending actions; or (z) the Zephyrus/EFP Grantors from commencing any action, suit or other proceeding against Enron Netherlands Holdings B.V. arising from or relating to any and all outstanding promissory notes and accounts payable of Enron Netherlands Holdings B.V. issued or currently for the benefit of the Zephyrus/EFP Grantors.  The Covenant Not to Sue shall be a complete defense to any arbitration, suit, action, litigation or other proceeding brought in violation of such Covenant Not to Sue.

- <u>Recovery Action Indebtedness</u>.  The parties to the EFP Redemption Agreement agree that: (a) a Recovery Action Defendant's act of acquiring Zephyrus Funding during the period following the Petition Date shall not form the basis of any (i) claim that might be premised, in part, upon a Course of Conduct Claim or (ii) claim by any party-in-interest seeking to subordinate, disallow or seek the waiver of any claim of such Recovery Action Defendant relating to such Zephyrus Funding, if such Recovery Action Defendant did not hold Recovery Action Indebtedness and/or did not have or hold any direct or indirect rights, obligations, interests or claims of any kind or nature whatsoever in any of the Zephyrus Transactions or under the Zephyrus Documents prior to, or as of, the Petition Date; and (b) Course of Conduct Claims shall not be used to withhold or challenge any distributions to be made to any Zephyrus Party on account of Allowed Claims, pursuant to the EFP Redemption Agreement, the Settlement Agreement or the Cherokee Liquidation Agreement, except to the extent that the interest of such Zephyrus Party in such Allowed Claim constitutes Recovery Action Indebtedness.

37.     In furtherance of the foregoing, the Debtors may execute and

deliver, or cause their respective subsidiaries and affiliates to execute and deliver, such

other documents, instruments and agreements (collectively, the "Ancillary Documents")

as the Debtors, upon consultation with the Creditors' Committee, determine are necessary

to effectuate the intent of the Proposed Agreements and the settlement contemplated

thereby (the "Settlement").

### Relief Requested

38.     The Debtor Movants request that the Bankruptcy Court authorize

and approve the execution, delivery and performance of the Proposed Agreements and

the Ancillary Documents, and the consummation of the Settlement pursuant to sections

105 and 363 of the Bankruptcy Code, and Bankruptcy Rules 2002, 3018, 6004, 9013 and

9019.

### Approval of the Proposed Agreements and
### Ancillary Documents Pursuant to Sections 105 and
### 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 3018 6004, 9013 and 9019

39.     As set forth below, the Debtor Movants submit that the

transactions delineated in the Proposed Agreements and any Ancillary Documents

relating thereto, and the consummation of the Settlement should be authorized and

approved by the Bankruptcy Court because they: (a) are in the best interest of the

Debtors, their estates and their creditors; (b) represent the sound business judgment of the

Debtors; and (c) are fair and reasonable.

### Section 105 of the Bankruptcy Code

40.     The Debtor Movants seek approval of the Proposed Agreements

and any Ancillary Documents, and authorization and approval to consummate the

Settlement pursuant to section 105(a) of the Bankruptcy Code, which provides that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Pursuant to section

105(a) of the Bankruptcy Code, the Bankruptcy Court has expansive equitable powers to fashion any order or decree that is in the best interests of the Debtors' estates and creditors. See Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.") (citation omitted). See also Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted); In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.") (citation omitted).

      41.    The Debtor Movants submit that the Settlement set forth in the Proposed Agreements and the Ancillary Documents is in the best interest of the Debtors, their estates and their creditors. Such Settlement resolves the complex legal and factual issues arising out of the Choctaw Transactions, the Zephyrus Transactions, the JPMC Action, the ENE Guaranty Action, the BofA Action Stipulation (collectively, the "Actions") and the Claims with certainty and without the time and expense of litigation. Specifically, the Settlement dismisses, with prejudice, the JPMC Action, the loss of which by the Debtors could result in a claim of approximately Two Billion One Hundred Million Dollars ($2,100,000,000.00) against their estates. While the Debtors believe that there are strong legal and factual bases in their favor with respect to the JPMC Action, they are aware that, after a thorough review, the Examiner appointed by the United States

Trustee and approved by the Bankruptcy Court in the Enron Cases was unable to

conclude that ENE's presentation of the Choctaw and Zephyrus interests failed to comply

with GAAP.  See Second Interim Report of Neal Batson, Court-Appointed Examiner,

Appendix I, Annexes 2 and 4.  In light of such uncertainty, the Debtors believe that it is

in their best interests, and the best interests of their creditors, to settle the JPMC Action in

accordance with the terms of the Settlement.

42.     The Settlement also dismisses, with prejudice, the ENE Guaranty

Action, while reducing the amounts of the ENE Guarantees (in accordance with the

amounts of the Allowed Claims set forth in Section 3.1 of the Settlement Agreement).

The Debtors believe that such resolution is a favorable result to the Debtors and their

creditors.

43.     In addition, pursuant to the terms of the Settlement, the Debtors

shall have been deemed to have satisfied all obligations with respect to the BofA Action

Stipulation, and JPMC, as agent for itself, the Choctaw Lenders and the Zephyrus

Lenders, shall have been deemed to have waived any claim or interest in the monies

seized by BofA that are the subject of the BofA Action.  The BofA Action was resolved

pursuant to a Stipulation and Order entered by the Bankruptcy Court on April 29, 2004,

pursuant to which BofA agreed to return Eighty Million Dollars ($80,000,000.00) to the

Debtors' estates.  As a result of the Settlement, this money will directly benefit the

Debtors' creditors.  The Debtors believe that such resolution is a favorable result to the

Debtors and their creditors.

44.     Furthermore, the Settlement will resolve the Omnibus Objection

by allowing only the Allowed Claims and dismissing the other Claims alleged by JPMC,

the Choctaw Parties, the Zephyrus Parties and the other parties identified above. This will avoid the expense, delay and uncertain outcome associated with conducting a hearing with respect thereto. The Debtors believe that such resolution is a favorable result to the Debtors and their creditors.

45.    Because of the substantive expense of litigating the issues associated with the Choctaw Transactions, the Zephyrus Transactions, the Actions and the Claims, the length of time necessary to resolve the issues presented therein, the inconvenience involved and the concomitant disruption to their efforts to consummate the transactions contemplated by the Plan, the Debtors have concluded that the Settlement is fair and reasonable, and promotes the best interests of the Debtors and the Debtors' creditors. In addition, JPMC and the Choctaw/Zephyrus Parties have conducted a thorough study and investigation of the law and facts relating to the Choctaw Transactions, the Zephyrus Transactions, the Actions and the Claims and have concluded that the Settlement is fair and reasonable and in the best interests of JPMC and the Choctaw/Zephyrus Parties.

## Section 363 of the Bankruptcy Code

46.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

47.    Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or lease of assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. See In re

Chateaugay Corp., 973 F.2d 141 (2nd Cir. 1992) (holding that a judge determining a §363(b) application must find from the evidence presented a good business reason to grant such application); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F2d 386, 390 (6th Cir. 1986) (holding that a bankruptcy court can authorize the sale of a debtor's assets under §363(b)(1) when a sound business purpose dictates such action); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a §363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

48.     The Debtor Movants submit that sufficient business justifications exist to merit the approval of the Settlement contained in the Proposed Agreements and the Ancillary Documents.  As set forth above, the resolution of the complex legal and factual issues arising out of the Choctaw Transaction, the Zephyrus Transactions, the Actions and the Claims would require extensive litigation and its attendant expense, and could have uncertain results.  In addition, such time-consuming litigation could detract from the Debtors' efforts to reorganize expeditiously.  By entering into the Proposed Agreements and the Ancillary Documents, the Debtors would avoid such expense and delay and preserve the assets of their estates, for the benefit of their creditors, while concomitantly securing the votes of the holders of the Allowed Claims in favor of the Plan.

**Bankruptcy Rule 9019**

49.     Bankruptcy Rule 9019(a) provides, in relevant part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Settlements and compromises are "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 428 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939)).

50.     To approve a compromise and settlement under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise and settlement is reasonable and in the best interests of the debtor's estate. See, e.g., In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994). The decision to approve a particular settlement lies within the sound discretion of a bankruptcy court. Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994). In exercising its discretion, a bankruptcy court must make an independent determination that the settlement is fair and reasonable. Id. at 122. A bankruptcy court may consider the opinions of the trustee or debtor in possession that the settlement is fair and reasonable. Id.; In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993). In addition, a bankruptcy court may exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., Inc., 217 B.R. 41 (Bankr. S.D.N.Y. 1998); see Shugrue, 165 B.R. at 123.

51.     In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s]

below the lowest point in the range of reasonableness.'" <u>In re W.T. Grant Co.</u>, 699 F.2d

599, 608 (2d Cir. 1983); <u>see</u> <u>Purofied Down Prods.</u>, 150 B.R. at 522 ("the court need not

conduct a 'mini-trial' to determine the merits of the underlying litigation").

      52.    In deciding whether a particular settlement falls within the "range

of reasonableness," courts consider the following factors:

      (a)    the probability of success in the litigation;

      (b)    the difficulties associated with collection;

      (c)    the complexity of the litigation, and the attendant expense, inconvenience and delay; and

      (d)    the paramount interests of creditors.

<u>See</u>, <u>e.g.</u>, <u>In re Drexel Burnham Lambert Group, Inc.</u>, 960 F.2d 285, 292 (2d Cir. 1992).

      53.    "The 'reasonableness' of a settlement depends upon all factors,

including probability of success, the length and cost of the litigation, and the extent to

which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or

collusions." <u>Ionosphere Clubs</u>, 156 B.R. at 428.

      54.    The Proposed Agreements are, and the Ancillary Documents shall

be, the result of extensive, good faith, arm's-length negotiations, are fair and equitable

and fall well within the range of reasonableness. As set forth above, the Settlement

settles costly and protracted litigation arising in connection with the Choctaw

Transactions, the Zephyrus Transactions, the Actions and the Claims, the outcomes of

which are currently uncertain, on terms that are favorable to the Debtors. Therefore, the

Settlement is reasonable and in the best interests of the Debtors' estates.

55.     Accordingly, the Debtor Movants believe that the Proposed Agreements and any Ancillary Documents are appropriate in light of the relevant factors and should be approved pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 3018, 6004, 9013 and 9019.

**Temporary Allowance**

56.     In order to permit JPMC to comply with its covenant to direct Cherokee and EFP to timely vote the applicable Allowed Claims that do not ultimately inure to the benefit of an affiliate of the Debtors in favor of the Plan, as set forth above, the Debtors have requested that the Bankruptcy Court enter an order (the "Scheduling Order"): (a) establishing the hearing date and time to consider this Motion; and (b) temporarily allowing Allowed Claims Nos. 11126, 11127, 11132, 11133 and the portion of 11125 allocable to the Choctaw Lenders and the Zephyrus Lenders in accordance with the provisions of the Cherokee Liquidation Agreement and the EFP Redemption Agreement (collectively, the "Voting Claims") for purposes of such vote.  The temporary allowance of the Voting Claims set forth in the Scheduling Order allows JPMC to vote the Voting Claims on or before the Ballot Date, and preserves the rights, if any, of JPMC, the Debtors and any party-in-interest with respect thereto in the event that the relief requested in this Motion is not granted by the Bankruptcy Court.

**Notice**

57.     As of the filing of this Motion, no trustee has been appointed in the Enron Cases.  Notice of this Motion will be given in accordance with the Court's Second Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of

Participation at Hearings, dated December 17, 2002.  The Debtor Movants submit that no other notice need be given.

### Order Effective Immediately

58.     Bankruptcy Rule 6004(g) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. 6004(g).  The Parties desire to consummate the transaction set forth in the Proposed Agreements and the Ancillary Documents as soon as possible and, therefore, the Movant Entities request that any order authorizing and approving the Proposed Agreements, the Ancillary Documents and the Settlement be effective immediately by providing that the 10-day stay pursuant to Bankruptcy Rule 6004(g) is inapplicable.

### Memorandum of Law

59.     Because this Motion does not raise any novel issues of law, the Debtor Movants respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.  The Debtor Movants reserve their rights to file a separate memorandum of law in reply to objections, if any, which may be interposed with respect to the relief requested herein.

60.     No previous motion for the relief requested herein has been made

to this Bankruptcy Court or any other court.

WHEREFORE the Debtor Movants respectfully request that the

Bankruptcy Court enter an order granting the relief requested herein and such other and

further relief as is just.

Dated:  New York, New York
   May 12, 2004

By: /s/ Brian S. Rosen
   Martin J. Bienenstock (MB 3001)
   Brian S. Rosen (BR 0571)
   WEIL, GOTSHAL & MANGES LLP
   767 Fifth Avenue
   New York, New York 10153
   Telephone:  (212) 310-8000
   Facsimile:  (212) 310-8007

   ATTORNEYS FOR DEBTORS
   AND DEBTORS IN POSSESSION