# EXHIBIT 20

**Objection Deadline: August 22, 2005**
**Hearing Date: September 1, 2005 @ 10:00 a.m.**

ISAAC M. PACHULSKI (Cal. State Bar No. 62337),
ERIC D. WINSTON (Cal. State Bar No. 202407), and
NATHAN A. SCHULTZ (Cal. State Bar No. 223539), Members of
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone (310) 228-5600
Facsimile (310) 228-5788
Attorneys for The Baupost Group, L.L.C. and
Abrams Capital, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                          Chapter 11

ENRON CORP., et al.,                           Case No. 01-16034 (AJG)

                         Debtors.               Jointly Administered

------------------------------------------------------------x

### LIMITED OBJECTION OF THE BAUPOST GROUP AND ABRAMS CAPITAL TO APPROVAL OF AMENDED SCHEDULE S TO PLAN SUPPLEMENT

**TO THE HONORABLE ARTHUR GONZALEZ, UNITED STATES BANKRUPTCY JUDGE:**

The Baupost Group L.L.C. ("Baupost") and Abrams Capital, LLC ("Abrams"

and, with Baupost, collectively, "Baupost/Abrams"),[1] who are, or manage funds that are,

holders of allowed senior general unsecured claims against Enron Corporation ("Enron"),

submit this Limited Objection to the "Notice of Presentment of Order Approving Amended

Schedule S to Plan Supplement" (the "Presentment Notice"), pursuant to which the

Reorganized Debtors seek an order approving the schedule attached to the Presentment

Notice as the amended Schedule S to the Plan Supplement ("Amended Schedule S").

---

[1]    All claims previously held by Racepoint Partners, L.P., which is an affiliate of Abrams, have been transferred to other funds managed by Abrams.

# I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

1.       Amended Schedule S purports to list the instruments and types of claims described on Exhibit "L" to the Plan that are entitled to the benefits of contractual subordination according to the provisions of the Subordinated Notes/Loans (as that term is defined below).  Beneficiaries of the subordination provisions of the Subordinated Notes/Loans who hold allowed claims will receive the any distributions that otherwise would have been made to holders of claims arising from the Subordinated Notes/Loans.

2.       Baupost/Abrams hold undisputed senior unsecured claims against Enron, and thus benefit from the subordination provisions of the Subordinated Notes/Loans. However, Amended Schedule S includes many claims which, under the terms of the subordination provisions of the Subordinated Notes/Loans, clearly are not entitled to benefit from such subordination provisions.  Such inclusion would dilute the distribution to creditors, such as Baupost/Abrams, who are the beneficiaries of such subordination provisions.

3.       Specifically, Amended Schedule S includes two categories of claims which do not constitute "Senior Indebtedness" under some or all of the Subordinated Notes/Loans.  The first category consists of claims held by affiliates of Enron (the "Intercompany Claims").  The second category consists of claims arising from or relating to reimbursement obligations under certain letters of credit (the "LOCs") obtained by Enron (the "LOC Claims").

4.       Baupost/Abrams objects to approval of Amended Schedule S to the extent it includes the Intercompany Claims or the LOC Claims.  For the Court's convenience, Baupost/Abrams has prepared and attached as Appendix "A" four schedules – one for each four sets of Subordinated Notes/Loans – identifying the claims (the "Identified Claims") that should be excluded from Amended Schedule S and the basis for such exclusion.

2

## II.

## FACTUAL BACKGROUND

5.      Prior to the Petition Date, Enron entered into the following four sets of transactions (the "Subordinated Notes/Loans"), each of which contains a subordination provision:

- The 8.25% Subordinated Debentures, with $104,563,109 outstanding as of the Petition Date and the 6.75% Subordinated Debentures, with $164,123,200 outstanding as of the Petition Date (collectively, the "Subordinated Debentures");

- The 7.75% Subordinated Debentures Due 2016, issued in the original aggregate principal amount of $181,926,000, and with $184,275,878 outstanding as of the Petition Date and the 7.75% Subordinated Debentures Due 2016, Series II, issued in the original aggregate principal amount of $136,450,000, with $138,218,479 outstanding as of the Petition Date (collectively, the "TOPRS Indentures");

- The November 15, 1993 Loan Agreement (the "1993 Loan Agreement") by and between Enron and Enron Capital LLC ("Enron Capital"), pursuant to which Enron Capital loaned Enron $270,569,621; and

- The August 3, 1994 Loan Agreement (the "1994 Loan Agreement") by and between Enron and Enron Capital Resources L.P. ("Enron Resource"), pursuant to which Enron Resource loaned Enron $94,936,709.

### A.    The 1987 Indenture

6.      The 8.75% Subordinated Debentures and the 6.75% Subordinated Debentures were issued pursuant to the certain Indenture, dated February 1, 1987 (the "1987 Indenture"). Article 13 of the 1987 Indenture provides that the Subordinated Debentures are

3

subordinated to "Senior Indebtedness".[2] Specifically, section 1301 of the 1987 Indenture states:

> The Company agrees, and each Holder of the Securities by his or her acceptance thereof likewise agrees, that the payment of all Obligations on the Securities is subordinated, to the extent and in the manner provided in this Article, to the prior payment in full of all Senior Indebtedness.
>
> This Article is intended for the benefit of all persons who hold, or, in reliance on the provisions of this Article, become holders of, or continue to hold, Senior Indebtedness, and each such person shall be entitled to enforce such provision.

1987 Indenture at § 1301. The provisions of Article 13 make it clear that payments on account of the securities issued pursuant to the 1987 Indenture are subordinated to all "Senior Indebtedness".

> 7.      The 1987 Indenture defines "Senior Indebtedness" to mean:

> [T]he principal of, and premium, if any, and interest on, any indebtedness of the Company (other than the Securities and any Exchangeable Subordinated Debentures issued and to be issued pursuant to the indenture, dated as of June 1, 1983 . . . ) outstanding at any time, whether unsecured or secured by a mortgage, deed of trust, pledge, security interest or other lien, except indebtedness which by its terms is not superior in right of payment to the Securities. Notwithstanding anything herein to the contrary, "Senior Indebtedness" (x) shall include Senior Bank Debt (including all Obligations which constitute Senior Bank Debt) and (y) shall not include (a) indebtedness of or monies owed by the Company for compensation to employees or for goods or material purchased in the ordinary course of business or for services or (b) indebtedness of the Company to a Subsidiary for money borrowed or advanced from such Subsidiary.

1987 Indenture at § 101. By its plain language, "indebtedness" of Enron to a "Subsidiary"[3]

---

[2]    The relevant portions of the 1987 Indenture are attached hereto as Appendix "B".

[3]    The 1987 Indenture defines "Subsidiary" to mean: "a corporation all of the voting shares (that is, shares entitled to vote for the election of directors, but excluding shares entitled to vote only upon the happening of some contingency unless such contingency shall have occurred) of which shall be owned by the Company or by one or more Subsidiaries or by the Company and one or more Subsidiaries." 1987 Indenture § 101, p. 9. The 1987 Indenture does not define the term "corporation", but it would lead to absurd results to

does not constitute "Senior Indebtedness", even if such indebtedness is for "money borrowed."

    8.    The definition of "Senior Indebtedness" in the 1987 Indenture requires that there be an "indebtedness". The 1987 Indenture defines "indebtedness" to mean:

> [A]s applied to the Company or any Subsidiary, . . . bonds, debentures, notes and other instruments representing obligations created or assumed by any such corporation for the repayment of money borrowed (other than unamortized debt discount or premium). All indebtedness secured by a lien upon property owned by the Company or any Subsidiary and upon which indebtedness any such corporation customarily pays interest, although such corporation has not assumed or become liable for the payment of such indebtedness, shall for all purposes hereof be deemed to be indebtedness of any such corporation. All indebtedness for money borrowed incurred by other persons which is directly guaranteed as to payment of principal by the Company or any Subsidiary shall for all purposes hereof be deemed indebtedness of any such corporation, but no other contingent obligation of any such corporation in respect of indebtedness incurred by other persons shall for any purpose be deemed indebtedness of such corporation.

1987 Indenture at § 101. According to the definition of "indebtedness", claims evidenced by an "instrument" for "money borrowed" constitute "indebtedness, but any contingent obligations in respect of indebtedness incurred by other persons, other than direct guarantees of principal, are not considered "indebtedness" as that term is used in the 1987 Indenture.

    9.    The definition of "indebtedness" in the 1987 Indenture continues on to expressly exclude five categories of obligations:

    a.    amounts which are payable only out of oil, gas, natural gas, metals or other natural resources produced, derived, or extracted from properties owned or developed by such corporation;

    b.    amounts representing capitalized lease obligations;

---

define the term "Subsidiary" to exclude limited liability companies, limited partnerships or similar business entities.

379300v3

c.    indebtedness incurred to finance oil, gas, natural gas, metals or

other natural resource or synthetic fuel exploration or development, payable, with

respect to principal and interest, solely out of the proceeds of such resources to be

produced, sold and/or delivered by the Company or any Subsidiary;

d.    indirect guarantees and other contingent obligations in

connection with the indebtedness of others, including agreements, contingent or

otherwise, with such other persons or with third persons with respect to, or to permit

or ensure payment of, obligations of such other persons, including, without limitation,

agreements to purchase or repurchase obligations of such other persons, agreements

to advance or supply funds to or invest in such other persons, or agreements to pay

for property, products, or services of such other persons . . . and any demand charge,

throughput, take-or-pay, keep-well, make-whole, cash deficiency, maintenance of

working capital or earnings or similar agreements; and

e.    guarantees with respect to leases or other similar periodic

payments to be made by other persons.

## B.    The TOPRS Indenture

10.    The two TOPRS Indentures were issued pursuant to two indentures,

one dated November 21, 1996, and the other dated January 16, 1997. Article 11 of the

TOPRS Indentures[4] sets forth the subordination provisions relating to the TOPRS

Debentures. There are twelve sections in Article 11 of the TOPRS Indentures. Section 1101

states:

> The Company covenants and agrees, and each Holder of a
> Security, by his or her acceptance thereof, likewise covenants
> and agrees, that, notwithstanding anything to the contrary
> contained herein, to the extent and in the manner hereinafter set
> forth in this Article, the indebtedness represented by the
> Securities and the principal of and premium, if any, and interest
> on each and all of the Securities are hereby expressly made

---

[4]    The two TOPRS Indentures appear to be identical. Relevant portions of the TOPRS
Indentures are attached hereto as Appendix "C" and "D", respectively.

379300v3

subordinate and subject in right of payment to the prior payment in full in cash or cash equivalents of all Senior Indebtedness (including any interest accruing after an Event of Default under Section 501(4) or (5)).

11.    The provisions of Article 11 make it clear that payments on account of the securities issued pursuant to the TOPRS Indentures are subordinated to all "Senior Indebtedness". The TOPRS Indentures define "Senior Indebtedness" to mean:

> [T]he principal of, premium, of any, and interest on and any other payment due pursuant to any of the following, whether outstanding at the date hereof or hereafter incurred, created or assumed: (i) all indebtedness of the Company (other than any obligations to trade creditors) evidenced by notes, debentures, bonds or other securities sold by the Company for money borrowed and capitalized lease obligations; (ii) all indebtedness of others of the kinds described in the preceding clause (i) assumed or guaranteed in any manner by the Company or in effect guaranteed by the Company; and (iii) all renewals, extensions or refundings of indebtedness of the kinds described in either of the preceding clauses (i) or (ii), unless, in the case of any particular indebtedness, capitalized lease obligation, guarantee, renewal, extension or refunding, the instrument creating or evidencing the same or the assumption or guarantee of the same expressly provides that such indebtedness, renewal, extension or refunding is subordinate to or is pari passu with the Securities.

By the plain language of Article 11, only indebtedness of Enron (other than any obligations to trade creditors) (a)(i) evidenced by notes, debentures, bonds or other securities sold by the Company and (ii) for money borrowed; (b) capitalized lease obligations; (c) guarantees of indebtedness that fall into clauses (a) and (b); and (d) renewals, extensions or refundings of the preceding constitute "Senior Indebtedness".[5]

12.    Each TOPRS Indenture was issued as a part of transactions for two affiliated entities, Enron Capital Trust I and Enron Capital Trust II, to issue trust related preferred securities (the "TOPRS Securities"). Prospectuses detailing the TOPRS Securities and the TOPRS Indentures (including the subordination provisions) were circulated (the

---

[5]    Unlike the 1987 Indenture, there is no separate definition of the term "indebtedness" in the TOPRS Indentures.

379300v3

"TOPRS Prospectuses"). Copies of the relevant portions of the TOPRS Prospectuses are attached hereto as Exhibit "E" and "F".

## C.    The 1993 And 1994 Loan Agreements

13.    On November 15, 1993, Enron and Enron Capital entered into the 1993 Loan Agreement, pursuant to which Enron guaranteed payment of dividends on preferred shares, and Enron Capital agreed to loan to Enron $270.6 million. A copy of the 1993 Loan Agreement is attached hereto as Exhibit "G". Section 4.01 of the 1993 Loan Agreement provided:

> Enron and Capital covenant and agree, and the holders of the Preferred Shares (and any trustee appointed by such holders) by their acceptance of such Preferred Shares likewise agree, that the Loans are subordinate and junior in right of payment to all Senior Indebtedness as provided herein. The term "Senior Indebtedness" shall mean the principal, premium, if any, and interest on (i) all indebtedness of Enron, whether outstanding on the date hereof or hereafter created, incurred or assumed, which is for money borrowed, or evidenced by a note or similar instrument given in connection with the acquisition of any business, properties, or assets, including securities, (ii) any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or indirectly, contingently or non-contingently) as guarantor or otherwise, (iii) any indebtedness secured by a lien upon property owned by Enron and upon which indebtedness Enron customarily pays interest, even though Enron has not assumed or become liable for the payment of such indebtedness and (iv) amendments, renewals, extensions and refundings of any such indebtedness, unless in any instrument or instruments evidencing or securing such indebtedness or pursuant to which the same is outstanding, or in any such amendment, renewal, extension or refunding, it is expressly provided that such indebtedness is not superior in right of payment to the Loans.

1993 Loan Agreement at § 4.01. There is no separate definition of the term "indebtedness".

14.    On August 3, 1994, Enron and Enron Capital Resources L.P. executed the 1994 Loan Agreement, which has a structure substantially similar to the 1993 Loan Agreement. A copy of the 1994 Loan Agreement is attached hereto as Exhibit "H". Section 4.01 of the 1994 Loan Agreement provided:

8

Enron and Resources covenant and agree, and the holders of the Series A Preferred Securities (and any trustee appointed by such holders) by their acceptance of such Series A Preferred Securities likewise agree, that the Loan is subordinate and junior in right of payment to all Senior Indebtedness as provided herein. The term "Senior Indebtedness" shall mean the principal, premium, if any, and interest on (i) all indebtedness of Enron, whether outstanding on the date hereof or hereafter created, incurred or assumed, which is for money borrowed, or evidenced by a note or similar instrument given in connection with the acquisition of any business, properties, or assets, including securities, (ii) any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or indirectly, contingently or non-contingently) as guarantor or otherwise, (iii) any indebtedness secured by a lien upon property owned by Enron and upon which indebtedness Enron customarily pays interest, even though Enron has not assumed or become liable for the payment of such indebtedness and (iv) amendments, renewals, extensions and refundings of any such indebtedness, unless in any instrument or instruments evidencing or securing such indebtedness or pursuant to which the same is outstanding, or in any such amendment, renewal, extension or refunding, it is expressly provided that such indebtedness is not superior in right of payment to the Loan and except that Senior Indebtedness shall not include the indebtedness pursuant to the [1993 Loan Agreement] and any extensions or refundings thereof . . .

1994 Loan Agreement at § 4.01. The definition of "Senior Indebtedness" in the 1994 Loan

Agreement is substantially similar to the definition of "Senior Indebtedness" in the 1993

Loan Agreement, except that the indebtedness pursuant to the 1993 Loan Agreement is

expressly excluded from the definition of "Senior Indebtedness".

   15.  Each Loan Agreement was a part of transactions for Enron Capital and

Enron Capital Resources to issue preferred securities (the "MIPS"). Prospectuses detailing

the MIPs and the loan agreements (including the subordination provisions) were circulated

(the "MIPS Prospectuses"). Copies of the MIPS Prospectuses are attached hereto as Exhibit

"I" and "J".

9

### D.    The Intercompany Claims.

16.    Each Intercompany Claim is a claim held by a direct or indirect subsidiary of Enron. The Intercompany Claims are:

| Claimant | Amount |
|---|---|
| Cherokee Finance V.O.F.[6] | $796.5 million[7] |
| Enron Finance Partners, LLC (Class 185 Claim)[8] | $280.5 million[9] |
| Enron Finance Partners, LLC (Class 4 Claim)[10] | $135 million[11] |
| Yosemite Securities Trust I[12] | $25 million |
| Yosemite Securities Company Ltd.[13] | £15,500,000 |
| Enron Equity Corp.[14] | $22.7 million |
| Enron Equity Corp.[15] | $59.3 million |
| Enron Equity Corp.[16] | $25.1 million |

[6]    This claim is listed on Schedule "S" as: 1987 Indenture Item No. 40; TOPRS Indentures Item No. 43; 1993 Loan Agreement Item No. 43; and 1994 Loan Agreement Item No. 43. Enron Finance

[7]    Allowed in such amount pursuant to Choctaw/Zephyrus Settlement (as that term is defined in Amended Schedule S). Pursuant to the Choctaw/Zephyrus Settlement, Claim No. 11132 was assigned to JP Morgan Chase, as agent for a group of lenders known as the "Choctaw Lenders".

[8]    This claim is listed on Schedule "S" as: 1987 Indenture Item No. 41; TOPRS Indentures Item No. 44; 1993 Loan Agreement Item No. 44; and 1994 Loan Agreement Item No. 44.

[9]    Allowed in such amount pursuant to Choctaw/Zephyrus Settlement (as that term is defined in Amended Schedule S). Pursuant to the Choctaw/Zephyrus Settlement, Claim No. 11126 was assigned to JP Morgan Chase, as agent for a group of lenders known as the "Zephyrus Lenders".

[10]    This claim is listed on Schedule "S" as: 1987 Indenture Item No. 42; TOPRS Indentures Item No. 44; 1993 Loan Agreement Item No. 45; and 1994 Loan Agreement Item No. 45.

[11]    Allowed in such amount pursuant to Choctaw/Zephyrus Settlement (as that term is defined in Amended Schedule S).

[12]    This claim is listed on Schedule "S" as: 1987 Indenture Item No. 51; TOPRS Indentures Item No. 53; 1993 Loan Agreement Item No. 53; and 1994 Loan Agreement Item No. 53.

[13]    This claim is listed on Schedule "S" as: 1987 Indenture Item No. 52; TOPRS Indentures Item No. 54; 1993 Loan Agreement Item No. 54; and 1994 Loan Agreement Item No. 54.

[14]    This claim is listed on Schedule "S" as: TOPRS Indentures Item No. 40; 1993 Loan Agreement Item No. 40; and 1994 Loan Agreement Item No. 40.

[15]    This claim is listed on Schedule "S" as: TOPRS Indentures Item No. 41; 1993 Loan Agreement Item No. 41; and 1994 Loan Agreement Item No. 41.

379300v3

**E.    The LOC Claims.**

17.    Each LOC Claim involves a contract between Enron and the LOC issuer pursuant to which Enron agreed to reimburse the LOC issuer to the extent any LOC issued was drawn by a third party.  In nearly every case, the LOC issuer issued a standby LOC for the benefit of a third party who had contracted with Enron.  In the days immediately prior to the Petition Date (or in some cases, days or months after the Petition Date) the third parties drew down the LOCs, triggering Enron's obligation to reimburse the LOC issuer.  The of Identified Claims that are LOC Claims is set forth in Exhibit "A".

### III.

### ARGUMENT

**A.    Contractual Subordination Principles**

18.    Subordination agreements are contractual arrangements by which creditors agree to subordinate their claims against a debtor to claims of other creditors.  See, e.g., In re Best Prods. Co., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994).  Contractual subordination agreements are enforceable under the Bankruptcy Code to the same extent that such agreements are "enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).

19.    The enforceability and extent of subordination agreements in bankruptcy must be judged by reference to generally applicable state contract law.  See HSBC Bank USA v. Branch (In re New England Corp.), 364 F.3d 355 (1st Cir. 2004).  In an *unambiguous* subordination agreement, the words governing the rights of the parties should be given their "plain, ordinary and usual meaning." Best Prods. Co., 168 B.R. at 69; see also Bank of N.Y. v. Amoco Oil Co., 35 F.3d 643, 661 (2d Cir. 1994); In re Leasing Consultants, Inc., 2 B.R. 165, 168 (Bankr. E.D.N.Y. 1980) ("[A]s a specie of contract, a subordination agreement is interpreted in accordance with the ordinary meaning of the language contained therein.") (citing Brainard v. New York Central, 151 N.E. 152 (N.Y. 1926)).

---

[16]    This claim is listed on Schedule "S" as: TOPRS Indentures Item No. 42; 1993 Loan Agreement Item No. 42; and 1994 Loan Agreement Item No. 42.

20.     In contracts drafted by counsel for sophisticated business parties, *ambiguous* language should be interpreted to "realize the reasonable expectations of the ordinary businessman." Bank of N.Y., 35 F.3d at 662.  Words and phrases are ambiguous when they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968) (finding that the term "non-exclusive" has an accepted legal meaning in a license agreement drafted by counsel); see also Bank of N.Y., 35 F.3d at 662 (finding the term "damages," as used in a settlement agreement, not to include prejudgment interest).

21.     Usage or custom can define an otherwise ambiguous phrase, provided (1) that a reasonable person in a particular business would be aware of the usage or custom, or (2) that the parties contracting were actually aware of the usage or custom. See, e.g., Frye v. New York, 78 N.Y.S.2d 342, 347-348 (App. Div. 1948).  In fact, "[t]echnical words in a contract *must* be taken in a technical sense unless the context of the instrument or a usage which is applicable clearly indicates a different meaning." Nau v. Vulcan Rail & Constr. Co., 36 N.E.2d 106 , 111 (N.Y. 1941) (citation omitted) (emphasis added).  When a term has a commonly accepted meaning in the legal profession, a party must specifically state its intention to have the term defined by a broader meaning. Vanderveer, 470 N.Y.S.2d at 757.

22.     It is a well settled rule that subordination agreements are strictly construed against a party claiming to benefit from subordination. See, e.g., Resolution Trust Co. v. BVS Dev., Inc., 42 F.3d 1206, 1214 (9th Cir. 1994) ("the law is well settled that rights of priority under [a subordination agreement] extend to and are limited strictly by the express terms and conditions of the agreement.") (citations omitted).  Thus, each holder of the Identified Claims carries the burden to show that such holder is entitled to benefit from the subordination provisions of the applicable Subordinated Notes/Loans. See Best Prods., 168 B.R. at 69.

**B.    The Intercompany Claims Are Not "Senior Indebtedness" Under Any Of The Subordinated Notes/Loans**

23.    Applying the principles articulated above, the Intercompany Claims do not constitute "Senior Indebtedness" as that term is defined in any of the Subordinated Notes/Loans.

**1.    Intercompany Claims Are Expressly Excluded From The Definition Of "Senior Indebtedness" Contained In The 1987 Indenture.**

24.    The 1987 Indenture expressly provides that indebtedness of, or money owed to, a "Subsidiary" does not constitute "Senior Indebtedness". See 1987 Indenture at § 101. The term "Subsidiary" includes any direct subsidiaries of Enron and any indirect subsidiaries where a "Subsidiary" has majority voting control. Each of the Intercompany Claims constitutes a claim held by a "Subsidiary". Thus, by the plain language of the 1987 Indenture, the Intercompany Claims should not be included on Schedule "S".

**2.    Intercompany Claims Do Not Constitute "Senior Indebtedness" Under The TOPRS Indentures Because They Are Not Notes, Bonds, Debentures Or Other Securities For "Money Borrowed."**

25.    While the TOPRS Indentures do not expressly exclude Intercompany Claims, the TOPRS Indentures limit "Senior Indebtedness" to capital leases (a category which is not relevant to the Identified Claims) and obligations (a) evidenced by a note, bond, debenture or other security and (b) sold by the Company for "money borrowed." If an Intercompany Claim is not a note, bond, debenture or other security, or is not "sold" for "money borrowed", it cannot constitute "Senior Indebtedness" under the TOPRS Indentures.

26.    Each Intercompany Claim is either not evidenced by a note or security, or was not "sold" by Enron to the holder of the Intercompany Claim, which is expressly required by the TOPRS Indentures.

27.    In addition, the TOPRS Prospectuses include descriptions of the subordination provisions in the TOPRS Indentures, and a representation that Enron's obligations under the loan agreements "are subordinate and junior in right of payment to all Senior Indebtedness . . . of Enron." There is no reference in the TOPRS Prospectuses to

13

379300v3

intercompany claims as constituting "Senior Indebtedness". In fact, the TOPRS Prospectuses state "Enron had outstanding consolidated senior indebtedness aggregating approximately $3.6 billion". Since this amount was disclosed as Enron's "Senior Indebtedness" on a consolidated basis (which would have the effect of excluding intercompany obligations), the intent of the TOPRS Indentures was to exclude all intercompany claims from the benefits of subordination.

28.    Moreover, implementing the benefit of contractual subordination in favor of a subsidiary of Enron creates illogical distribution issues. If a portion of distributions to be made on account of Enron subordinated debt is channeled to a subsidiary, that subsidiary would in turn deliver a portion of such distributions to trade creditors, employees, or other affiliates, thereby effectively cleansing the distributions as distributions made on account of subordinated debt. The Official Committee of Unsecured Creditors (the "Committee") supported this position in its "Objection Of Official Committee Of Unsecured Creditors Of Enron Corp., Et Al. To Motion By Harrison J. Goldin, Court-Appointed Examiner In Enron North America Corp. Bankruptcy Case, For Order Defining Role And Duties Of Examiner For Period From And After Effective Date Of Supplemental Modified Fifth Amended Joint Plan Of Affiliated Debtors Pursuant To Chapter 11 Of United States Bankruptcy Code" (the "Committee Objection"), at pages 19-21 [Docket No. 20898].

### 3.    There Is Strong Evidence That Intercompany Claims Were Not Intended To Be Treated As "Senior Indebtedness" Under The 1993 Loan Agreement Or The 1994 Loan Agreement.

29.    Though neither the 1993 Loan Agreement nor the 1994 Loan Agreement defines "Senior Indebtedness" to expressly exclude Intercompany Claims, there is nothing in either loan agreement to suggest that Enron and its affiliates intended to permit Intercompany Claims to benefit from the subordination as if such claims were held by non-affiliated senior unsecured claims of Enron.[17] In fact, documents provided to the buying

---

[17]    It is far from clear whether the "loans" Enron Capital and Enron Capital Resources made to Enron were in fact "loans", as opposed to equity investments. Each "loan" was in an aggregate principal amount equal to the sum of (a) capital contributions made by Enron,

14

public strongly suggest that Intercompany Claims were not intended to benefit from the subordination provisions in either loan agreement.

30.     The prospectuses accompanying the MIPS include a description of the subordination provisions in the 1993 Loan Agreement and 1994 Loan Agreement, and a representation that Enron's obligations under the loan agreements "are subordinate and junior in right of payment to all Senior Indebtedness . . . of Enron." There is no reference to intercompany claims as constituting "Senior Indebtedness". In fact, the prospectus relating to the 1994 Loan Agreement states that the amount of "Senior Indebtedness" as of June 30, 1994, was approximately $3.2 billion. The $3.2 billion amount for "Senior Indebtedness" does not appear to include any intercompany claims, as it appears to have been reported on a consolidated basis. See Form 10-Q for the quarter ending June 30, 1994 (reporting $3.2 billion in long-term debt on a consolidated basis).[18]

31.     Moreover, as previously noted above, implementing the benefit of contractual subordination in favor of Enron Capital or Enron Capital Resources creates illogical distribution issues. If distributions are channeled to Enron Capital or Enron Capital Resources, these subsidiaries would in turn deliver a portion of such distributions to trade creditors, employees, or other affiliates who are creditors of Enron Capital and Enron Capital Resources, thereby effectively cleansing the distributions as distributions made on account of subordinated debt.

**C.      The LOC Claims Are Not "Senior Indebtedness" Under The 1987 Indenture Or The TOPRS Indentures.**

**1.      The 1987 Indenture Excludes From The Definition Of "Indebtedness" Indirect Guarantees And Contingent Obligations Such As The LOC Claims.**

32.     Similar to the treatment of Intercompany Claims, the 1987 Indenture expressly excludes LOC Claims from the definition of "Senior Indebtedness". As noted

---

as general partner of Enron Capital and Enron Capital Resources, and (b) the liquidation preference of preferred securities issued by Enron Capital and Enron Capital Resources.

[18]     A copy of the Form 10-Q is attached hereto as Exhibit "K".

above, the definition of "indebtedness" (which is an element of "Senior Indebtedness"),

excludes:

> indirect guarantees and other contingent obligations in connection with the indebtedness of others, including agreements, contingent or otherwise, with such other persons or with third persons with respect to, or to permit or ensure payment of, obligations of such other persons, including, without limitation, agreements to purchase or repurchase obligations of such other persons, agreements to advance or supply funds to or invest in such other persons, or agreements to pay for property, products, or services of such other persons . . . and any demand charge, throughput, take-or-pay, keep-well, make-whole, cash deficiency, maintenance of working capital or earnings or similar agreements.

1987 Indenture at § 101. An obligation to reimburse the Issuer of a letter of credit necessarily constitutes an "indirect guarantee or other contingent obligation" in connection with the indebtedness of others. Enron reimburses a LOC issuer only after the applicable LOC has been drawn down by a third party. The reimbursement agreement between Enron and the LOC issuer effectively is an "indirect guarantee" by Enron. Thus, under any circumstances, the LOC Claims do not constitute "indebtedness" as defined in the 1987 Indenture, cannot constitute "Senior Indebtedness", and must be excluded from Schedule "S".

33.     Even if any of the LOC Claims do not fall within the exclusion set forth above, none of the LOC Claims are evidenced by an "instrument", as that term is used in the definition of "indebtedness." In order to qualify as "Senior Indebtedness", a claim must constitute "indebtedness", which requires (a) an instrument and (b) obligation for the repayment of money borrowed.

34.     The term "instrument" is not defined in the 1987 Indenture, but the term has a clear meaning in the commercial transaction setting. In the commercial law setting an instrument refers to "an unconditional promise or order to pay a fixed amount of money, with or without interest or other fixed charges described in the promise or order." BLACK'S LAW DICTIONARY 802 (7th ed. 1999).

16

35.    The term "instrument" is further qualified in the Uniform Commercial Code. See U.C.C. §§ 3-104, 9-102 (2005).[19] Under Article Three, "instrument" refers to a negotiable instrument. U.C.C. § 3-104(b). With limitations not applicable here, a "negotiable instrument" is:

> an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand at a definite time; and (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

U.C.C. § 3-104(a). The definition of "instrument" under Article Nine includes Article Three's "negotiable instrument," as well as:

> any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment. The term does not include (i) investment property, (ii) letters of credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained no or for use with the card.

U.C.C. § 9-102(a)(47).  While not explicitly excluded by statute, letters of credit are also not instruments under Article Three.[20] See Bank of China v. Chan, 937 F.2d 780, 783 (2d Cir. 1991). "[U]nlike a negotiable instrument, a letter of credit is conditional." Id.

---

[19]    The Uniform Commercial Code is codified in New York. See N.Y. U.C.C. Law § 1-101 (Consol. 2005).

[20]    Letters of credit are governed by Article Five of the U.C.C. See U.C.C. § 5-101. In Article Five, the term "instrument" is neither used nor defined. See U.C.C. § 5-102.

379300v3

36.    Instead, "letters of credit" and "letter-of-credit rights"[21] are defined as "general intangibles" under Article Nine. U.C.C. § 9-102(a)(42).[22] "Letter-of-credit rights" include rights to payment under letters of credit under Article Five, section 102, with the noted exception of a beneficiary's right to demand payment or performance. See U.C.C. § 9-102 cmt. 5(e). As a result, an issuer's right to reimbursement from a letter-of-credit applicant appears to be a general intangible, and perhaps a payment intangible. See U.C.C. § 5-102 cmt. 3 ("The contract between the applicant and the issuer (sometimes called the 'reimbursement' agreement) is governed in part by this article…and partly by other law (e.g., the general law of contracts).").

37.    A reimbursement agreement is conditional on a beneficiary's drawing on a letter of credit.[23]  The agreement is not "unconditional" as the term is used in either Black's Law Dictionary (defining "instrument" in the commercial setting) or the U.C.C.

38.    For the reasons set forth above, the LOC Claims do not constitute "Senior Indebtedness" under the 1987 Indenture.

### 2.    The LOC Claims Do Not Constitute "Senior Indebtedness" Under The TOPRS Indentures.

39.    While the TOPRS Indentures do not expressly exclude contingent obligations such as the LOC Claims, the TOPRS Indentures are more restrictive than the 1987 Indenture by requiring that applicable obligations are (a) evidenced by a note, bond, debenture or other security and (b) sold by the Company for "money borrowed."[24]

---

[21]    Article Nine defines as "letter-of-credit right" as "a right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitles to demand payment or performance. The term does not include the right of a beneficiary to demand payment or performance under a letter of credit." U.C.C. § 9-102(a)(51).

[22]    In the most recent U.C.C. revision, "general intangible" includes the subcategory of "payment intangible," defined as a "general intangible under which the account debtor's principal obligation is a monetary obligation." U.C.C. 9-102(a)(61).

[23]    Or, in the case of a standby letter of credit, a reimbursement agreement is conditional on an applicant's default in his obligations to the beneficiary.

[24]    The 1987 Indenture uses the arguably broader term "instrument", while the TOPRS Indentures use the term "security".

18

40.    None of the LOC Claims constitutes a note, bond, debenture or *other* security that was sold by Enron.[25]  Contractual obligations to reimburse the issuer of a letter of credit clearly are not "securities" under any applicable law.[26]  None of the LOC Claims includes rights under a promissory note, a bond or debenture delivered to the LOC claimants. Thus, the LOC Claims do not constitute "Senior Indebtedness" under the TOPRS Indentures, and must be excluded from Schedule "S".

---

[25]    The use of the phrase "sold by [Enron]" is telling.  A company may sell notes, bonds, debentures or other securities, but would not "sell" an obligation to reimburse the issuer of a letter of credit.

[26]    Though not binding, the Bankruptcy Code's definition of "security" generally does not include contractual obligations.  See 11 U..C. § 101(49).  If the Bankruptcy Code had contemplated that contractual obligations such as the LOC Claims could constitute "securities", then such claims would be subordinated pursuant to 11 U.S.C. § 510(b).

19

## IV.

### CONCLUSION

For the reasons and based on the authorities presented above, Baupost/Abrams respectfully request that this Limited Objection be sustained, and that each of the Identified Claims be excluded from Schedule "S".

Dated:    August 22, 2005
          Los Angeles, California

STUTMAN, TREISTER & GLATT
Professional Corporation

By _____/s/ Eric D. Winston_____
ISAAC M. PACHULSKI(Cal. State Bar No. 62337)
ERIC D. WINSTON (Cal. State Bar No. 202407)
NATHAN A SCHULTZ (Cal. State Bar No. 223539)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone (310) 228-5600
Facsimile (310) 228-5788

ATTORNEYS FOR THE BAUPOST GROUP,
L.L.C. AND ABRAMS CAPITAL, LLC

379300v3