# APPELLEES'
# APPENDIX


# TAB C

Mark I. Bane (MB 4883)
Sarah Reid (SR 4603)
Jay N. Heinrich (JH 0629)
Alison L. MacGregor (AM 0481)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Attorneys for JPMorgan Chase Bank, N.A.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Enron Corp., <u>et al.</u>,<br><br>          Debtors. | Chapter 11<br><br>Case No. 01-16034 (AJG)<br><br>Jointly Administered |

**OPPOSITION OF JPMORGAN CHASE BANK, N.A. TO THE LIMITED
OBJECTION OF THE BAUPOST GROUP AND ABRAMS CAPITAL TO
APPROVAL OF AMENDED SCHEDULE S TO PLAN SUPPLEMENT**

TO THE HONORABLE ARTHUR GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

        JPMorgan Chase Bank, N.A. ("JPMC"), as agent with respect to those

certain financing transactions commonly referred to as Choctaw, Zephyrus and the

Syndicated LC Facility, as well as on its own behalf, hereby submits this opposition (the

"Opposition") to the Limited Objection of the Baupost Group and Abrams Capital to

Approval of Amended Schedule S to Plan Supplement (the "Objection").

**PRELIMINARY STATEMENT**

      1.      By the Objection, The Baupost Group L.L.C. and Abrams Capital,

LLC (collectively, "Baupost") seek to preclude certain claims from benefiting from the

subordination provisions of the Subordinated Notes/Loans (as defined in the Objection)

even though the Reorganized Debtors have determined that such claims should so benefit. Notwithstanding the analysis performed by the Reorganized Debtors, reflected in the Amended Schedule S to the Plan Supplement (the "Amended Schedule S"), and notwithstanding the unambiguous language of the subordination provisions of the Subordinated Notes/Loans, Baupost alleges that two types of claims included on Amended Schedule S were not intended to benefit from the subordination of the Subordinated Notes/Loans: (1) claims that are allegedly held by affiliates of Enron and (2) claims arising from or relating to reimbursement obligations in connection with certain letters of credit.

      2.     JPMC, in various capacities, presents this Opposition on account of five claims identified in the Objection (as detailed herein, collectively, the "Claims"): (i) Claim No. 11132, as described and in the amount allowed pursuant to the Choctaw/Zephyrus Settlement (as defined in the Amended Schedule S) (A copy of the Choctaw/Zephyrus Settlement is attached hereto as Exhibit A)[1] (the "Cherokee Claim"); (ii) The Class 185 portion of Claim No. 11126, as described and in the amount allowed in the Choctaw/Zephyrus Settlement (the "EFP Class 185 Claim"); (iii) The Class 4 portion of Claim No. 11126, as described and in the amount allowed in the Choctaw/Zephyrus Settlement (the "EFP Class 4 Claim" and together with the Cherokee Claim and the EFP

---

[1] The Choctaw/Zephyrus Settlement was approved by this court pursuant to that certain Order, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 3018, 6004, 9013 and 9019, Authorizing and Approving (A) the Execution, Delivery and Performance of (1) Settlement Agreement with Respect to Choctaw Transactions and Zephyrus Transactions, (2) Liquidation Agreement with Respect to Cherokee Finance V.O.F. i.l., and (3) Redemption Agreement with Respect to Enron Finance Partners, LLC, and (B) the Consummation of the Transactions Contemplated Thereby, dated May 28, 2004, Docket No. 18762, as modified by Orders, dated February 7, 2005, Docket No. 23437, and April 12, 2005, Docket No. 25131.

Class 185 Claim, the "Cherokee/EFP Claims"); (iv) Claim No. 11166 (the "Syndicated LC Facility Claim"), arising from and relating to that certain U.S. $500,000,000 Letter of Credit and Reimbursement Agreement dated as of May 14, 2001 among Enron Corp., the financial institutions party thereto and JPMorgan Chase Bank, N.A. (formerly the Chase Manhattan Bank) and Citibank, N.A., as co-administrative agents, and JPMorgan Chase Bank as Paying Agent and as Issuing Bank (the "Syndicated LC Facility Reimbursement Agreement"); and (v) Claim No. 11136 (the "Bilat LC Facility Claim" and together with the Syndicated LC Facility Claim, the "LOC Claims") arising from and relating to that certain Master Letter of Credit and Reimbursement Agreement dated as of June 16, 1995 between Enron Corp. and JPMorgan Chase Bank, N.A. (formerly the Chase Manhattan Bank) (the "Bilat LC Facility Reimbursement Agreement" and together with the Syndicated LC Facility Reimbursement Agreement, the "Reimbursement Agreements").

3.    A simple and straightforward reading of the applicable subordination provisions with respect to the Claims disposes of the Objection. In light of the clear language entitling the Claims to the benefit of the subordination provisions, Baupost attempts to invent issues of intent. The intent of the Subordinated Notes/Loans, however, is not relevant where the terms of the subordination provisions are unambiguous. In fact, absent a judicial finding of ambiguity in the language of such subordination provisions, this Court cannot entertain argument regarding intent and cannot look outside the terms of the Subordinated Notes/Loans. Accordingly, the Court should overrule the Objection and approve the Amended Schedule S as presented by the Reorganized Debtors.

## BACKGROUND

4.       Commencing on December 2, 2001 (the "Petition Date"), and periodically thereafter, Enron Corp. ("Enron") and its affiliated entities (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

5.       By Order dated July 15, 2004 (the "Confirmation Order"), the Bankruptcy Court confirmed the Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated July 2, 2004  (the "Plan").  On November 17, 2004, the Plan became effective and the Debtors emerged from chapter 11 as reorganized debtors (the "Reorganized Debtors").

### Amended Schedule S

6.       Pursuant to the terms of the Plan and Confirmation Order, the Reorganized Debtors were to file a schedule listing the instruments and types of claims described on Exhibit "L" to the Plan that are entitled to the benefits of subordination according to the provisions of Subordinated Notes/Loans.  By notice of presentment dated July 29, 2005, the Reorganized Debtors submitted Amended Schedule S for approval by the Court.  Each of the Cherokee Claim, the EFP Class 185 Claim, the EFP Class 4 Claim, the Syndicated LC Facility Claim and the Bilat LC Facility Claim are listed on Amended Schedule S, indicating that each Claim benefits from the subordination provisions of each of the Subordinated Notes/Loans.

7.       By the Objection, dated August 22, 2005, Baupost objected to the inclusion of the Claims on Amended Schedule S.  Baupost has not objected to the Syndicated LC Facility Claim or the Bilat LC Facility Claim being listed on Amended

4

Schedule S with respect to the 1993 Loan Agreement and the 1994 Loan Agreement (each as defined in the Objection). Also, pursuant to the Notice of Modification and Correction of Baupost/Abrams' Limited Objection to Approval of Amended Schedule S to Plan Supplement, dated September 12, 2005, Baupost has withdrawn its objection to the Cherokee Claim being listed on Amended Schedule S with respect to the 1987 Indenture (as defined in the Objection). Copies of the relevant subordination provisions for each of the Subordinated Notes/Loans were attached to the Objection.

**The Claims**

8.      Pursuant to the terms of the Choctaw/Zephyrus Settlement, the Cherokee Claim, Claim No. 11132, was allowed in the amount of $796.5 million and was assigned by Cherokee Finance VOF ("Cherokee") to JPMC, as agent for the Choctaw Lenders (as defined in the Choctaw/Zephyrus Settlement).

9.      As explained in detail in Claim No. 11132, a copy of which is annexed hereto as Exhibit B, Claim No. 11132 was asserted by Cherokee against Enron for Enron's guarantee to Cherokee of the amounts due Cherokee from ENA. Enron guaranteed to Cherokee, among other things, the payment due under that certain Promissory Note, dated as of November 1, 2001, issued by ENA and payable to Cherokee, pursuant to which ENA agreed to pay Cherokee, on the maturity date, up to $820,000,000, plus interest.

10.     Pursuant to the terms of the Choctaw/Zephyrus Settlement, the EFP Class 185 Claim and the EFP Class 4 Claim, each filed as Claim No. 11126, were allowed in the amounts of $280.5 million and $135 million, respectively, and were each

assigned by Enron Finance Partners LLC ("EFP") to JPMC, as agent for the Zephyrus

Lenders (as defined in the Choctaw/Zephyrus Settlement).

11. As articulated in detail in Claim No. 11126, a copy of which is

annexed hereto as Exhibit C, the EFP Class 185 Claim was asserted by EFP against

Enron for Enron's guarantee to EFP of the amounts due EFP from ENA. Enron

guaranteed to EFP, among other things, the payment due under that certain Promissory

Note, dated as of November 1, 2001, issued by ENA and payable to EFP, pursuant to

which ENA agreed to pay EFP, on the maturity date, up to $508,000,000, plus interest.

12. As further articulated in detail in Claim 11126, the EFP Class 4

Claim was asserted by EFP against Enron for Enron's direct obligation under that certain

Demand Promissory Note, dated as of November 21, 2000 (the "$125M Promissory

Note"), issued by Enron and payable to Enron Capital Investments Corp. ("ECIC"),

pursuant to which Enron agreed to pay ECIC $125,000,000, plus interest. Pursuant to the

Assignment of the Demand Promissory Note, dated as of November 21, 2000, ECIC

assigned to EFP ECIC's interest in and under the $125M Promissory Note.

13. The Syndicated LC Facility Claim, Claim No. 11166, a copy of

which is annexed hereto as Exhibit D, was filed by JPMC, as agent, against Enron for

Enron's obligations under the Syndicated LC Facility Reimbursement Agreement.

14. The Bilat LC Facility Claim, Claim No. 11166, a copy of which is

annexed hereto as Exhibit E, was filed by JPMC against Enron for Enron's obligations

under the Bilat LC Facility Reimbursement Agreement.

**ARGUMENT**

I.    **THIS COURT MUST GIVE "PLAIN MEANING" TO UNAMBIGUOUS CONTRACT TERMS**

15.    "Where unambiguous, courts are to interpret contractual language pursuant to its plain meaning, especially when dealing with 'sophisticated counseled business people negotiating at arms length.'" Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, No. 04CIV10014PKL, 2005 WL 1950116, at *4 (S.D.N.Y. 2005) (interpreting the language of an indenture based on its "plain meaning"), quoting Vt. Teddy Bear Co. v. 538 Madison Reality Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 768, 807 N.E.2d 876, 879 (2004). "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." Id., quoting Met Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990).

16.    "It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract." Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002). As to an unambiguous contract, the parties "are preclud[ed] from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing". Id.

17.    "The proper interpretation of an unambiguous contract is a question of law for the court." Id. "It is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." Mazzola v. County of Suffolk, 143 A.D.2d 734, 735, 533 N.Y.S. 297, 297 (2d Dep't 1988). Only if a contract is ambiguous may extrinsic evidence "be considered to ascertain the correct or intended meaning of a term or terms." Kohl's Dept. Stores, Inc.

v. Rongrant Assocs., LLC, No. 04-CV-4907 (NGG)(MDG), 2005 WL 1263616, at *1
(E.D.N.Y. May 27, 2005).

18.    As Baupost correctly notes in the Objection, courts apply these
contract interpretation rules to subordination agreements such as the ones contained in the
1987 Indenture, the TOPRS Indenture, the 1993 Loan Agreement and the 1994 Loan
Agreement (each as defined in the Objection).

19.    The definitions of "Senior Indebtedness" and "Indebtedness" in the
1987 Indenture, the TOPRS Indenture, and the 1993 and 1994 Loan Agreements are
unambiguous, and applying the plain meaning of the relevant terms, each of the Claims
are "Senior Indebtedness."

20.    In the event this Court finds that the terms of the subordination
provisions are ambiguous, the Court must allow JPMC the opportunity to take discovery
and present relevant extrinsic evidence bearing on the intent of the parties. Fortune v.
Medical Assocs. of Woodhull, P.C., 803 F. Supp. 636, 641 (E.D.N.Y. 1992) ( ). "Where
the terms of a contract are ambiguous, the court must give the parties an opportunity to
adduce extrinsic evidence of their intent."

## II.    THE CHEROKEE/EFP CLAIMS ARE SENIOR INDEBTEDNESS

### A.    The 1987 Indenture Does Not Exclude The EFP Class 185 Claim And The EFP Class 4 Claim From Its Definition Of "Senior Indebtedness"

21.    Baupost claims that the EFP Class 185 Claim and the EFP Class 4
Claim are each a claim of a Subsidiary of Enron, and are, therefore, not "Senior
Indebtedness" under the 1987 Indenture. Baupost's objection, however, is meritless since
neither of these claims against Enron are held by a "Subsidiary" for purposes of the 1987
Indenture. These two claims are, thus, "Senior Indebtedness."

22.    The 1987 Indenture provides that indebtedness of Enron to a "Subsidiary" does not constitute "Senior Indebtedness." "Subsidiary" is defined in the 1987 Indenture as:

> a corporation all of the voting shares (that is, shares entitled to vote for the election of directors, but excluding shares entitled so to vote only upon the happening of some contingency unless such contingency shall have occurred) of which shall be owned by the Company or by one or more Subsidiaries or by the Company and one or more Subsidiaries.

(1987 Indenture, § 101, at p. 9).

23.    First, EFP is not a "Subsidiary" because only a "corporation" is defined as a "Subsidiary." EFP is a limited liability company, not a "corporation." The definition of "Subsidiary" in the 1987 Indenture plainly states that an entity must be a "corporation" to be a "Subsidiary." EFP, a limited liability company, is not a corporation under the plain meaning of the term "corporation."

24.    Second, even if this Court determines that EFP is a corporation for purposes of the 1987 Indenture, EFP is still not a "Subsidiary" because EFP fails to fall within the other parameter of "Subsidiary," described under the 1987 Indenture. A "Subsidiary" is defined as including only a corporation in which all of its voting shares are owned, directly or indirectly, by Enron. For these purposes, shares which vote only if a contingency occurs are voting shares if, in fact, the contingency has occurred.

25.    As detailed in Claim No. 11126, Zephyrus Investments LLC ("Zephyrus"), an entity wholly unrelated to Enron, was the holder of all of the Class C Units of EFP. The Third Amended and Restated Limited Liability Agreement of Enron Finance Partners, LLC (the "EFP Agreement") (a copy of which is annexed hereto as Exhibit F) provides that, in the event of a "Specified Event," the Class C Members may

elect two (2) of three (3) members of the board of directors of EFP. *See* Article 7.01 of the EFP Agreement.

26.    The definition of "Specified Event" in the EFP Agreement includes, among other things:

> the rating by either Rating Agency [i.e. S&P or Moody's] of the unsecured long-term debt obligations owing by Enron is withdrawn or downgraded below BBB-(in the case of S&P) or Baa3 (in the case of Moody's) . . .

EFP Agreement 5.05(f).

27.    A Specified Event occurred, at the latest, on November 28, 2001, when Enron announced that S&P, Moody's and Fitch had downgraded Enron's credit rating to below investment grade. (*See* Disclosure Statement at p. 100). At that moment, the Class C Units became voting shares. As such, as of November 28, 2001, or earlier, Enron, did not own all voting Shares of EFP because Zephyrus, a non-Enron entity, enjoyed the right to elect two members to the EFP board of directors.

28.    Under the definition of "Subsidiary" in the 1987 Indenture, the "contingency" occurred on or before November 28, 2001, when, at the latest, Zephyrus became entitled to elect two out of the three directors of EFP. Accordingly, EFP is not a "Subsidiary" under the 1987 Indenture, and the EFP Class 185 Claim and the EFP Class 4 Claim are "Senior Indebtedness."

**B.    The Cherokee/EFP Claims Are Senior Indebtedness Under The TOPRS Indentures**

29.    Baupost misguidedly claims that the Cherokee/EFP Claims are not "Senior Indebtedness" under the TOPRS Indentures. The TOPRS Indentures define "Senior Indebtedness" as:

> [T]he principal of, premium, of any, and interest on and
> any other payment due pursuant to any of the following,
> whether outstanding at the date hereof or hereafter
> incurred, created or assumed: (i) all indebtedness of the
> Company (other than obligations to trade creditors)
> evidenced by notes, debentures, bonds or other securities
> sold by the Company for money borrowed and capitalized
> lease obligations; (ii) all indebtedness of others of the kinds
> described in the preceding clause (i) assumed or guaranteed
> in any manner by the Company or in effect guaranteed by
> the Company; . . .

(TOPRS Indenture, § 1101). As discussed below, under this definition, each of the

Cherokee EFP Claims are "Senior Indebtedness."

**The Cherokee Claim and the EFP Class 185 Claim**

        30.     As explained above, and as detailed in Claim No. 11132, the

Cherokee Claim was filed against Enron in respect of Enron's guarantee of a note issued

by ENA to Cherokee. As also explained above, and as detailed in Claim No. 11126, the

EFP Class 185 Claim was filed against Enron in respect of Enron's guarantee of a note

issued by ENA to EFP.

        31.     Baupost seeks to argue that the Cherokee Claim and the EFP Class

185 Claim do not fit within the parameters of clause (i) of the definition of "Senior

Indebtedness." In so doing, Baupost has focused on the wrong clause of the TOPRS

Indentures' definition of "Senior Indebtedness." Both Enron's guarantee of the ENA

note to Cherokee and Enron's guarantee of the ENA note to EFP satisfy clause (ii) of the

definition. Through application of clause (ii), which includes "(ii) all indebtedness of

others of the kinds described in the preceding clause (i) assumed or guaranteed in any

manner by [Enron] or in effect guaranteed by [Enron]" the Cherokee Claim and the EFP

Class 185 Claim fall squarely within the definition of "Senior Indebtedness."

11

32.    Baupost probably appreciates the proper application of the definition, and, therefore, attempts to vary the unambiguous express terms of the TOPRS Indentures by improperly citing to prospectuses and other materials.  The 1987 Indenture's plain meaning of the definition of "Senior Indebtedness" controls, and applying the facts underlying the Cherokee Claim and the EFP Class 185 Claim to such plain meaning must result in a determination that the Cherokee Claim and the EFP Class 185 Claim are Senior Indebtedness for purposes of the 1987 Indenture.

**The EFP Class 4 Claim**

33.    As explained above, and as described in detail in Claim No. 11126, the EFP Class 4 Claim was filed against Enron for Enron's obligations under a note issued by Enron to ECIC, which note was assigned to EFP by ECIC.

34.    The assertions by Baupost in the Objection appear to indicate that Baupost simply does not understand that the basis of the EFP Class 4 Claim is a note issued by Enron.  In its objection, Baupost argues that a claim that "is not a note, bond, debenture or other security, *or* is not "sold" for "money borrowed," cannot constitute "Senior Indebtedness" under the TOPRS Indenture."  Objection at ¶ 25 (emphasis in original).  Baupost next proclaims that the EFP Class 4 Claim "is either not evidenced by a note or security, or was not "sold" by Enron to the holder of the [claim], which is expressly required by the TOPRS Indentures."  Objection at ¶ 26 (emphasis in original).

35.    In fact, however, the EFP Class 4 Claim is for obligations due on a note issued by Enron.  Application of the EFP Class 4 Claim to the plain language of the TOPRS Indentures could not be simpler.  Accordingly, the EFP Class 4 Claim constitutes

"Senior Indebtedness" under the TOPRS Indenture and is appropriately listed on Amended Schedule S.

**The TOPRS Indentures are Unambiguous**

36.    While the plain meaning of the TOPRS Indentures makes clear that the Cherokee/EFP Claims are Senior Indebtedness, Baupost appears to be attempting to inject an ambiguity into the plain meaning of the first clause of the definition of "Senior Indebtedness" by twisting the language to require that there be a note, debenture, or other security, and that such note, debenture, or other security must be "for money borrowed."

37.    A note, by its plain meaning, is for "money borrowed," as is a debenture.   Securities, by contrast, are often issued for purposes other than for money borrowed, and the term "sold for money borrowed" is obviously included to modify only the phrase "or other securities."

38.    Of course, even if the phrase "money borrowed" does modify "note," as Baupost appears to suggest, implicit in Baupost's Objection must be an argument that the notes underlying the Cherokee/EFP Claims were not "for money borrowed." Baupost, however, presents no facts or arguments supporting such a position. As clarified in Claim No. 11132 and Claim No. 11126, each of the notes underlying the Cherokee/EFP Claims was, in fact, for money borrowed.

C.    **The Cherokee/EFP Claims Constitute "Senior Indebtedness" Under the Plain Language of the 1993 and 1994 Loan Agreements**

39.    Baupost correctly notes that there is nothing in the 1993 or 1994 Loan Agreements that excludes the Cherokee/EFP Claims from the definition of "Senior Indebtedness." Indeed, the definition of Senior Indebtedness in the 1993 and 1994 Loan Agreements provides:

. . . The term "Senior Indebtedness" shall mean the principal, premium, if any, and interest on (i) all indebtedness of Enron, whether outstanding on the date hereof or hereafter created, incurred or assumed, which is for money borrowed or evidenced by a note or similar instrument given in connection with the acquisition of any business, properties, or assets, including securities , (ii) any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or indirectly, contingently or non-contingently) as a guarantor or otherwise. . .

(1993 Loan Agreement § 4.01).

40.     Here, each of the Cherokee/EFP Claims are "Senior Indebtedness" under the 1993 and 1994 Loan Agreements pursuant to the above definition:

(a)     The EFP Class 4 Claim: This claim relates to Enron's note issued to ECIC and assigned to EFP and falls under clause (i) which defines "Senior Indebtedness" as "(i) all indebtedness of Enron, whether outstanding on the date hereof or hereafter created, incurred or assumed, which is for money borrowed or evidenced by a note or similar instrument given in connection with the acquisition of any business, properties, or assets, including securities."

(b)     The Cherokee Claim:  The Cherokee Claim is for Enron's guarantee of a note issued by ENA to Cherokee, and falls under clause (ii) which defines "Senior Indebtedness" as  "any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or indirectly, contingently or non-contingency) as a guarantor or otherwise. . ."

(c)     The EFP Class 185 Claim:  This claim is in respect of Enron's guarantee of a note issued by ENA to EFP, and falls under clause (ii) which defines "Senior Indebtedness" as  "any indebtedness of others of the kinds described in the preceding clause (i) for the payment of which Enron is responsible or liable (directly or

14

indirectly, contingently or non-contingently) as a guarantor or otherwise. . ."

41.     Baupost relies on improperly referenced extrinsic evidence to contradict the plain meaning of the definition of "Senior Indebtedness." Baupost even fails to contend that the definition of Senior Indebtedness somehow excludes the Cherokee/EFP Claims, or that the definition itself is ambiguous.

42.     Baupost references certain prospectuses and Enron's 1994 10-Q. Even if relevant, which these documents are not, the introduction of these documents constitute parole evidence outside of the four corners of the Loan Agreements and must be disregarded. Where a contract's language is unambiguous, "its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." Goodheart Clothing Co. v. Laura Goodman Enterprises, Inc., 962 F.2d 268, 272 (2d Cir. 1992).

43.     Accordingly, the Cherokee/EFC Claims are "Senior Indebtedness" under the 1993 and 1994 Loan Agreements.

## III.     THE LOC CLAIMS ARE "SENIOR INDEBTEDNESS" UNDER THE 1987 INDENTURE AND THE TOPRS INDENTURES

### A.     THE LOC CLAIMS ARE "SENIOR INDEBTEDNESS" UNDER THE 1987 INDENTURE

44.     The 1987 Indenture does not expressly exclude the LOC Claims from "Senior Indebtedness." The 1987 Indenture defines "Senior Indebtedness" as:

> the principal of, and premium, if any, and interest on, any
> indebtedness of the Company (other than the Securities and
> any Exchangeable Subordinated Debentures issued and to
> be issued pursuant to the indenture, dated as of June 1,
> 1983, between the Company and Morgan Guaranty Trust
> Company of New York, as Trustee, as the same has been or
> may be amended from time to time) outstanding at any
> time, whether unsecured or secured by any mortgage, deed
> of trust, pledge, security interest or other lien, except

indebtedness which by its terms is not superior in right of payment to the Securities. Notwithstanding anything herein to the contrary, "Senior Indebtedness" (x) shall include all Senior Bank Debt (including all Obligations which constitute Senior Bank Debt) and (y) shall not include (a) indebtedness or of monies owed by the Company for compensation to employees or for goods or material purchased in the ordinary course of business or for services or (b) indebtedness of the Company to a Subsidiary for money borrowed or advanced from such subsidiary.

(1987 Indenture, § 101, p. 8).

45.    Furthermore, the LOC Claims are "Indebtedness" under the 1987 Indenture. "Indebtedness" is defined in the 1987 Indenture as

bonds, debentures, notes, and other instruments representing obligations created or assumed by any such corporation for the repayment of money borrowed (other than amortized debt discount or premium). All indebtedness secured by a lien upon property owned by the Company or any Subsidiary and upon which indebtedness any such corporation customarily pays interest, although any such corporation has not assumed or become liable for the payment of such indebtedness, shall for all purposes hereof be deemed to be indebtedness of any such corporation. All indebtedness for money borrowed incurred by other persons which is directly guarantee as to payment of principal by the Company or any Subsidiary shall for all purposes hereof be deemed to be indebtedness of any such corporation, but no other contingent obligation of any such corporation in respect of indebtedness incurred by other persons shall for any purpose be deemed indebtedness of such corporation.

(1987 Indenture, § 101, p. 3-4).

46.    The same definition expressly excludes the following from "Indebtedness":

(iv) indirect guarantees or other contingent obligations in connection with the indebtedness of others, including agreements, contingent or otherwise with such other persons or with third persons with respect to, or to permit

16

or ensure the payment of, obligations of such other persons, including, without limitation, agreements to purchase or repurchase obligations of such other persons, agreements to advance or supply funds or to invest in such other persons, or agreements to pay for property, products, or services of such other persons (whether or not conferred, delivered ore rendered), and any demand charge, throughput, take-or-pay, keep-well, make-whole, cash deficiency, maintenance of working capital or earnings or similar agreements . . .

(1987 Indenture, § 101, p. 4).

47.    Enron's obligations under the Reimbursement Agreements are not "indirect guarantee[s] or other contingent obligation[s]." While the draw on a letter of credit may be a contingent event, Enron's obligations under the Reimbursement Agreements are not contingent and are not indirect guarantees. For instance, the language of section 2.04(b) and section 2.05 of the Syndicated LC Facility Reimbursement Agreement makes it unequivocal that once a drawing is made under a letter of credit , Enron's obligations to reimburse the Issuing Bank are "absolute, unconditional, and irrevocable." A copy of the Syndicated LC Reimbursement Agreement is attached hereto as Exhibit G. (See also, the Bilat LC Facility Reimbursement Agreement, a copy of which is attached hereto as Exhibit H.) Furthermore, the non-contingent nature of Enron's obligations under the Reimbursement Agreements are evidenced by the fact that each letter of credit issued under a Reimbursement Agreement reduced the limit of letters of credit available to Enron under that Reimbursement Agreement. This reduction in availability occurred upon the issuance of a letter of credit, not upon such letter of credit being drawn on.

48.    Because the LOC Claims do not fall into the 1987 Indenture's exclusion of "contingent obligations" from "Indebtedness," they are "Senior Indebtedness."

17

49.    As Baupost identifies in paragraph 32 of the Objection, the

Reimbursement Agreements are the operative documents in determining whether the

LOC Claims are "Indebtedness." Contrary to Baupost's arguments, however, the

Reimbursement Agreements, as well as the letters of credit themselves, are each

"instruments."

50.    According to Black's Law Dictionary, an "instrument" is:

"A written legal document that defines rights, duties, entitlements, or liabilities, such as a

contract, will, promissory note, or share certificate." Bryan A. Garner, BLACK'S LAW

DICTIONARY, 8th Ed. 2004, at 813.  Black's further notes in a comment that:

> "An 'instrument' seems to embrace contracts, deeds,
> statutes, wills, Orders in Council, orders, warrants,
> schemes, letters patent, rules, regulations, bye-laws,
> whether in writing or in print, or partly in both; in fact, any
> written or printed document that may have been interpreted
> by the Courts.'" Edward Beal, Cardinal Rules of Legal
> Interpretation 55 (A.E. Randall ed., 3d ed. 1924).

(Id.).[2]

51.    It is not disputed that each Reimbursement Agreement is a contract

entered into between Enron and the relevant parties.  A contract is an instrument.  Thus,

the Reimbursement Agreements are instruments and are "Indebtedness" for purposes of

the 1987 Indenture.

52.    The Second Circuit has specifically referred to a reimbursement

agreement as a contract (which is without question an instrument).  In Red Rock

Commodities, Ltd. v. Standard Chartered Bank, 140 F.3d 420 (2d Cir. 1998), the court

---

[2]    Baupost cites to an earlier edition of Black's and cites to the pocket version. See Objection at ¶ 9,
citing to the 7th edition of Black's.

applied contract interpretation rules under New York law to a reimbursement agreement in connection with an LOC and ultimately found that the plain meaning of the terms controlled. The court refused to consider the parole evidence offered by one of the parties. 140 F.3d at 423-24. See also Red Rock Commodities, Ltd. v. Standard Chartered Bank, No. 94 Civ. 8555 (LAK), 1997 WL 23179 (S.D.N.Y. Jan. 22, 1997) (using "agreement", "instrument" and "contract" to describe a letter of credit reimbursement agreement).

53.    Baupost also argues that a letter of credit itself is the relevant portion of the LOC Claims, and that a letter of credit is not an instrument. This is incorrect.

54.    To support its position, Baupost relies on definitions of "negotiable instrument" borrowed from the UCC. The definition of "Indebtedness" in the 1987 Indenture, however, requires only an "instrument," not a "negotiable instrument." Baupost's argument regarding the definitions of "negotiable instrument" take into account matters beyond the four corners of the 1987 Indenture and should not considered in interpreting the unambiguous term "instrument."

55.    A letter of credit is an "instrument." Courts regularly refer to letters of credit as instruments. See Homemaker Indus., Inc. v. Official Comm. Of Unsecured Creditors of HMKR, Inc., No. 03 Civ. 9303 (DLC), 2004 WL 838168, at *6 (S.D.N.Y. April 20, 2004) ("[L]etters of credit are 'unique commercial instruments' governed by distinct legal principles"); Nissho Iwai Europe PLC v. Korea First Bank, 99 N.Y.2d 115, 119, 782 N.E.2d 55, 58, 752 N.Y.S.2d 259, 262 (2002) ("Letters of credit are commercial instruments. . ."); J.P. Doumak, Inc. v. Westgate Fin. Corp., 4 A.D.2d 62,

63, 776 N.Y.S.2d 1, 2 (1st Dep't 2004) ("[A] party to a letter of credit is held in strict

compliance with the instrument's terms. . .").

56.    For all the foregoing reasons, the LOC Claims are "Senior

Indebtedness" under the 1987 Indenture and are properly listed on Amended Schedule S.

**B.    The LOC Claims Are "Senior Indebtedness" Under The TOPRS Indentures**

57.    The TOPRS Indentures do not expressly exclude the LOC Claims

from "Senior Indebtedness." In fact, the LOC Claims fall squarely within the plain

meaning of the definition of "Senior Indebtedness" under the TOPRS Indenture. The

definition of "Senior Indebtedness" provides:

> [T]he principal of, premium, of any, and interest on and
> any other payment due pursuant to any of the following,
> whether outstanding at the date hereof or hereafter
> incurred, created, or assumed: (i) all indebtedness of the
> Company (other than obligations to trade creditors)
> evidenced by notes, bonds, or other securities sold by the
> Company for money borrowed and capitalized lease
> obligations; (ii) all indebtedness of others of the kinds
> described in the preceding clause (i) assumed or guaranteed
> in any manner by the Company; and (iii) all renewals,
> extensions or refundings of indebtedness of the kinds
> described in either of the preceding clauses (i) or (ii),
> unless, in the case of any particular indebtedness,
> capitalized lease obligation, guarantee, renewal, extension
> or refunding, the instrument creating or evidencing the
> same or the assumption or guarantee of the same expressly
> provides that such indebtedness, renewal, extension or
> refunding is subordinate to or is pari passau with the
> Securities.

(TOPRS Indenture, § 1101).

58.    Black's Law Dictionary defines "bond" as:

> 1. An obligation; a promise. 2. A written promise to pay
> money or do some act if certain circumstances occur or a
> certain time elapses; a promise that is defeasible upon a
> condition subsequent . . .

Bryan A. Garner, BLACK'S LAW DICTIONARY, 8th ed. 2004, at p. 187.

      59.    Here, the Reimbursement Agreements are "bonds" because, as explained above, the Reimbursement Agreements are written promises of Enron to pay upon the occurrence of a draw being made on a letter of credit.

      60.    Thus, applying the plain meaning of the definition of "Senior Indebtedness" to the LOC Claims makes clear that the LOC Claims are "Senior Indebtedness" under the TOPRS Indentures and are properly listed on Amended Schedule S.

### RESERVATION OF RIGHTS

      61.    JPMC reserve the right to amend, modify, supplement or withdraw the Opposition in all respects, and further reserves the right to conduct discovery in the event that the Court determines that any of the subordination provisions are ambiguous.

21

WHEREFORE, JPMC respectfully request that this Court, (i) overrule the objection, and (ii) approve Amended Schedule S as presented by the Reorganized Debtors, and (iii) grant such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
          September 19, 2005

                                        KELLEY DRYE & WARREN
                                        LLP

                                        By: /s/ Mark I. Bane
                                            Mark I. Bane (MB 4883)
                                            Sarah Reid (SR 4603)
                                            Jay N. Heinrich (JH 0629)
                                            Allison MacGregor (AM 0481)
                                        101 Park Avenue
                                        New York, NY 10178
                                        Tel: (212) 808-7800
                                        Facsimile: (212) 808-7897
                                        Attorneys for JPMorgan Chase Bank
                                        N.A.